**LAW OFFICES OF DALE K. GALIPO**
Dale K. Galipo (SBN 144074)
dalekgalipo@yahoo.com
Benjamin S. Levine (SBN 342060)
blevine@galipolaw.com
21800 Burbank Blvd., Suite 310
Woodland Hills, CA 91367
Tel: (818) 347-3333
Fax: (818) 347-4118

*Attorneys for Plaintiffs*

# UNITED STATES DISTRICT COURT

## CENTRAL DISTRICT OF CALIFORNIA

| | |
|---|---|
| NELSON VASQUEZ, individually and as successor-in-interest to Decedent, Oscar Vasquez Lopez; DAYLIN VASQUEZ, individually and as successor-in-interest to Decedent, Oscar Vasquez Lopez; LUSSY VASQUEZ, individually and as successor-in-interest to Decedent, Oscar Vasquez Lopez; OSCAR VASQUEZ, individually and as successor-in-interest to Decedent, Oscar Vasquez Lopez; K.V., by and through her guardian ad litem, Daylin Vasquez, individually and as successor-in-interest to Decedent, Oscar Vasquez Lopez; A.V., by and through his guardian ad litem, Daylin Vasquez, individually and as successor-in-interest to Decedent, Oscar Vasquez Lopez; and JOSE VASQUEZ LOPEZ, individually, <br><br> Plaintiffs, <br><br> v. <br><br> CITY OF LOS ANGELES; SEAN STEELMON; and DOES 2 through 10, inclusive, | Case No. 8:24-cv-02421-FLA-JDE <br><br> *Hon. Fernando L. Aenlle-Rocha* <br><br> **PLAINTIFFS' OPPOSITION TO DEFENDANT SEAN STEELMON'S MOTION FOR SUMMARY JUDGMENT AND/OR PARTIAL SUMMARY JUDGMENT OF ISSUES** <br><br> *[Filed concurrently with Plaintiffs' Response to Sean Steelmon's Statement of Uncontroverted Facts and Additional Undisputed Material Facts; Declaration of Benjamin S. Levine and Exhibits thereto; Declaration of Daylin D. Vasquez; and Declaration of Jeffrey J. Noble]* <br><br> Hearing Date:   April 3, 2026 <br> Time:   1:30 p.m. <br> Crtm:   6B |

---

Defendants.

# TABLE OF CONTENTS

MEMORANDUM OF POINTS AND AUTHORITIES .............................................. 1

I.      INTRODUCTION ......................................................................................... 1

II.     STATEMENT OF FACTS ........................................................................... 1

III.    LEGAL STANDARD .................................................................................. 5

IV.     STEELMON'S USE OF DEADLY FORCE WAS UNREASONABLE UNDER
        THE FOURTH AMENDMENT ................................................................... 6

V.      THE LAW WAS CLEARLY ESTABLISHED .......................................... 14

VI.     STEELMON UNLAWFULLY DETAINED AND ARRESTED OSCAR ....... 17

VII.    STEELMON'S USE OF DEADLY FORCE VIOLATED PLAINTIFFS'
        FOURTEENTH AMENDMENT RIGHTS .................................................. 18

VIII.   STEELMON WAS NEGLIGENT ............................................................. 19

IX.     STEELMON COMMITTED BATTERY ................................................... 20

X.      STEELMON VIOLATED THE BANE ACT .............................................. 21

XI.     CONCLUSION ........................................................................................... 21

PLAINTIFFS' OPPOSITION TO DEFENDANT SEAN STEELMON'S MOTION FOR SUMMARY
JUDGMENT AND/OR PARTIAL SUMMARY JUDGMENT OF ISSUES

# **TABLE OF AUTHORITIES**

## **Cases**

*A.D. v. Cal. Highway Patrol*,
  712 F.3d 446 (9th Cir. 2013) .................................................................. 23

*Albritten v. Dougherty County*,
  973 F.Supp. 1455 (M.D. Ga. 1997) ....................................................... 13

*Aleman v. City of Charlotte*,
  80 F.4th 264 (4th Cir. 2023) .................................................................. 14

*Anderson v. Liberty Lobby, Inc.*,
  477 U.S. 242 (1986)................................................................................ 24

*Ashcroft v. al-Kidd*,
  563 U.S. 731 (2011)................................................................................ 17

*B.B. v. County of Los Angeles*,
  25 Cal.App.5th 115 (2018) .................................................................... 25

*Barnes v. Felix*,
  605 U.S. 73 (2025)................................................................................... 7

*Bilbrew v. City of Hawthorne*,
  2014 WL 12577134 (C.D. Cal. Mar. 31, 2014) ..................................... 8

*Biscotti v. Yuba City*,
  636 F. App'x 419 (9th Cir. 2016) .......................................................... 14

*Brosseau v. Haugen*,
  543 U.S. 194 (2004)................................................................... 16, 17, 19

*Brown v. Texas*,
  443 U.S. 47, 51 (1979)........................................................................... 20

*Bryan v. MacPherson*,
  630 F.3d 805 n.12 (9th Cir. 2010) ............................................. 8, 12, 15

*Calonge v. City of San Jose*,
  104 F.4th 39 (9th Cir. 2024) ...........................................................passim

*Cruz v. City of Anaheim*,
  765 F.3d 1076 (9th Cir. 2014) ......................................................... 19, 20

*Curnow v. Ridgecrest Police*,
  952 F.2d 321 (9th Cir. 1991) ........................................... 11, 17, 18, 19

*Deorle v. Rutherford,*
   272 F.3d 1272 (9th Cir. 2001) .......................................................... 9, 13, 15, 16

*Drummond v. City of Anaheim,*
   343 F.3d 1052 (9th Cir. 2003) ........................................................................ 17

*Estate of Aguirre v. County of Riverside,*
   29 F.4th 624 (9th Cir. 2022) ............................................................................ 7

*Estate of Lopez v. Gelhaus,*
   871 F.3d 998 (9th Cir. 2017) .......................................................................... 11

*Ewolski v. City of Brunswick,*
   287 F.3d 492 (6th Cir. 2002) .......................................................................... 22

*Franklin v. City of Charlotte,*
   64 F.4th 519 (4th Cir. 2023) .......................................................................... 14

*Garcia v. City of Azusa,*
   2023 WL 9420513 (C.D. Cal. Dec. 1, 2023) .................................................. 26

*George v. Morris,*
   736 F.3d 829 (9th Cir. 2013) ................................................................... passim

*Glenn v. Washington County,*
   673 F.3d 864 (9th Cir. 2011) .............................................................. 7, 13, 15

*Gonzalez v. City of Anaheim,*
   747 F.3d 789 (9th Cir. 2014) ....................................................................... 6, 9

*Graham v. Connor,*
   490 U.S. 386 (1989) ..................................................................................... 7, 9

*Gravelet-Blondin v. Shelton,*
   728 F.3d 1086 (9th Cir. 2013) ........................................................................ 12

*Green v. McNamara,*
   2025 WL 2602602 (9th Cir. Sept. 9, 2025) .................................................... 11

*Greer v. City of Hayward,*
   229 F.Supp.3d 1091 (N.D. Cal. 2017) ........................................................... 22

*Gupta v. Melloh,*
   19 F.4th 990 (7th Cir. 2021) .......................................................................... 13

*Harris v. Roderick,*
   126 F.3d 1189 (9th Cir. 1997) ..................................................................... 9, 19

*Hayes v. County of San Diego,*
   736 F.3d 1223 (9th Cir. 2013) ................................................................. passim

PLAINTIFFS' OPPOSITION TO DEFENDANT SEAN STEELMON'S MOTION FOR SUMMARY
JUDGMENT AND/OR PARTIAL SUMMARY JUDGMENT OF ISSUES

*Holloway v. City of Pasadena*,
    2018 WL 8799884 (C.D. Cal. Nov. 8, 2018) .................................................. 11, 19

*Hope v. Pelzer*,
    536 U.S. 730 (2002) .................................................................................. 16, 17, 19

*Kosakoff v. City of San Diego*,
    2010 WL 1759455 (S.D. Cal. Apr. 29, 2010) ....................................................... 21

*Koussaya v. City of Stockton*,
    54 Cal.App.5th 909 (2020) .................................................................................. 25

*Krouse v. Graham*,
    19 Cal.3d 59 (1977) ............................................................................................. 24

*Lake Nacimiento Ranch Co. v. San Luis Obispo County*,
    841 F.2d 872 (9th Cir. 1987) ................................................................................. 5

*Lennox v. City of Sacramento*,
    2024 WL 3845378 (E.D. Cal. Aug. 16, 2024) ................................................. 22, 23

*Liston v. County of Riverside*,
    120 F.3d 965 (9th Cir. 1997) ................................................................................. 6

*Llera v. LVMPD*,
    2023 WL 6393092, (D. Nev. Sept. 30, 2023) ...................................................... 19

*Mattos v. Agorano*,
    661 F.3d 433 (9th Cir. 2011) ................................................................................. 9

*McLeod v. City of Redding*,
    2024 WL 3011227 (E.D. Cal. June 12, 2024) ................................................. 24, 25

*Moreland v. LVMPD*,
    159 F.3d 365 (9th Cir. 1998) ............................................................................... 22

*Nehad v. Browder*,
    929 F.3d 1125 (9th Cir. 2019) ............................................................................. 15

*Nelson v. City of Davis*,
    685 F.3d 867 (9th Cir. 2012) ............................................................................... 16

*Orn v. City of Tacoma*,
    949 F.3d 1167 (9th Cir. 2020) ............................................................................. 16

*Peck v. Montoya*,
    51 F.4th 877 (9th Cir. 2022) ............................................................................... 11

*Petit v. City of Los Angeles*,
    2026 WL 98007 (C.D. Cal. Jan. 13, 2026) ........................................................... 8

v

*Porter v. Osborn*,
    546 F.3d 1131 (9th Cir. 2008) ............................................................. 21

*Quiroz v. San Diego County*,
    2017 WL 3020956 (S.D. Cal. July 17, 2017) ...................................... 14

*Reese v. County of Sacramento*,
    888 F.3d 1030 (9th Cir. 2018) ............................................................. 25

*Rice v. Morehouse*,
    989 F.3d 1112 (9th Cir. 2021) ............................................................. 12

*Rios v. City of Los Angeles*,
    2022 WL 17219086 (C.D. Cal. Aug. 25, 2022) ................................... 26

*S.L. v. County of Riverside*,
    2025 WL 1755147 (C.D. Cal. June 23, 2025)...................................... 22

*Sabbe v. Washington County Board of Commissioners*,
    84 F.4th 807 (9th Cir. 2023) ......................................................... 19, 20

*Sanderlin v. Dwyer*,
    116 F.4th 905 (9th Cir. 2024) ................................................................ 6

*Santos v. Gates*,
    287 F.3d 846 (9th Cir. 2002) .................................................................. 6

*Scott v. Henrich*,
    39 F.3d 912 (9th Cir. 1994) .................................................................... 6

*Smith v. City of Hemet*,
    394 F.3d 689 (9th Cir. 2005) ...................................................... 7, 12, 15

*Tabares v. City of Huntington Beach*,
    988 F.3d 1119 (9th Cir. 2021) ............................................................. 23

*Torres v. City of Madera*,
    648 F.3d 1119 (9th Cir. 2011) ......................................................... 8, 21

*U.S. v. Lopez*,
    482 F.3d 1067 (9th Cir. 2007) ............................................................. 21

*Vanegas v. City of Pasadena*,
    46 F.4th 1159 (9th Cir. 2022) ................................................................ 8

*Villalobos v. City of San Maria*,
    85 Cal.App.5th 383 (2022) .................................................................. 24

*Vos v. City of Newport Beach*,
    892 F.3d 1024 (9th Cir. 2018) ................................................................ 6

vi

*Wallisa v. City of Hesperia*,
   369 F.Supp.3d 990 (C.D. Cal. 2019) ........................................................ 14

*White v. Pauly*,
   580 U.S. 73 (2017)...................................................................................... 16

*Wilks v. Hom*,
   2 Cal.App.4th 1264 (1992) ........................................................................ 24

*Willis v. City of Fresno*,
   520 F. App'x 590 (9th Cir. 2013) .......................................................21, 23

**<u>Statutes</u>**

Pen. Code § 415 ............................................................................................... 7

Pen. Code § 17(b) ............................................................................................ 7

Pen. Code § 25850(c)(7)................................................................................... 7

Pen. Code § 415(2) .......................................................................................... 7

Pen Code § 835(a) .......................................................................................... 20

**<u>Other Authorities</u>**

Cal. Civ. Jury Instr. 1305B .......................................................................20, 21

Cal. Civ. Jury Instr. 441 ................................................................................ 20

# MEMORANDUM OF POINTS AND AUTHORITIES

## I.    INTRODUCTION

This case concerns LAPD officer Sean Steelmon's shocking killing of Oscar Vasquez Lopez, whom officers encountered passed out drunk. Steelmon woke Oscar, yelling commands at him in a language Steelmon believed he did not understand, then shot him because Oscar had a gun in his waistband and moved his hand over his thigh slightly, while he was in an obvious intoxicated stupor and faced away. Viewing the evidence in Plaintiffs' favor, summary judgment must be denied.

## II.    STATEMENT OF FACTS

### A. Officers Respond to Dispatch Report, Find Two Men Asleep and Inebriated

On October 7, 2023, LAPD officers responded to a dispatch report regarding a man with a gun in or near a pickup truck at a parking lot in Canoga Park. (SUF-1-4.) The report did not indicate that the gun had been pointed at anyone, that any shots were fired, or that anyone was threatened or injured. (SUF-57-59.) The report included no suspect description. (SUF-60.)

Defendant Steelmon arrived with Officer Robert Tamate. (SUF-6, 12.) Sergeant John Talbot was already present, and Officers David Mirzoyan and Phillip Phan soon arrived. (SUF-11, 19.) There, the officers observed a grey pickup truck, which was parked, off, had no lights on and no apparent occupants. (SUF-12, 61.) The officers believed it may not have been the vehicle referenced in the dispatch report, which they believed was vague and are often inaccurate, and believed the referenced man might be elsewhere. (SUF-62-65.) They knew the area was largely Spanish-speaking. (SUF-66.)

The officers approached and, before observing anyone inside, Officer Tamate, who knew limited Spanish, began issuing commands in Spanish. (SUF-24, 67-68.) Through a propped-open rear window, they observed a man in the front passenger seat, slumped over and asleep. (SUF-69.) The officers looked through the front

1  passenger window, opened the door, and saw two Hispanic men asleep and highly

2  inebriated. (SUF-30, 70-72.) The officers remarked that the men appeared "drunk,"

3  "passed out," "hammered," and that "[t]hese guys are out!" (SUF-73.) They saw no

4  injuries or blood. (SUF-74.)

5       Steelmon pointed a shotgun with a flashlight into the vehicle, and the other

6  officers had handguns. (SUF-22, 27.) The officers shook the passenger and shouted

7  further to wake the men. (SUF-32.) The passenger was Plaintiff Jose Vasquez Lopez.

8  (SUF-25.) The man in the driver's seat was Decedent Oscar Vasquez Lopez, Jose's

9  brother, who did not speak or understand English and spoke only Spanish. (SUF-13,

10  75-76.) The officers had no information either man had any criminal history or ever

11  committed any act of violence. (SUF-77.)

12       **B. Defendant Sean Steelmon Fatally Shoots Oscar Vasquez Lopez While**

13       **Oscar Is Barely Awake and In an Intoxicated Stupor**

14       Jose awoke, visibly dazed, and looked toward the officers. (SUF-78.) Steelmon

15  leaned into the vehicle, began yelling "Gun!" repeatedly, and shouted commands to

16  Oscar in English. (SUF-79.) Steelmon did not speak Spanish. (SUF-80.) Steelmon

17  realized the men might not understand English. (SUF-81.) Steelmon stated there was a

18  gun in Oscar's waistband and directed Tamate to pull Jose out, which Tamate did.

19  (SUF-82.) Phan believed Jose appeared unable to comply with commands in his

20  condition. (SUF-83.) The gun's barrel and trigger were inside Oscar's waistband and

21  not visible to the officers. (SUF-84.)

22       Oscar appeared to wake but remained in an obvious intoxicated stupor, and his

23  eyes largely remained closed. (SUF-85.) His hands were empty and he held them

24  forward, over the middle part of his thighs, occasionally clasping or rubbing them

25  together and slightly raising or lowering them while facing forward, with his eyes

26  closed or barely open. (SUF-86.) Steelmon told Oscar in English not to reach for the

27  gun. (SUF-40.) Just after, Talbot, in broken Spanish, told Oscar, "put your hands,"

28

2

1  without saying where. (SUF-87.) No other command, or any warning deadly force
2  was used, was given in Spanish. (SUF-88-89.)

3      Steelmon said, "Get me a Spanish speaker," recognizing Oscar likely did not
4  understand his English commands. (SUF-90-91.) Oscar's hand then lowered again
5  slightly, no more than an inch or two from where it had been, and Steelmon
6  immediately fired his shotgun, striking Oscar in the neck. (SUF-92-93.)

7      Oscar never touched the gun, removed it from his waistband, moved it in
8  Steelmon's direction, pointed it at anyone, or fired it. (SUF-94.) After Steelmon fired,
9  Oscar's hand came up, empty, the gun still in his waistband. (SUF-51-53, 95.) Oscar
10  made no verbal threats and said nothing to challenge the officers. (SUF-96.) When
11  Steelmon fired, Jose heard it and understood Oscar was shot. (SUF-97.) Oscar died
12  from his injuries. (SUF-98.)

13      **C. Tactics, Training, and Deadly Force Principles**

14      Despite the report of a gun, Steelmon issued no commands before approaching
15  the truck, and the officers never discussed using, or attempted to use, their vehicles'
16  PA systems, lights, or sirens to call occupants out from a distance and from cover.
17  (SUF-99-100.) Steelmon never considered requesting an airship to illuminate the
18  vehicle's interior. (SUF-101.) The officers never discussed pulling up their vehicles to
19  use as cover. (SUF-102.)

20      Before approaching, the officers did not discuss any tactical plan except that
21  Steelmon would lead in a "stick" formation approaching the passenger side. (SUF-
22  103.) They did not discuss who would communicate with any occupants who spoke
23  Spanish, even though Steelmon did not speak Spanish. (SUF-104.) Before
24  approaching, Steelmon did not communicate with Sergeant Talbot, who played no
25  role in discussion or planning. (SUF-105-106.) Nobody officer was designated to
26  carry a less-lethal weapon. (SUF-107.)

27      After seeing the occupants, the officers had no tactical discussion before seeing
28  the gun. (SUF-108.) When the officers saw two people in the vehicle, Phan suggested

that they re-deploy, allowing the officers to take cover and request additional

resources including ballistic shields and an airship, but was ignored. (SUF-109-110.)

Steelmon never suggested repositioning to a position of cover, including after seeing

the gun, and did not consider creating additional distance or taking cover. (SUF-111-

112.) Instead, the officers woke Jose and Oscar, though Plaintiffs' expert opined that a

reasonable officer would know waking an unconscious, intoxicated person may result

in him not obeying commands and may escalate the situation. (SUF-113.) No officer

"cleared" Oscar's waistband before Steelmon fired because Steelmon never discussed

going, or directed anyone to go, to the vehicle's driver's side. (SUF-114.)

Steelmon believed they should get a Spanish speaker to confirm Oscar

understood commands and received an opportunity to comply, but did not request one

until immediately before firing, and took no other action to have Spanish commands

issued, even though Tamate knew some Spanish. (SUF-115.) Steelmon knew it was

important when conducting a stop potentially involving a gun to determine what

language the stopped individuals speak and, if not English, get an officer who speaks

their language. (SUF-116.)

LAPD officers are trained in tactics, use of cover, and deadly force. (SUF-117.)

They are trained, when communicating with an individual who may be subjected to

deadly force, to speak in a language he can understand. (SUF-118.) They are trained

that utilizing cover is important to protect against someone with a firearm, for both

that person and the officer. (SUF-119.) They are trained no arrest justifies exposing

themselves to needless danger. (SUF-120.)

Officers are trained deadly force may only be used to defend against an

immediate or imminent threat of death or serious bodily injury. (SUF-121.) They are

trained a suspect must have the ability, opportunity, *and* apparent intent to

immediately cause death or serious injury. (SUF-122.) They are not trained they may

shoot someone just because he has a gun in his hand. (SUF-123.) Steelmon admitted it

would not have been appropriate to shoot if Oscar did not touch the gun. (SUF-124.)

PLAINTIFFS' OPPOSITION TO DEFENDANT SEAN STEELMON'S MOTION FOR SUMMARY
JUDGMENT AND/OR PARTIAL SUMMARY JUDGMENT OF ISSUES

1  Steelmon testified that, to use the gun, Oscar would have had to draw it from his

2  waistband, turn around, and aim it at Steelmon while Steelmon was behind the pillar

3  on the vehicle's passenger side. (SUF-125.)

4      Plaintiffs' expert opined that Steelmon's use of deadly force was inappropriate

5  and inconsistent with accepted police practices. (SUF-126.) He opined there was no

6  exigency or need for haste and, if the officers had slowed the situation, they could

7  have secured a Spanish speaker to communicate with Oscar from cover. (SUF-127.)

8  He opined that while the officers should have re-deployed after encountering the two

9  men, the necessity to do so was heightened once Steelmon saw the gun. (SUF-128.)

10  He opined that the officers' failure to engage in reasonable planning, to designate a

11  less-lethal officer, to move to cover once Steelmon saw the gun, or account for

12  Oscar's inability to understand English created the circumstances that led Steelmon to

13  use deadly force. (SUF-129.)

14  **III.   LEGAL STANDARD**

15      At summary judgment, the Court must view the evidence and draw all

16  reasonable inferences in the light most favorable to the nonmovant. *Lake Nacimiento*

17  *Ranch Co. v. San Luis Obispo County*, 841 F.2d 872, 875 (9th Cir. 1987). Even where

18  key facts are undisputed, summary judgment should be denied if reasonable minds

19  could differ on what inferences to draw. *Id.* This applies to video evidence that is

20  ambiguous or susceptible to multiple interpretations. *Sanderlin v. Dwyer*, 116 F.4th

21  905, 915 (9th Cir. 2024) (explaining that "the reasonableness of the force used …

22  turns on 'how the jury interprets the video footage'"); *Vos v. City of Newport Beach*,

23  892 F.3d 1024, 1028 (9th Cir. 2018) ("The mere existence of video footage … does

24  not foreclose a genuine factual dispute as to the reasonable inferences that can be

25  drawn from that footage.").

26      "Because [the excessive force inquiry] nearly always requires a jury to sift

27  through disputed factual contentions," summary judgment "in excessive force cases

28  should be granted sparingly." *Santos v. Gates*, 287 F.3d 846, 853 (9th Cir. 2002); *see*

5

*Liston v. County of Riverside*, 120 F.3d 965, 976 n.10 (9th Cir. 1997) ("We have held repeatedly that the reasonableness of force used is ordinarily a question … for the jury."). "Deadly force cases pose a particularly difficult problem because the officer defendant is often the only surviving eyewitness." *Gonzalez v. City of Anaheim*, 747 F.3d 789, 794-95 (9th Cir. 2014) (en banc) (alteration adopted). Accordingly, courts "must ensure that the officer is not taking advantage of the fact that the witness most likely to contradict his story—the person shot dead—is unable to testify," *id.* at 795, and "must carefully examine all the evidence." *Scott v. Henrich*, 39 F.3d 912, 915 (9th Cir. 1994).

## IV. STEELMON'S USE OF DEADLY FORCE WAS UNREASONABLE UNDER THE FOURTH AMENDMENT

Fourth Amendment excessive force claims are judged by "whether the officers' actions [we]re 'objectionably reasonable'" given "the facts and circumstances confronting them." *Graham v. Connor*, 490 U.S. 386, 397 (1989). Factors weighed against the "nature and quality of the intrusion" include "(1) the severity of the crime," "(2) whether the suspect poses an immediate threat," and "(3) whether he is actively resisting" or attempting to flee. *Id.* at 396. Additional factors include (4) whether the suspect is impaired or has a diminished capacity, *Glenn v. Washington County*, 673 F.3d 864, 876 (9th Cir. 2011); (5) whether he received clear, comprehensible commands, *Calonge v. City of San Jose*, 104 F.4th 39, 46 (9th Cir. 2024); and (6) the availability of alternative methods to effectuate an arrest, *Smith v. City of Hemet*, 394 F.3d 689, 701 (9th Cir. 2005) (en banc). "[T]he 'totality of the circumstances' inquiry into a use of force has no time limit" and includes all preceding "facts and circumstances." *Barnes v. Felix*, 605 U.S. 73, 80 (2025).

"The intrusiveness of … deadly force is unmatched," *Graham*, 490 U.S. at 397, "because, once deceased, an individual [cannot] have his guilt and punishment determined." *Estate of Aguirre v. County of Riverside*, 29 F.4th 624, 628 (9th Cir. 2022) (cleaned up). Although "officers are often forced to make split-second

judgments," "[n]ot all errors in perception or judgment ... are reasonable." *Torres v. City of Madera*, 648 F.3d 1119, 1124 (9th Cir. 2011) (cleaned up).

### 1. No Severe Crime

The officers were responding to a reported disturbance of the peace, a misdemeanor. Pen. Code § 415(2); *Vanegas v. City of Pasadena*, 46 F.4th 1159, 1165 (9th Cir. 2022). Carrying a loaded firearm in public was also a misdemeanor. *Calonge*, 104 F.4th at 46-47 (citing Pen. Code § 25850(c)(7)[1]). Neither is "a serious crime that could justify a high degree of force." *Id.* at 47; *see Bryan v. MacPherson*, 630 F.3d 805, 829 n.12 (9th Cir. 2010); *Petit v. City of Los Angeles*, 2026 WL 98007, at *5 (C.D. Cal. Jan. 13, 2026) ("[T]he reports to which Defendants were responding—man with a stick, lighting trash on fire, possibly with a gun—is not a serious crime …."); *Bilbrew v. City of Hawthorne*, 2014 WL 12577134, at *6 (C.D. Cal. Mar. 31, 2014) (§ 415 misdemeanor "far from severe"). Although Steelmon argues Oscar's possession of a gun *could have* amounted to a felony "in certain circumstances," he does not argue those circumstances were present (Mot. at 15), and crediting this argument would require impermissibly resolving disputed facts and drawing inferences in his favor, including assuming he knew the gun was loaded.

### 2. No Immediate Threat

The "most important" factor is "whether the suspect posed an immediate threat." *Mattos v. Agorano*, 661 F.3d 433, 441 (9th Cir. 2011) (en banc) (cleaned up). Use of deadly force is reasonable only if an officer has probable cause to believe the suspect poses an immediate threat of death or serious injury to himself or others. *See Gonzalez*, 747 F.3d at 793; *George v. Morris*, 736 F.3d 829, 838 (9th Cir. 2013). A "statement by an officer that he fears for his safety or the safety of others is not

---

[1] Section 25850 was subsequently invalidated. *Baird v. Bonta*, 163 F.4th 723 (9th Cir. 2026).

1    enough; there must be objective factors to justify such a concern." *Deorle v.*

2    *Rutherford*, 272 F.3d 1272, 1281 (9th Cir. 2001).

3       An officer's "desire to resolve quickly a potentially dangerous situation" does

4    not justify deadly force. *Id.* Nor does "[t]he mere fact that a suspect possesses a

5    weapon." *Hayes v. County of San Diego*, 736 F.3d 1223, 1233 (9th Cir. 2013); *see*

6    *Calonge*, 104 F.4th at 48 ("We have held over and over that a suspect's possession of

7    a gun does not itself justify deadly force."); *Harris v. Roderick*, 126 F.3d 1189, 1204

8    (9th Cir. 1997) ("Law enforcement officials may not kill suspects who do not pose an

9    immediate threat to their safety or to the safety of others simply because they are

10   armed."). Rather, the circumstances must be such that a reasonable officer would

11   believe the suspect would immediately use the weapon to inflict death or serious

12   injury unless deadly force were used. *See Aguirre*, 29 F.4th at 628 (deadly force not

13   justified where, on plaintiffs' facts, man holding "bat-like object" was not facing

14   officer, "coming 'on the attack,'" or approaching bystanders); *George*, 736 F.3d at

15   838 (deadly force not justified where, on plaintiffs' facts, man armed with gun did not

16   turn and point gun at deputies); *Hayes*, 736 F.3d at 1234. "If a person possesses a

17   weapon but '*doesn't* reach for his waistband or make some similar threatening

18   gesture, it would clearly be unreasonable for the officer[] to shoot him.'" *Calonge*,

19   104 F.4th at 46 (citation omitted).

20      Viewed in Plaintiffs' favor, the evidence shows the officers first found Oscar

21   asleep and highly inebriated. They had no information he had threatened anybody,

22   used a gun in any manner, or injured anyone, or that he ever did any of these things in

23   his life. The officers woke Oscar, despite knowing he might possess a gun, by

24   shouting at him. Oscar awoke but remained in an obvious stupor, barely able to move

25   or respond, with his eyes mainly closed. Oscar almost exclusively faced forward, not

26   toward any officer, and immediately before Steelmon fired from Oscar's right, Oscar

27   was facing *left*, *away* from Steelmon, who was behind the truck's "B" pillar. Oscar

28   held his hands over the middle portion of his thighs, and occasionally grasped his

1    hands together, but otherwise made only slow, slight movements with them,

2    occasionally lowering or raising them slightly. He did not reach for his waistband or

3    the gun,[2] touch the gun, draw it, move it, point it at anyone, or fire it. *See id.* ("[W]e

4    take as true that [decedent] did not reach for his waistband or make a similar furtive or

5    threatening movement."). Steelmon testified that to use the gun against him, Oscar

6    would have had to draw it, turn around to his right, aim it at Steelmon, and fire.

7    Viewing the videos, a jury could conclude Oscar was so incapacitated that he could

8    not have done this in his condition. Steelmon also admitted that if Oscar had not

9    touched the gun, it would not have been appropriate to shoot—and Oscar did not

10    touch it, nor does Steelmon argue he did.

11        Accordingly, a jury could conclude Oscar posed no immediate threat. *See*

12    *Estate of Lopez v. Gelhaus*, 871 F.3d 998, 1010-11 (9th Cir. 2017) (no immediate

13    threat even where teenager carrying apparent AK-47 turned toward officer with it and

14    raised it slightly); *George*, 736 F.3d at 832-33, 838 (no immediate threat where man

15    came onto balcony holding handgun but whether he "turned and pointed" it at officers

16    was disputed); *Curnow v. Ridgecrest Police*, 952 F.2d 321, 324-25 (9th Cir. 1991) (no

17    immediate threat where armed man never pointed gun at officers and was not directly

18    facing them when they fired); *Holloway v. City of Pasadena*, 2018 WL 8799884, at

19    *8-9 (C.D. Cal. Nov. 8, 2018) (denying summary judgment where whether plaintiff

20    turned and pointed gun toward officer was disputed), *aff'd*, 2021 WL 3929972 (9th

21    Cir. Sept. 2, 2021); *see also Peck v. Montoya*, 51 F.4th 877, 887-88 (9th Cir. 2022)

22    (no immediate threat, despite reports decedent was threatening to shoot someone with

23    firearm and swore at and behaved erratically toward officers and yelled, "I'll show

24    you my gun! You wanna see my gun?", where parties disputed whether he ever

25    reached for or grabbed gun); *Green v. McNamara*, 2025 WL 2602602, at *1-2 (9th

26

27    _____

28    [2] The gun is not visible in Oscar's waistband in any video.

PLAINTIFFS' OPPOSITION TO DEFENDANT SEAN STEELMON'S MOTION FOR SUMMARY JUDGMENT AND/OR PARTIAL SUMMARY JUDGMENT OF ISSUES

Cir. Sept. 9, 2025); *cf. Aguirre*, 29 F.4th at 628 (no immediate threat where man holding bat was 15 feet away, not facing or approaching deputy).

Nor does the slight movement of Oscar's hand amount to a "furtive movement" or "harrowing gesture" under these circumstances, as Steelmon argues. (Mot. at 16.) "Furtive" means "done in a quiet and secretive way to avoid being noticed," and "harrowing" means "acutely distressing or painful."[3] A reasonable officer in Steelmon's position would not have believed Oscar's slight movement of his hand, which was visible to and not hidden from Steelmon, was actually a sly effort to reach for and draw the gun unnoticed, when, viewing the evidence in Plaintiffs' favor, Oscar was barely conscious and clearly had no awareness of what was occurring, let alone any capacity to trick the officers. Steelmon's argument also depends on his assertion that Oscar "grabbed for the firearm" (Mot. at 17), which is disputed.

### 3. No Resistance or Attempt to Flee

"'Resistance' …. runs the gamut from the purely passive protestor who simply refuses to stand, to the individual who is physically assaulting the officer." *Bryan*, 630 F.3d at 830. Where an individual "d[oes] not resist arrest or attempt to escape," force is less likely to be reasonable. *See Gravelet-Blondin v. Shelton*, 728 F.3d 1086, 1091 (9th Cir. 2013). Here, Oscar "did not attempt to run from the officers," *Smith*, 394 F.3d at 703, and his stupor and inability to understand English show that merely remaining seated and not raising his hands high "do[] not constitute resistance at all." *Bryan*, 630 F.3d 830 & n.13. Even where someone is "not perfectly passive," resistance does not support significant force if it is "not particularly bellicose." *Id.* at 830 (quoting *Smith*, 394 F.3d at 703); *see Rice v. Morehouse*, 989 F.3d 1112, 1123 (9th Cir. 2021) ("Rice's refusals to exit his car are far closer to 'the purely passive protestor who simply refuses to stand' than to the 'minor' or even 'truly active' forms

---

[3] *"Furtive,"* Merriam-Webster, https://www.merriam-webster.com/dictionary/furtive; *"Harrowing,"* Merriam-Webster, https://www.merriam-webster.com/dictionary/harrowing.

PLAINTIFFS' OPPOSITION TO DEFENDANT SEAN STEELMON'S MOTION FOR SUMMARY
JUDGMENT AND/OR PARTIAL SUMMARY JUDGMENT OF ISSUES

1  of resistance that we have considered in other cases."). Accordingly, Oscar's lack of
2  any resistance or flight favors Plaintiffs, notwithstanding Steelmon's assertion,
3  without authority, that Oscar "ignor[ing] … commands"—a disputed fact—
4  constituted an "attempt[] to evade or flee." (Mot. at 17.)

5    **4.  Oscar Was Impaired with Diminished Capacity**

6    An individual's apparent intoxicated condition or other diminished capacity
7  may render him unable to understand or comply with commands, undercutting the
8  reasonableness of subsequent force. *See Glenn*, 673 F.3d at 876 (explaining that
9  although officers warned decedent to drop knife or be killed, decedent "'may not have
10  heard or understood these warnings' because he was intoxicated," and denying
11  summary judgment); *Gupta v. Melloh*, 19 F.4th 990, 999 (7th Cir. 2021) (denying
12  summary judgment where plaintiff's evidence showed "he was not resisting arrest,"
13  "the extent of his impairment was obvious," and officers "knew [he] was intoxicated"
14  when they pushed him to ground); *Deorle*, 272 F.3d at 1282-83 (force less likely to be
15  justified against mentally ill individuals due to their lack of capacity); *see also*
16  *Albritten v. Dougherty County*, 973 F.Supp. 1455, 1465 (M.D. Ga. 1997) (denying
17  summary judgment for officers who beat arrestee when he "was moving slowly" due
18  partly "to his intoxication").

19    Here, Oscar was extremely intoxicated, barely awake, and in an obvious stupor.
20  His movements were sluggish and confused due to his clear impairment, which the
21  officers recognized and even joked about, remarking that he was "drunk" and
22  "hammered." Although, as addressed below, Oscar did not understand English and
23  could not have understood Steelmon's commands, even were this not the case his
24  capacity to comprehend and promptly comply was clearly diminished, as any
25  reasonable officer would have recognized, substantially undercutting the
26  reasonableness of using deadly force against him due to a slight and apparently
27  unknowing movement of his hand.

28

11

### 5. Commands Not Comprehensible and Conflicting

When officers issue unclear or conflicting commands, an individual's failure to comply does not justify use of force. *See Calonge*, 104 F.4th at 46, 48-49 ("When a man is walking down the street carrying a gun in his waistband, posing no immediate threat, police officers may not shout conflicting commands at him and then kill him."); *Biscotti v. Yuba City*, 636 F. App'x 419, 422 (9th Cir. 2016) (denying summary judgment where "several [officers] shouted imperceptible orders" before shooting woman holding gun); *Wallisa v. City of Hesperia*, 369 F.Supp.3d 990, 1007 (C.D. Cal. 2019) ("Defendants' commands were inconsistent and at times unintelligible, *i.e.*, they were insufficient and otherwise improper."); *Napier ex rel. Quiroz v. San Diego County*, 2017 WL 3020956, at *6 (S.D. Cal. July 17, 2017); *see also Franklin v. City of Charlotte*, 64 F.4th 519, 525 (4th Cir. 2023) (use of deadly force less likely justified "when [an] officer's abstruse commands require the suspect to divine their meaning"). Commands are unclear when they are issued in a language officers believe the recipient cannot understand. *Aleman v. City of Charlotte*, 80 F.4th 264, 292 (4th Cir. 2023) (Spanish-speaking decedent armed with gun "may not even have understood the English commands to 'drop the gun' and 'put it down'").

Viewing the evidence in Plaintiffs' favor, Steelmon knew or should have known Oscar did not understand English and thus that, even assuming Oscar understood his circumstances despite his severe intoxication, he could not understand Steelmon's commands. Although Tamate initially issued some commands in Spanish, this was before Oscar awoke. The only command issued in Spanish after Oscar awoke was Talbot's command to "put your hands," without saying where, which was seconds apart from Steelmon's English commands to not reach for the gun. Even assuming Oscar understood English, Talbot's affirmative command to "put [his] hands" somewhere clearly conflicted with Steelmon's negative command to *not* do something with his hands. Accordingly, shooting Oscar based on his purported noncompliance was unreasonable.

12

### 6.  Alternative Methods and Tactics Available

Officers also must "consider what other tactics if any were available" to apprehend a suspect. *Bryan*, 630 F.3d at 831 & n.15 (cleaned up). If "alternative methods of capturing or subduing" him were available besides "the force employed," this "militate[s] against finding the use of force reasonable." *Nehad v. Browder*, 929 F.3d 1125, 1135 (9th Cir. 2019) (first quoting *Smith*, 394 F.3d at 703; then quoting *Glenn*, 673 F.3d at 876) (alterations adopted).

Numerous alternative tactics were available that Steelmon did not consider or attempt. Before approaching, he did not utilize lights, sirens, or PA, or call an airship to attempt to illuminate the truck, and call out the occupants from cover. Nor did he ever redeploy, including after observing the two occupants or the gun, to utilize the above tactics after gaining this information. *See Deorle*, 272 F.3d at 1282 ("Rutherford could easily have avoided a confrontation, and awaited the arrival of the negotiating team by retreating to his original position .... Nothing in the record before us suggests that Rutherford considered other, less dangerous, methods of stopping Deorle."). There was no discussion about communicating with the occupants in Spanish (even though Steelmon knew or should have known they spoke Spanish, as Tamate did), whether any officer would carry less-lethal, who would provide cover, utilizing cover, or clearing the driver's side. No urgency or exigency prevented these many reasonable alternatives from being considered or attempted. *See id.* ("There was no immediate need to subdue Deorle ...."). Had Steelmon done so, his use of deadly force may not have occurred. *See Nelson v. City of Davis*, 685 F.3d 867, 882 (9th Cir. 2012).[4]

---

[4] An officer's violation of training when using force also suggests the force is excessive. *Drummond v. City of Anaheim*, 343 F.3d 1052, 1059 (9th Cir. 2003). Steelmon violated his training by not tactically repositioning to utilize available cover.

## V.    THE LAW WAS CLEARLY ESTABLISHED

Qualified immunity does not apply where officials "violate clearly established … constitutional rights of which a reasonable person would have known." *White v. Pauly*, 580 U.S. 73, 78-79 (2017). The touchstone is whether "officers [had] fair notice of the illegality of their conduct." *Orn v. City of Tacoma*, 949 F.3d 1167, 1178 (9th Cir. 2020); *see Brosseau v. Haugen*, 543 U.S. 194, 198 (2004); *Hope v. Pelzer*, 536 U.S. 730, 739-40 (2002). Although this ordinarily requires "cases relevant to the situation [officers] confronted," *Brosseau*, 543 U.S. at 200, it does "not require a case directly on point," *Ashcroft v. al-Kidd*, 563 U.S. 731, 741 (2011); *see Hope*, 536 U.S. at 740 (qualified immunity should be denied even "despite notable factual distinctions …, so long as the prior decisions gave reasonable warning that the conduct … violated constitutional rights"). Training on use of force can also provide notice that force is unreasonable. *Drummond v. City of Anaheim*, 343 F.3d 1052, 1062 (9th Cir. 2003).

Viewing the evidence and drawing inferences in Plaintiffs' favor, existing precedent clearly established the unlawfulness of deadly force. In *Curnow*, officers encountered a man apparently beating a woman in a home, next to a rifle. 952 F.2d at 323 (9th Cir. 1991). They claimed that, when they broke down the door, he grabbed the gun and, after an officer shot him, pointed it at the officer, who shot again. *Id.* The woman disputed this, claiming the man had not reached for the gun before the officer's first shot, which she said struck him in the back, and only grabbed the gun by the muzzle before the second shot. *Id.* The Ninth Circuit denied summary judgment, explaining that, crediting the plaintiff's evidence, "the police officers could not reasonably have believed the use of deadly force was lawful because Curnow did not point the gun at the officers and apparently was not facing them when they shot him the first time." *Id.* at 324-25.

In *Lopez*, deputies attempted to stop a teenager who carried an apparent AK-47 and walked away from them, toward "several houses" with "individuals outside." 871 F.3d at 1002-03 (9th Cir. 2017). A deputy testified that the teenager "glance[d]

1  backwards" before "rotat[ing] his body clockwise," and he "saw the gun come

2  around" toward him, "with the barrel … coming up." *Id.* He fired, striking the

3  teenager in the chest. *Id.* at 1003. Other testimony, however, disputed whether the

4  teenager glanced backward or raised the gun. *Id.* at 1002-03. Due to factual disputes,

5  "most importantly, … the movement of [the] gun," summary judgment was denied.

6  *Id.* at 1007-13.

7      In *George*, deputies responded to a "domestic disturbance involving a firearm,"

8  and were told a man was outside "with his gun." 736 F.3d at 832 (9th Cir. 2013). The

9  man appeared on a balcony, and deputies ordered him to show his hands. *Id.* He was

10  holding a gun and, according to one deputy, "turn[ed] … and raise[d]" it and

11  "point[ed] it directly at [him]," and the deputy fired. *Id.* at 833 n.4. The plaintiff,

12  however, testified the man held the gun "with the barrel pointing down." *Id.* at 832.

13  Given the dispute regarding whether the officer fired "without objective provocation"

14  while the man's "gun [was] trained on the ground," the Ninth Circuit denied summary

15  judgment because "a reasonable fact-finder" could find the "use of force …

16  excessive." *Id.* at 838-39.

17      By 2023, these decisions clearly established that where an individual is armed

18  with or possesses a gun, but whether he reached for it, grabbed it, or took other

19  threatening action with it is disputed, a jury could conclude using deadly force against

20  him is unreasonable. This is particularly so given that these decisions addressed *more*

21  objectively dangerous circumstances than here and nevertheless denied summary

22  judgment: In *Curnow* and *George*, officers were responding to what they believed was

23  domestic violence in progress, whereas here they had no information Oscar harmed

24  anyone; in *Lopez* and *George*, the person who was shot was *holding* a gun (or, in

25  *Lopez*, what officers believed was a gun) and did not simply have it in his waistband;

26  and in all, the person shot was undisputedly awake and lucid, and there was little or no

27  question about his capacity to understand commands or to act. In fact, in *Calonge*, the

28  Ninth Circuit held that as of 2019, existing precedent including *Lopez* and *George*

15

clearly established that "[w]hen a man is walking down the street carrying a gun in his waistband, posing no immediate threat, police officers may not shout conflicting commands at him and then kill him"—which differs from the facts here solely by virtue of the decedent walking, versus sitting in a car. *See also Harris*, 126 F.3d at 1202-04 (denying summary judgment where officer shot suspect who made no threatening movement but was believed to have killed FBI agent day before); *Lopez*, 871 F.3d at 1018 (deeming law clearly established by *George*, *Curnow*, and *Harris*); *Holloway*, 2021 WL 3929972, at *2 (citing *Lopez* and *Curnow*); *Llera v. LVMPD*, 2023 WL 6393092, at *9-11 (D. Nev. Sept. 30, 2023) (citing *Harris*); *cf. also Aguirre*, 29 F.4th at 626-29 (establishing officers may not shoot someone armed with a weapon, even if he ignores commands and already engaged in violent, threatening conduct, where he is not facing the officer, approaching bystanders, or indicating he is about to attack). Indeed, in the circumstances of this case—which shares material details with the foregoing cases, but is even more egregious by virtue of Oscar's intoxication, his clear lack of awareness of his circumstances, and Steelmon's reckless escalation of the encounter—the unlawfulness of the shooting was "obvious." *See Aguirre*, 29 F.4th at 629; *Brosseau*, 543 U.S. at 199; *Hope*, 536 U.S. at 738.

Although Steelmon relies on *Sabbe v. Washington County Board of Commissioners*, 84 F.4th 807 (9th Cir. 2023), and *Cruz v. City of Anaheim*, 765 F.3d 1076 (9th Cir. 2014), to argue it was clearly established that shooting someone who "reaches for a gun" is reasonable, this argument requires impermissibly viewing the evidence in Steelmon's favor to conclude Oscar reached for the gun. But as explained, a reasonable jury could conclude that Oscar did not do this, or reach for his waistband at all, rendering these cases inapplicable. They are also distinguishable. In *Sabbe*, the decedent "had been behaving erratically and in a hostile manner," rammed a police vehicle, and held and prepared to aim a rifle at officers. 84 F.4th at 828. In *Cruz*, officers knew the suspect was armed, had a felony firearm conviction, was a gang member, said he "was not going back to prison," and attempted to flee. 765 F.3d at

1  1077-78. Here, Oscar was calm, had committed no violence, was not holding or

2  reaching for a weapon, had no known criminal history, and did not attempt to flee.

3  Qualified immunity should be denied.[5]

4  **VI.  STEELMON UNLAWFULLY DETAINED AND ARRESTED OSCAR**

5  Detentions, including *Terry* stops, require reasonable suspicion of criminal

6  activity. *Brown v. Texas*, 443 U.S. 47, 51 (1979). Steelmon had none before opening

7  the truck's door, as the officers had observed no indications of criminal activity,

8  doubted whether this was the vehicle referenced by dispatch, and further doubted this

9  when they saw two men—not one—sleeping inside, and saw no gun or evidence of a

10  crime through the passenger window, or anyone disturbing the peace.[6] Without

11  reasonable suspicion, the officers opened the passenger door, and Steelmon detained

12  the two men at gunpoint.

13  Force applied to a person with intent to restrain is an arrest. *Torres v. Madrid*,

14  592 U.S. 306, 311-12 (2021). Warrantless arrests require probable cause. *U.S. v.*

15  *Lopez*, 482 F.3d 1067, 1072 (9th Cir. 2007). Steelmon had no probable cause to arrest

16  Oscar when he fired. Viewing the evidence in Plaintiffs' favor, Oscar did not reach

17  for, touch, or otherwise indicate he would use the gun, such that there was no assault,

18  and Steelmon lacked details showing Oscar's possession of the gun was illegal.

19

20

_____

21  [5] Steelmon does not argue the law governing Plaintiffs' unlawful detention and arrest

22  and Fourteenth Amendment claims was not clearly established (Mot. at 22-25),
    waiving such argument. *Archibald v. County of San Bernardino*, 2018 WL 6017032,

23  at *7 (C.D. Cal. Oct. 2, 2018) (motion's failure to argue "that the law was not clearly

24  established" "waive[s] the second prong" of qualified immunity); *see George*, 736
    F.3d at 837 ("We will not 'do a[] [party]'s work for it [] by manufacturing its legal

25  arguments….'").

26  [6] *Foster v. City of Indio*, 908 F.3d 1204, 1207 (9th Cir. 2018), involved a far more

27  detailed 911 call than the one here, which provided little indicia of reliability; *Foster*
    also involved a man who fled from officers, validating their suspicions, rather than

28  two sleeping men.

PLAINTIFFS' OPPOSITION TO DEFENDANT SEAN STEELMON'S MOTION FOR SUMMARY
JUDGMENT AND/OR PARTIAL SUMMARY JUDGMENT OF ISSUES

## VII. STEELMON'S USE OF DEADLY FORCE VIOLATED PLAINTIFFS' FOURTEENTH AMENDMENT RIGHTS

Official action violates due process when it "shocks the conscience." *Hayes*, 736 F.3d at 1230. Where "deliberation is practical" before using force, only "deliberate indifference" must be shown. *Id.* In situations "that escalate so quickly" the officer cannot deliberate, plaintiffs must show "a purpose to harm unrelated to legitimate law enforcement objectives." *Porter v. Osborn*, 546 F.3d 1131, 1137 (9th Cir. 2008). "Deliberate indifference" applies where officers can evaluate the threat an individual poses, *see Willis v. City of Fresno*, 520 F. App'x 590, 592 (9th Cir. 2013); *Kosakoff v. City of San Diego*, 2010 WL 1759455, at *11-12 (S.D. Cal. Apr. 29, 2010), or where officers use force following a standoff with time to create a plan, *Ewolski v. City of Brunswick*, 287 F.3d 492, 511 (6th Cir. 2002). "Purpose to harm" applies where unforeseen changes, or clear, immediate, deadly threats allow only split seconds to make decisions. *E.g.*, *Hayes*, 736 F.3d at 1230; *Moreland v. LVMPD*, 159 F.3d 365, 372 (9th Cir. 1998). Where pertinent facts are disputed, only the jury can determine which standard applies. *Greer v. City of Hayward*, 229 F.Supp.3d 1091 (N.D. Cal. 2017).

Steelmon had time to deliberate. Before approaching, he knew the vehicle might contain a man with a gun. Although he could have accounted for this by using lights, sirens, or a PA to try to call occupants out before approaching, or by doing so after he saw two occupants, or saw the gun, he never did. That he saw a gun after approaching was hardly unforeseeable. *Cf. Lennox v. City of Sacramento*, 2024 WL 3845378, at *25 (E.D. Cal. Aug. 16, 2024) ("[A] trier of fact could also find that defendants … had time to deliberate regarding their use of force because they had predicted in advance that the decedent would run toward the door …."). Steelmon approached with no plan, and yelled at the men despite believing a gun might be inside, waking Oscar, himself creating the purported urgency he claims justified shooting. *See S.L. v. County of Riverside*, 2025 WL 1755147, at *16 (C.D. Cal. June

18

23, 2025) (denying summary judgment based on factual disputes "regarding whether or not the individual defendants had time to deliberate in their interaction with [decedent], or whether [his] actions forced them to act quickly" and because "reasonable jurors could disagree as to the individual defendants' mental state"). There was no need for a "snap judgment" when Steelmon had numerous viable options to safely control the situation, including redeploying and obtaining additional resources. *Willis*, 520 F. App'x at 592; *see Lennox*, 2024 WL 3845378, at *26 & n.21 (applying deliberate indifference standard based on "genuine dispute as to whether deliberation was feasible," and denying qualified immunity).

Even under purpose-to-harm, summary judgment must be denied because Steelmon fired when Oscar was turned away and was not reaching for the gun, and thus posed no threat. *See A.D. v. Cal. Highway Patrol*, 712 F.3d 446, 451, 458 (9th Cir. 2013) (shooting violated due process even where suspect rammed into police vehicle but posed no apparent threat at time of subsequent shooting).[7]

## VIII.  **STEELMON WAS NEGLIGENT**

California negligence law is "broader" than Fourth Amendment law and places added emphasis on officers' pre-shooting tactics and decisions. *Tabares v. City of Huntington Beach*, 988 F.3d 1119, 1125-26 (9th Cir. 2021). In addition to the absence of any significant crime, immediate threat, or resistance, Steelmon's pre-shooting tactics further show he was negligent. Although he knew there might be a gun in the truck, he hastily approached and never attempted to utilize available resources such as lights and sirens, his PA, or an airship to identify and call occupants out from a

---

[7] Although Steelmon waived his argument that the Fourteenth Amendment violation was not clearly established, cases such as *A.D.*, *Willis*, and *Kosakoff* suffice to clearly establish the law. *See Debeaubien v. California*, 2022 WL 574157, at *10-11 (E.D. Cal. Feb. 25, 2022) (less factual similarity required for claims under Fourteenth Amendment than under Fourth); *see also Drummond*, 343 F.3d at 1060 (unpublished and district court decisions may clearly establish law in Ninth Circuit).

distance using cover, and formulated no plan for how to communicate with them or what roles officers would take.

Regarding Jose's negligent infliction claim, it is sufficient that he "sensorially perceive[d]" Steelmon's use of force and was contemporaneously aware it injured a close relative, his brother. *See Wilks v. Hom*, 2 Cal.App.4th 1264, 1271 (1992). Plaintiffs' evidence shows Jose was aware of being pulled out of the vehicle and hearing Steelmon fire, and he understood Oscar had been shot. This is sufficient to preclude summary judgment. *See id.* at 1273; *Krouse v. Graham*, 19 Cal.3d 59, 65-66 (1977). Steelmon argues Jose was not awake, based on video evidence that is too blurry and was recorded from too far away to establish this, asking the Court to construe evidence in Steelmon's favor. And although Steelmon challenges Jose's credibility, courts cannot assess credibility on summary judgment. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 255 (1986).

## IX.    STEELMON COMMITTED BATTERY

California battery claims against officers utilize the same negligence standard set forth in *Hayes v. County of San Diego*, 57 Cal.4th 622, 629-32 (2013), and both claims require consideration of "the totality of the circumstances" including pre-force conduct and the force itself. *See McLeod v. City of Redding*, 2024 WL 3011227, at *8 (E.D. Cal. June 12, 2024); *Villalobos v. City of San Maria*, 85 Cal.App.5th 383, 389 (2022); *Koussaya v. City of Stockton*, 54 Cal.App.5th 909, 937 (2020). This aligns with California's standard jury instructions for battery and negligence claims against police for use of deadly force—issued following 2020 amendments to Penal Code § 835a, governing officers' use of deadly force—which are identical. *Compare* Cal. Civ. Jury Instr. 1305B ("Battery by Peace Officer (Deadly Force)") *with* Cal. Civ. Jury Instr. 441 ("Negligent Use of Deadly Force by Peace Officer"); *see McLeod*, 2024 WL 3011227, at *8 (citing Cal. Civ. Jury Instr. 1305B). Accordingly, for the reasons explained for Plaintiffs' Fourth Amendment and negligence claims, summary judgment must be denied for Plaintiffs' battery claim as well.

20

## X.     STEELMON VIOLATED THE BANE ACT

Under California's Bane Act, beyond showing a civil rights violation, plaintiffs must only show the defendant acted with specific intent to violate an individual's rights. *See B.B. v. County of Los Angeles*, 25 Cal.App.5th 115, 129-33 (2018), *rev'd on other grounds*, 10 Cal.5th 1 (2020). A "reckless disregard for a person's constitutional rights is evidence of specific intent to deprive [him] of those rights." *Reese v. County of Sacramento*, 888 F.3d 1030, 1045 (9th Cir. 2018).

Steelmon violated Oscar's right to be free from excessive force and, viewing the evidence in Plaintiffs' favor, demonstrated reckless disregard. There was no immediate threat when Steelmon fired; Oscar was facing away, not reaching for or touching the gun, barely awake, and in an obvious stupor. Oscar had harmed or threatened nobody. Although Steelmon knew or should have known Oscar could not understand his commands, he made no attempt to designate a Spanish-speaker until immediately before firing. These factors show Steelmon "at least recklessly disregarded whether" the force was "more than necessary under the circumstances." *Rios v. City of Los Angeles*, 2:21-cv-05341-RGK-MAA, 2022 WL 17219086, at *4 (C.D. Cal. Aug. 25, 2022); *see Garcia v. City of Azusa*, CV 22-3457-MWF (JPRx), 2023 WL 9420513, at *8 (C.D. Cal. Dec. 1, 2023).

## XI.     CONCLUSION

Summary judgment should be denied.

DATED: March 13, 2026       **LAW OFFICES OF DALE K. GALIPO**

By:    */s/ Benjamin S. Levine*
      Dale K. Galipo
      Benjamin S. Levine
      Attorneys for Plaintiffs

**CERTIFICATION OF COMPLIANCE WITH WORD LIMIT (L.R. 11-6.1)**

The undersigned, counsel of record for Plaintiffs, certifies that this brief contains 7,000 words, which complies with the word limit of L.R. 11-6.1.

DATED: March 13, 2026          **LAW OFFICES OF DALE K. GALIPO**

By:     */s/ Benjamin S. Levine*
Dale K. Galipo
Benjamin S. Levine
Attorneys for Plaintiffs

PLAINTIFFS' OPPOSITION TO DEFENDANT SEAN STEELMON'S MOTION FOR SUMMARY JUDGMENT AND/OR PARTIAL SUMMARY JUDGMENT OF ISSUES