# Exhibit 1
## (Sean Steelmon Deposition Transcript Excerpts)

1          UNITED STATES DISTRICT COURT

2          CENTRAL DISTRICT OF CALIFORNIA

3                  --oOo--

4

5   NELSON VASQUEZ, ET AL.,

6          Plaintiff,

7

8   v.                    Case No.  8:24-cv-02421-FLA-JDE

9   CITY OF LOS ANGELES; SEAN
    STEELMON; and DOES 2 through 10,
10  inclusive,

11         Defendants.
    _____/

12

13

14        STENOGRAPHIC REPORTER'S TRANSCRIPT OF

15           REMOTE VIDEO DEPOSITION OF

16               SEAN STEELMON

17            ***UNSEALED PORTION***

18         WEDNESDAY, OCTOBER 8, 2025

19

20  Reported Stenographically by:

21  KIMBERLY D'URSO, CSR 11372, RPR

22  Job No.  19426

23

24

25

1    recalling exact incidents.

2         Q.    Okay.  How about pepper spray?  Had you used

3    that in the field before?

4         A.    No.

5         Q.    Let's talk about this incident that happened on

6    October 7th, 2023.  Do you recall your shift hours at

7    the time?

8         A.    Yes.

9         Q.    What were your shift hours?

10        A.    I was assigned Watch 3.  Shift hours were 1915

11   to 0715.

12        Q.    So 7:15 to 7:15, essentially?

13        A.    Yes.

14        Q.    How old are you now?

15        A.    Tough question, 39.

16        Q.    I was trying to ask you an easy one.

17              How tall are you?

18        A.    Approximately 5'9.

19        Q.    How much do you currently weigh?

20        A.    260.

21        Q.    What was your weight, approximately, at the

22   time of the incident?  Was it about the same?

23        A.    Probably about the same, yes.

24        Q.    What information did you have regarding the

25   call, before you got to the scene?

1    A.   When the call came out, we were on an unrelated

2    call nearby.  We heard the radio call broadcast over the

3    air, stating it was a 415, man with a gun, in or near a

4    dark pickup truck, in the area of Sherman Way and

5    Variel.  We heard that a supervisor had bought the call

6    and was responding, and we decided to respond as well,

7    to assist.

8    Q.   Okay.  Let me stop you there.

9         "415, man with a gun," what does that

10   essentially mean, the "415" part?

11   A.   Disturbing the peace, causing a disturbance,

12   and armed with a gun.

13   Q.   Okay.  The "supervisor had bought the call,"

14   what does that generally mean?

15   A.   "Bought" is just a term that we use -- it's --

16   he requested the call be assigned to him.  He broadcast

17   it over the -- over the radio for the RTO to assign the

18   call to him.

19   Q.   And do you know what supervisor that was?

20   A.   Sergeant Talbot.

21   Q.   Do you know how to spell his last name?

22   A.   T-A-L-B-O-T.

23   Q.   Was he your supervisor on that shift?

24   A.   I don't recall if he was on our shift or

25   another shift, but he was a patrol supervisor; so, yes.

1    Q.    Did you have any information as to the names of

2    any of the suspects?

3    A.    No.

4    Q.    Any description of height, weight, age?

5    Anything like that?

6    A.    I don't recall if an accurate suspect

7    description was given in the comments of the call.

8    Q.    Anything about clothing?

9    A.    I don't recall a clothing description.

10    Q.    Any information that any shots had been fired?

11    A.    No.

12    Q.    Any information that anyone had pointed a gun

13    at anyone?

14    A.    No.

15    Q.    Any information that anyone had been injured?

16    A.    No.

17    Q.    Did you have information as to the number of

18    suspects?

19    A.    I believe the radio call only mentioned the one

20    suspect, armed with a gun.

21    Q.    Did you have an understanding as to when the

22    call came in versus when you got to the scene; in other

23    words, how much time had passed?

24    A.    No.  I don't recall exactly when the call was

25    generated.  I heard it when it was broadcast initially,

1    over the air, and that's when we responded.

2        Q.    And when you say "we," who are you referring

3    to?

4        A.    My partner officer.

5        Q.    And who is your partner officer?

6        A.    Officer Tamate.

7        Q.    Is that spelled T-A-M-A-T-E?

8        A.    Yes.

9        Q.    Is Officer Tamate bilingual, meaning he speaks

10   English and Spanish?

11       A.    I don't know to what extent he is fluent in

12   Spanish.  I know that I have heard him communicate with

13   various people using Spanish language.  I don't know how

14   fluent he is, but he has spoke it in front of me in the

15   past.

16       Q.    Would it be fair to say that you were aware he

17   spoke at least some Spanish?

18       A.    Yes.

19       Q.    And are you, yourself, a Spanish speaker?

20       A.    No.

21       Q.    Do you understand Spanish at all?

22       A.    Very little.

23       Q.    Had you responded to a 415, man with a gun

24   call, before in your career?

25       A.    Yes.

1        A.    Yes, he was still in his car.

2        Q.    At some point, did other officers arrive?

3        A.    Yes.

4        Q.    When did you first notice other officers

5   arriving?

6        A.    Well, Sergeant Talbot was on the far east end

7   of the parking lot.  He appeared to be waiting for other

8   officers to respond since he is a supervisor, he's

9   employed as an L-car or a loan officer in the car.  And

10  he was stopped a ways away, waiting for other officers

11  to arrive.

12              When me and my partner arrived and spotted the

13  vehicle, we were driving eastbound Sherman Way,

14  approaching Variel.  We decided to make a left-hand turn

15  onto Variel and go northbound, to enter the parking lot.

16  That way, we didn't cross in front of the suspect

17  vehicle on Sherman Way as we passed, because, there is a

18  large median that prevents you from making any left turn

19  from eastbound lanes.

20              As we approached -- or as we continued

21  northbound Variel, we essentially were parallel with

22  suspect vehicle.  My partner and I, we both tried to look

23  from a distance into the suspect vehicle and look for

24  anybody sitting inside, any hands on the wheels, any sign

25  that the vehicle was occupied.

1          We then entered the parking lot, continually

2   discussing tactics, what we see, what we -- where the

3   truck is, and et cetera.  Officer Tamate positioned the

4   car directly behind the suspect vehicle, about a car

5   length, car length and a half behind it.

6          Then as we exited our vehicle, Officer Tamate

7   began ordering the occupants of the vehicle to put their

8   hands up and come out of the vehicle.

9          A few moments later, another patrol unit pulled

10  in along side on my right-hand side, in what could be

11  termed a "high-risk formation."

12      Q.   Okay.  And who was in that other vehicle, if

13   you know?

14      A.   Officer Mirzoyan and Officer Phan.

15      Q.   Do you know how to spell either of those names?

16      A.   I could try, but I don't know.

17      Q.   Okay.  We'll try to get those for our court

18   reporter later.

19          MR. TOUCHSTONE:  I can tell you now, Dale, if

20   you like.

21          MR. GALIPO:  That would be great, Jim.

22          MR. TOUCHSTONE:  Yeah.  Mirzoyan is

23   M-I-R-Z-O-Y-A-N.  Phan, P-H-A-N.

24          MR. GALIPO:  Thank you, Jim.

25   BY MR. GALIPO:

```
 1        Q.    Okay.  So let me just back you up a little bit.

 2              Were you, at some point, trying to observe what

 3     was going on in the pickup truck from about a hundred

 4     yards away?

 5        A.    Yeah.  I don't know the exact distance we were,

 6     but when we were making the left-hand turn and going

 7     northbound Variel -- yeah, it's hard to estimate.

 8     Seventy-five, a hundred yards, approximately, from the

 9     suspect vehicle, at that point.

10        Q.    And were you driving or the passenger in your

11     car?

12        A.    I was the passenger.

13        Q.    Was the front of the truck facing southbound?

14        A.    Yes.

15        Q.    Could you tell if the engine was on or off from

16     that distance?

17        A.    I didn't see any obvious signs that the engine

18     was running.  Couldn't observe, like, shaking with idle

19     or any exhaust fumes or anything like that.

20        Q.    Any lights on, either outside or inside, from

21     what you could see at that distance?

22        A.    No.

23        Q.    Any movement in the car that you could see?

24        A.    None.

25        Q.    And then it sounds like you went to about --
```

1    did you say a car length or a car length and a half

2    behind it?

3        A.    Approximately.

4        Q.    Were you offset to one side or the other?

5        A.    No.  We were directly behind the vehicle.

6        Q.    Up to that point in time, had you talked about

7    any tactics with Sergeant Talbot?

8        A.    Personally, with Sergeant Talbot, regarding

9    this incident, no, because he was on the far end of the

10   parking lot, well out of earshot and communication range

11   at this point.

12           My partner and I, we -- we had worked together

13   on and off for approximately 13 years.  We've been

14   involved in multiple situations and we discuss tactics

15   regularly.

16           While we were responding to the call, we were

17   discussing tactics.  We were discussing the comments of

18   the call, where the suspect vehicle could be, where the

19   suspect could be, et cetera, et cetera.

20       Q.    Okay.  Did you -- do you know if you had a

21   police radio, such that you could communicate over the

22   police radio with Sergeant Talbot, if you wanted to?

23       A.    Yes.

24       Q.    And do you know if your vehicle was equipped

25   with a PA system?

1    A.    Yes, it was.

2    Q.    And you had a body-worn camera, obviously, on

3    your person?

4    A.    Yes.

5    Q.    And was it soon after you pull the car length

6    or a car length and a half behind the truck that the

7    other patrol vehicle pulled up?

8    A.    I don't know the exact time frame.  I know that

9    when we arrived me and my partner both exited the

10   vehicle.  We activated our forward-facing spotlights to

11   try and light up and to see into the vehicle, which we

12   were unsuccessful.

13        Officer Tamate attempted to call out the

14   occupants, and about -- probably after Officer Tamate

15   called out the occupants is when the other officers

16   arrived.

17   Q.    And when they pulled up, do you recall whether

18   they pulled to the passenger side of your vehicle or the

19   driver's side?

20   A.    They pulled along the passenger side, next to

21   where I was standing.

22   Q.    And was their vehicle, more or less, parallel

23   with your vehicle?

24   A.    No.  Their vehicle was offset and pointed

25   towards the suspect vehicle, if that makes sense.

1    Q.    Okay.  So your vehicle would have also been

2  generally facing south?

3    A.    Yes.

4    Q.    And if I'm understanding you correctly, their

5  vehicle was more direction southeast?

6    A.    Yes.

7    Q.    Now, you indicated that you discussed tactics,

8  to some extent, with your partner, on your way to the

9  call?

10    A.    Yes.

11    Q.    What tactics did you discuss with him?

12    A.    General, what the comments of the call were --

13  call -- excuse me -- were.  We discussed contact and

14  cover.

15        I had decided, based on the comments on the

16  radio call, that I was going to deploy my department

17  approved Remington 870 shotgun.  Because the chance,

18  based on the comments, that we would be -- we could be

19  confronted with a potentially armed suspect, and so I

20  pre-deployed that.

21        And so from there, it would be understood that

22  I would be contact.  I would be the direct cover officer

23  or DCO.  Officer Tamate would handle communications.

24        And those roles can be reversed.  Like I said,

25  we had worked with each other for the last 13 years, and

1    we've been on tactical situations.  We've worked

2    scenarios together.  I know -- I'm -- I'm familiar with

3    his reactions, he's familiar with mine, and we can kind

4    of play off of each other.

5         Q.   Do you believe that Officer Tamate was aware

6    that you were not a Spanish speaker?

7         A.   I don't know if he was aware or not.

8         Q.   Well, having worked with him for 13 years, had

9    you ever spoken Spanish in front of him?

10        A.   No.

11        Q.   Had you ever -- strike that.

12             Had you been previously on high-risk felony

13   stops with Officer Tamate?

14        A.   Yeah.

15        Q.   And do you have an estimate as to how many?

16        A.   It would be a guess, but I would probably say

17   multiple.

18        Q.   And did you have training with respect to

19   high-risk felony stops?

20        A.   Yes.

21        Q.   How -- you approached, obviously, the passenger

22   side of the truck at some point; is that correct?

23        A.   Yes.

24        Q.   And when did you activate your body-worn

25   camera, chronologically, in the event?

1    A.   After reviewing the body-worn video, I realized

2    that I was late on activating my camera.  Based on the

3    situation, my attention was on the suspect vehicle, the

4    threat potentially posed by the suspect vehicle, and my

5    duties there.

6         As soon as I realized that I failed to activate

7    my camera, I activated it.  I believe that was at some

8    point on the passenger side of the vehicle.

9    Q.   Do you know when Officer Tamate activated his

10   camera?

11   A.   No, I do not.

12   Q.   Prior to you approaching the vehicle, was there

13   a time frame that you were in the open door area on the

14   passenger side?

15        MR. TOUCHSTONE:  Vague and ambiguous as to what

16   vehicle.

17        MR. GALIPO:  Your patrol vehicle.

18   BY MR. GALIPO:

19   Q.   So, in other words, I'm envisioning your patrol

20   vehicle stopped about a car length, a car length and a

21   half behind the truck, and you're both facing south; is

22   that correct?

23   A.   Yes.

24   Q.   And obviously, you got out of your car at some

25   point; correct?

1      A.    Yes.

2      Q.    I'm wondering if you stayed in the open V on

3  the passenger side for some period of time before

4  approaching?

5      A.    Yes.

6      Q.    And how long would you estimate you were in

7  that open V for?

8      A.    I don't -- I don't know.  A minute.  It's hard

9  to estimate.

10     Q.    And during the time frame you were in the open

11 V on the passenger side, do you know if Officer Tamate

12 was in the open V on the driver's side?

13     A.    Our vehicle was a Ford Explorer police vehicle.

14 It's a little bit more high-profile than, say, the Crown

15 Victoria or the Dodge Charger.  And so it can be

16 difficult to see exactly where your partner is.  But,

17 yes, I believe he was positioned behind his driver --

18 open driver door as well.

19     Q.    And at that point, were you treating it as a

20 high-risk felony stop?

21     A.    We were positioned as if in a high-risk stop.

22 It didn't quite meet the criteria of a high-risk stop

23 because we didn't -- first off, we didn't actually stop

24 the vehicle.  The vehicle was already stopped.  We

25 didn't know if anyone was inside the vehicle.  We didn't

1    see anybody.  We hadn't seen any movement.

2        And after calling out to -- after the call-out

3    was conducted, we didn't see any movement then.  We

4    didn't see any brake lights light up, any jostling or

5    heads pop up.  The rear windows were dark tint.  Even

6    with our spotlights, we were unable to see through.

7        Q.   Did you give any commands from -- during the

8    time that you were inside the V on the passenger side?

9        A.   I don't believe so.  After Officer Tamate

10   attempted a call-out, I discussed with him what we

11   thought, or what I was thinking, and asking his opinion.

12   And then as Officer Mirzoyan and Phan arrived, I

13   discussed with them that, at that moment, since we

14   hadn't seen any movement, we had seen no evidence of

15   anybody inside the vehicle, that I believed the vehicle

16   may be empty or not related, or that the sus- -- the

17   suspect in the radio call could have left the vehicle

18   and could be walking around one of the many taco stands

19   that were directly south of the vehicle or, in general,

20   in the parking lot.

21        Q.   Do you recall what Officer Tamate said, in

22   terms of the call-out, when he was on the driver's side?

23        A.   I don't recall his exact words, but it probably

24   was something to the effect of, "Hey, anybody inside the

25   car, put your hands up or step out."

1      Q.   Do you recall if that was said in Spanish or

2   English?

3      A.   I believe English.

4      Q.   Was the PA system used at that point?

5      A.   No.  The newer vehicles, the Explorers and the

6   Chargers, they have a problematic PA system.  To

7   properly use the PA system, one would have to sit inside

8   of the vehicle with all of the doors closed and all of

9   the windows up, broadcast your PA, and then it would be

10  audible.

11           But even at that extent, there's a lot of

12  feedback in that system, and the volume is not -- not

13  nearly as much as, say, the Crown Victoria in the past.

14           So, at that moment, it's me and Officer Tamate.

15  I -- I wouldn't have thought it safe to sit inside the

16  vehicle, close all the doors, and operate the PA system.

17     Q.   Right.  But at that point, you didn't even know

18  if there was anyone in the car; is that correct?

19     A.   Yes.

20     Q.   Did you consider initially positioning your car

21  a little greater distance than the car length or car

22  length and a half, until you could determine if someone

23  was in the vehicle?

24     A.   We were limited as to -- we were limited to as

25  far as we could deploy behind the vehicle, based on

1    where the vehicle was stopped in the parking lot.  It

2    was in -- I want to say the second row of parking

3    stalls.  And behind us was the CVS and an abandoned

4    church, kind of a large strip mall.

5          And so in the space that we deployed was just

6    enough that we could get our vehicle turned behind the

7    suspect vehicle and exit.  There -- we would only be

8    able to back up maybe 5 to 10 feet more before colliding

9    with the sidewalk or the building.

10   Q.    Was the truck parked in a parking space?

11   A.    I don't remember if it was between the lines of

12   a parking space, but generally in a row of parking

13   spaces, yes.

14   Q.    What type of vehicle, if you recall, did the

15   other officers have, the other patrol unit that pulled

16   up on your passenger side?

17   A.    They were in a Dodge Charger.

18   Q.    Do you know if that has a PA system in it?

19   A.    It does.

20   Q.    You said that you had some discussion with your

21   partner about how to proceed after there was no response

22   and no movement inside the car?

23   A.    Yes.

24   Q.    Can you tell me about that discussion, please?

25   A.    I don't -- I don't know exactly what was said.

1    I don't recall.  But it was to the extent of, "Hey, I

2    don't -- I don't see anybody.  Do you see anybody inside

3    the vehicle?"

4            "No."

5            "Okay.  Do you want to clear this car?"

6            "Yes."

7            Then I consulted with Officer Mirzoyan, who was

8    on my right-hand side, next to his vehicle, going, "Hey,

9    do you see in the car?  Do you see anybody?"

10           "No."

11           "Okay.  Well, let's form what is called a

12   'stick,' and approach on the passenger side of the

13   suspect vehicle."

14      Q.   Any other discussions that you generally recall

15   regarding tactics, other that what you've told me?

16      A.   No.  No.

17      Q.   And --

18      A.   Yeah, go ahead.

19      Q.   No.  I'm sorry.  Go ahead.

20      A.   I was just going to say, up until that point,

21   knowing Officer Tamate's tenure and Officer Mirzoyan's

22   abilities and time on the job, the tactics that we were

23   employing at that point were very basic or boiler plate.

24   I was confident everybody knew their responsibilities in

25   those cases.

1          When we decided to form a stick, I was the

2    officer equipped with the shotgun.  I would clearly be

3    the contact officer.  I would be the DCO.  Behind me, it

4    would be understood that the officer behind me would be

5    either transitioned to less lethal or an intermediate

6    force option or be part of the arrest team, along with

7    the person directly behind him.

8          The last person on the stick is always going to

9    handle communications, typically.  And at that point, I

10   hadn't seen him or knew where he was -- sorry -- he was

11   on the driver's side, but I imagined Sergeant Talbot was

12   there, too; and he would take the supervisory role at

13   the rear of the stick as well.

14   Q.   At some point did you see Sergeant Talbot

15   approach your location?

16   A.   I did not.  My view was obstructed by my police

17   vehicle.

18   Q.   Did you have any communications with Sergeant

19   Talbot before approaching the vehicle?

20   A.   No.

21   Q.   So when you said "DCO," is that "designated

22   cover officer," or something else?

23   A.   Yes.

24   Q.   So you were going to be the contact and the

25   cover officer?

1      A.   Yes.

2      Q.   And then what did you understand the other

3  officer's role?  You said someone might be less lethal?

4      A.   Yes.  As I am point or the number one position

5  on the stick, my responsibility is relaying the

6  information to the rest of my team or the officers

7  behind me, identifying any possible threats, or if we --

8  if anything changes.  The person behind me could take

9  over as contact and start issuing commands from behind

10  me, or they could transition to, say, a Taser or OC

11  spray, or that -- or their responsibility could change

12  to being part of an arrest team with another officer.

13          And a tactical movement, the movement -- or the

14  situation is fluid and can change.  Officers need to be

15  able to adapt.  Roles can switch.  I may be point with a

16  shotgun as we initiate the approach and something

17  happens, and now I'm rear, handling communications.

18  Officers typically adapt and think on their feet.

19      Q.   Okay.  So with regards to your choice of the

20  shotgun, as opposed to your handgun -- I'm assuming you

21  had a handgun on you?

22      A.   Yes.

23      Q.   What type of handgun?  Was that a .45 caliber

24  or something else?

25      A.   Yes, it was a .45 caliber.

1    a firearm, if he had the ability to take cover, then the

2    shotgun would be the appropriate weapon system needed.

3        Q.    When you selected the shotgun, did you need to

4    get the supervisor's approval for that?

5        A.    No.

6        Q.    Was there anyone specifically designated less

7    lethal in the tactical conversations?

8        A.    Like I mentioned before, this was a basic

9    maneuver.  We've cleared cars, thousands and thousands

10   of times.  The positions and roles are understood in

11   that movement.

12          We're all equipped with Tasers on our person.

13   We're all equipped with OC spray on our person.  And so

14   it would be the officers behind me, their role would

15   adapt to as the situation unfolded, and could transition

16   to a Taser, if needed or if prudent.  Yeah.

17       Q.    Okay.  So basically you're saying, based on

18   training, they had the option to go less lethal, but no

19   one specifically said, "You're going to be less lethal,"

20   for example?

21       A.    Yeah, no.  Nobody was specifically tasked with

22   being less lethal, no.

23       Q.    And was anyone -- was it discussed that if

24   there are occupants in the car and they're only

25   Spanish-speaking, who would do the talking?

1          A.    No.

2          Q.    I'm assuming one of the factors in your

3     decision to approach in the manner you did, on the

4     passenger side, was you not seeing anyone in the car and

5     seeing any movement in the car.  Would that be correct?

6          A.    We decided -- I decided to form the plan to

7     approach the vehicle, based on what I knew at the time.

8     I had a radio call, a 415, man with a gun, in or around

9     a dark pickup truck.  We had observed no signs of any

10    occupants inside.

11              We didn't see any shadows.  We didn't see any

12    movement.  We used our spotlights to light up the

13    vehicle; still saw no movement or shadows.

14              When calling out to the potential occupants in

15    the vehicle, we got no response, no jostling, no brake

16    pedals, brake pedal getting hit and the lights flashing

17    momentarily.  Nothing.

18              I didn't see any smoke or steam coming off the

19    vehicle.  There was no steam on the windows indicating

20    somebody sleeping for a long period of time inside the

21    vehicle.

22              So at that point, I was -- I believed that the

23    vehicle was potentially empty, and I thought the suspect

24    could be on foot in the area.  Like, I -- I didn't

25    explain earlier, but the area is a large parking lot in a

1    strip mall.  Directly north of the strip mall is a lot of

2    different apartment buildings.

3              That parking lot is used for overflow parking

4    for those apartment buildings as well.  So it's not

5    uncommon for cars to be parked there all night.

6              Also, on Sherman Way, there's multiple popup

7    taco stands running along Sherman Way, and there was a

8    couple directly in front of the suspect vehicle, with

9    vendors and pedestrians or customers in that area.  And

10   so believing the vehicle was empty and believing that

11   this vehicle may not be involved, may not be the suspect

12   vehicle, or the suspect could be on foot nearby, I wanted

13   to further investigate, confirm that no one was inside

14   the vehicle, and investigate further from there.

15        Q.   Okay.  What I'm getting at, I think -- and we

16   talked about the high-risk felony stop -- but if you

17   believe someone may have a gun, some of your training is

18   to take cover when you can.  Is that fair?

19        A.   Yes.  Typically, a high-risk stop, you

20   generally call the occupants out from cover.  But in

21   this particular case, we had not stopped the vehicle.

22   We did not know if there were occupants.  We attempted

23   to call out the occupants from cover, but were

24   unsuccessful.

25        Q.   Right.  I'm --

1    A.    Yes.  Sorry.

2    Q.    I want you to be able to finish, if you want to

3  finish your answer.

4    A.    I was just going to say, as typically how a

5  high-risk stop is handled, once the occupants are called

6  out and either proned out on the street or placed at a

7  position of disadvantage, then the next step is to clear

8  the vehicle, in a stick.

9         You approach the vehicle on whichever side you

10  deem safest.  You approach.  You clear the vehicle.

11  Alert the rest of the units that the vehicle is cleared,

12  and then approach the suspects and take them into

13  custody.

14    Q.    Okay.

15    A.    Since we had no response and we had no

16  occupants at that moment, we moved to the next step.

17    Q.    Right.  I guess what I was trying to get at, if

18  you had observed people in the car, hypothetically, your

19  tactical approach might have been different?

20    A.    Yes.

21    Q.    Okay.  Because if you had observed movement or

22  people in the car, then you may have stayed in a

23  position of cover and tried to see if you could get the

24  people to come out of the car?  Is that fair?

25    A.    Yes.  If we were aware -- we had confirmation

1    that someone was inside the vehicle, I would have stayed

2    behind cover, and then we could discuss various

3    different tactics that could be deployed from there.

4         Q.   And I take it in a high-risk felony stop, if

5    you're calling people out, one of the things you want to

6    figure out is what language they speak.  So if it turns

7    out that they may only be Spanish-speaking, then you

8    would want to have an officer who speaks Spanish to

9    speak with them.  Is that generally a fair statement?

10        A.   Yes.

11        Q.   So when you start to approach, you would be the

12   first one in the line?

13        A.   Yes.  I was the point officer, and I would be

14   in the number one position.

15        Q.   And to your knowledge, was everyone initially

16   approaching on the passenger side?

17        A.   I couldn't see behind me; but, yes, I believed

18   everybody was in a staggered column or a stick, as we

19   call it, behind me.

20        Q.   Was there any discussion about having anyone

21   approach on the driver's side?

22        A.   No.

23        Q.   And at some point, as you were approaching, I

24   take it you saw that there were people in the car?  Is

25   that correct?

1        A.    Yes.

2        Q.    And where were you in relation to the car when

3    you first noticed there were occupants in the car?

4        A.    So as we approached -- as we approached, I was

5    about the passenger rear taillight area when I observed

6    that the extended cab rear window on the passenger

7    side -- which is not a roll-down -- it was a pop-out --

8    the older style windows -- was ajar.  Using my shotgun's

9    equipped tactical light, I illuminated the gap in

10   between that light and observed somebody laying in the

11   front passenger seat.

12       Q.    Okay.  And then so you would have observed that

13   when you were towards the rear of the car, on the

14   passenger side?

15       A.    Yeah.  I would say we were at or just past the

16   rear bumper of the passenger side of the vehicle.

17       Q.    And -- and at that point, did you tell the

18   other officers, "There is someone in the car; let's

19   tactically reposition behind cover"?

20       A.    I immediately alerted my team that I saw

21   someone sitting in the front passenger seat.  My

22   partner, Officer Tamate, began an additional call-out,

23   yelling out to the occupant to put his hands up.  As I

24   was -- as -- because when I saw, we stopped there and

25   held position there.

1       Officer Tamate started giving commands, ordered

2   loud, verbal orders, I believe in English and Spanish,

3   while I continued to observe the passenger through that

4   cracked window.  At no point did I see any movement.

5       I had visual of the back of the passenger's

6   neck and back of their head.  The neck never moved.  The

7   head never moved.  Officer Tamate even slammed hard on

8   the truck bed to jolt the occupant awake, and there was

9   still no movement.

10      At that point, I was concerned for the

11  well-being of that occupant.  Like we said, we had a

12  pretty vague radio call, and I was concerned -- what was

13  running through my head was:  Is this a crime scene?  Did

14  we -- were we called to the area and discovered a -- a

15  shoot -- the end of a shooting?  Was this person

16  unconscious?  Were they in medical distress?  Were they

17  possibly overdosing?  Et cetera.

18      Q.   Okay.  So it sounds like after first observing

19  that there was an individual in the passenger seat, you

20  did not request the other officers to tactically

21  reposition to cover.  Is that fair?

22      A.   No.  Based on -- based on everything I had

23  observed up until that point, I was confident that we

24  could safely further investigate and verify the

25  condition of the passenger.

```
 1        Q.   And in terms of -- and at some point, you
 2   noticed someone in the driver's seat; correct?
 3        A.   Yes.  Down the line, from this point, yes.
 4        Q.   When did you first notice someone in the
 5   driver's seat?
 6        A.   So as we -- we continued our approach, slow and
 7   methodical, as I approached on the passenger side, I'm
 8   looking primarily for the occupant's hands, the front
 9   passenger occupant.  I want to see if he's holding a
10   weapon, or where his hands are, if they're concealed, or
11   that's going to change.
12             I could see the subject wasn't holding any
13   weapon.  He was -- he appeared unconscious.  I couldn't
14   see any visible signs of injury, but that was still a
15   concern.
16             As I continued to investigate, he was -- he
17   appeared unconscious, so I felt safe and that it was
18   reasonable that I could push past the B pillar,
19   momentarily, to look into the rest of the vehicle and
20   see what else I can see from that point.  And that is
21   when I discovered that there was another occupant in --
22   seated in the front driver's seat, who also appeared
23   unconscious.
24             MR. TOUCHSTONE:  Before you get too far into
25   this, is now a convenient time for a break?
```

1          MR. GALIPO:  I was going to go about one more

2    minute if we could make it there?

3          MR. TOUCHSTONE:  Yeah.  Sure.  Sure.

4          MR. GALIPO:  Okay.  Thank you.

5    BY MR. GALIPO:

6     Q.   And when you saw the driver in the driver's

7    seat, at that point did you attempt to tactically

8    reposition to cover?

9     A.   When I saw the driver, I tried to scan the

10   interior of the vehicle, the center console, and I

11   believe it was a clothing item on the center console

12   obstructed a portion of my view, but -- no, I was -- I

13   was scanning, trying to gather more information, as I

14   could, while the occupants appeared to be unconscious.

15        And then Officer Tamate opened the door, the

16   right passenger -- tested the door handle and opened the

17   door.  That's when we redeployed.  I moved back to --

18   towards the B pillar of the vehicle and maintained cover

19   there.

20    Q.   And in terms of cover, are you trained that

21   having cover in certain tactical situations where

22   someone could have a firearm is important for officer

23   safety?

24    A.   Yes.

25    Q.   And are you trained that it's also potentially

1    important for the safety of the suspects?

2        A.    Yes.

3            MR. GALIPO:   Okay.   I think, Jim, is this a

4    good time for everyone?   We'll take like a ten-minute

5    break?

6            MR. TOUCHSTONE:   That would be great, Dale.

7            MR. GALIPO:   Okay.   Sure.   We'll have our

8    videographer read us off.

9            THE VIDEOGRAPHER:   We're going off the record.

10   The time is 11:11 a.m.

11           (Break taken.)

12           THE VIDEOGRAPHER:   We are back on the record.

13   The time is 11:27 a.m.

14   BY MR. GALIPO:

15       Q.   Okay.   Are you ready to continue?

16       A.   Yes.   Thank you.

17       Q.   You're welcome.

18           I can't remember if I asked you this, but did

19   you have specific information as to the type of vehicle?

20       A.   Just the comments of the radio call.   I believe

21   they had mentioned a dark or a gray pickup truck.

22       Q.   Did you have information as to where it was

23   positioned or parked?

24       A.   I believe the comments stated it was in front

25   of the CVS.

1    Q.    So are you saying, as you started approaching

2    the vehicle, you weren't even sure that was the correct

3    vehicle; is that fair?

4    A.    Yes.

5    Q.    And you weren't sure whether the suspect in the

6    call was in the vehicle or not; is that also fair?

7    A.    Yes.

8    Q.    And when you saw the two individuals in the

9    vehicle initially, you didn't know if either one of them

10   was the suspect of the call or not?  Would that also be

11   a fair statement?

12   A.    Yes.

13   Q.    So, obviously, you would have had your shotgun

14   in either one or both of your hands as you approached?

15   A.    Yes.  It would be in both my hands.

16   Q.    And with respect to the passenger -- I think

17   you've already commented on this -- but did he look

18   unconscious or passed out, from your perspective?

19   A.    Yes.

20   Q.    And did you have the impression that the

21   passenger might be passed out drunk?

22   A.    Potentially.  There was also the possibility

23   that it could be just a medical issue.  It could be --

24   he could be injured, or it could be a narcotics-related

25   overdose; but, yes.

1    Q.   And what was it about your observations and his

2    responses, or lack thereof, that made you believe this

3    guy is passed out or unconscious, for some reason?

4    A.   His position.  His eyes were closed.  We had

5    attempted multiple callouts at that point.  We banged on

6    the vehicle.  We were flashing flashlights in his face,

7    and he was -- we were unable to wake him.

8           After opening the door, Officer Tamate even

9    jostled and raised him out of the seat, essentially, and

10   the suspect still appeared to be unconscious and asleep.

11   Q.   When the door was opened by Officer Tamate, I

12   take it that would be the passenger door?

13   A.   Yes, the front passenger door.

14   Q.   Could you smell any alcohol coming from the

15   passenger at that time?

16   A.   I personally didn't; but from my position,

17   being in an open area, it probably could have been

18   difficult to smell alcohol.

19   Q.   And so the driver, did he also appear to be

20   unconscious or passed out for some period of time?

21   A.   Yes.

22   Q.   And for the same reasons; in other words, the

23   way he was positioned, the eyes closed, the lack of any

24   response to any stimuli?

25   A.   Yes.

1    with them?  Were they hurt?  Were they victims?  Do they

2    need assistance?  Et cetera.

3        Q.   Was there any further tactical discussions

4    before -- and this is before you saw the handgun --

5    because I realize, at some point, you saw a portion of a

6    handgun in the driver's waistband; is that correct?

7        A.   Yes.  No, in the matter of seconds that this

8    took -- that this period of time took place in, no.  We

9    didn't have any discussions about tactics at that -- at

10   that point, no.

11       Q.   Do you recall if -- what commands, if any, you

12   were giving before you -- you saw the -- a portion of

13   the firearm in the waistband?

14       A.   No.  I don't recall if I gave any commands or

15   not.  I don't recall.  I believe Officer Tamate was

16   trying to wake the occupants.

17       Q.   And what was Officer Tamate doing, based on

18   your observations, to try to wake the occupants?

19       A.   Well, we attempted to call them out multiple

20   times, call out and wake them up.  Officer Tamate had

21   already banged on the truck very loudly.  Officer Tamate

22   also opened the door.

23           He physically touched the passenger, attempted

24   to lift him out of the vehicle, but was unsuccessful;

25   and the passenger remained, what appeared, unconscious

1    had a gun and pointing towards it, had he pulled it out

2    of his waistband yet at that point?

3        A.    No.

4        Q.    Had he touched it up to that point in time that

5    you could see?

6        A.    No, not that I could see.

7        Q.    Did you know for sure whether it was a real gun

8    or not?

9        A.    No, but the characteristics that I explained

10   earlier led me to believe that it was a real firearm.

11       Q.    Did you know for sure whether it was loaded or

12   not?

13       A.    No.  But it had a magazine inserted, which

14   would be somewhere someone would carry ammunition to

15   feed the weapon.

16       Q.    Now, prior to you observing the portion of the

17   gun that you've indicated, the driver had essentially

18   appeared to be passed out or unconscious; is that right?

19       A.    Yes.

20       Q.    And one of the considerations you thought, he

21   might have been passed out drunk?  That was one of the

22   things you thought was a possibility?

23       A.    Yes.

24       Q.    And you didn't know at that point whether the

25   driver understood English or not; is that correct?

1          A.    Yes.

2          Q.    And he appeared to be Hispanic; is that also

3    fair?

4          A.    Yes.

5          Q.    And one of the things you were thinking is you

6    needed to get a Spanish speaker to make sure this guy

7    understands what we're telling him?  Is this also what

8    you were trying to do?

9          A.    Yes.  Eventually in the incident, I -- I

10   requested a Spanish speaker.

11         Q.    Right; because, obviously, you wanted to make

12   sure, if commands were being given to him, that he

13   understood the commands; correct?

14         A.    Yes.

15         Q.    And hopefully, you know, would comply with them

16   if -- if that would be the best outcome; right?

17         A.    Yes.

18         Q.    And since you don't know Spanish, and he might

19   have been Spanish-speaking only, that's one of the

20   reasons you thought it would be helpful to get someone

21   giving him the commands in Spanish.  Is that generally a

22   fair statement?

23              MR. TOUCHSTONE:  Objection.  Calls for

24   speculation.

25              You can answer.

1              THE WITNESS:   Yes.

2    BY MR. GALIPO:

3         Q.   What commands were you giving him in English,

4    if you recall, after you saw a portion of this object in

5    his waistband?

6         A.   So, as soon as I saw the weapon, I immediately

7    called out to my team.  I yelled, "Gun, gun, gun."  I

8    don't remember -- recall the exact timing or sequence of

9    what I said, but I repeatedly shouted for the suspect to

10   put his hands up, to not move.

11             I warned the suspect, if he touched the gun, I

12   would shoot.  I just repeatedly -- I begged him to not

13   touch the weapon, to keep his hands up, to put his hands

14   on his head.  All of which, the suspect did not comply.

15             He initially -- his hands would come up, and

16   then they would come back down to what, at the moment, I

17   perceived as him gauging my reaction to how close he can

18   get to the weapon.

19        Q.   And were you giving your commands to him in

20   English?

21        A.   Yes.

22        Q.   And do you have any sense as to how much time

23   passed between you seeing the portion of the gun for the

24   first time and you firing your shot?

25        A.   After reviewing the video, approximately 30

```
 1    seconds.
 2         Q.    And after seeing the gun, did you ever try to
 3    tactically reposition to an area of cover?
 4         A.    So when I saw the gun, I was at the B pillar.
 5    At that point, we don't know the relationship of the
 6    occupants.  I know the driver has a weapon in his
 7    waistband, and the passenger was unconscious the last I
 8    had checked.
 9              I was concerned, if an officer-involved
10    shooting did occur, that that passenger would potentially
11    be in the crossfire.  I -- initially, I pushed passed the
12    passenger, kind of leaned over him, and instructed my
13    partner to pull the passenger out of the vehicle and out
14    of harm's way.
15              My partner, Officer Tamate, pulled the
16    passenger occupant out and removed him, somewhere behind
17    me.  I did not see where the passenger went from there.
18    Then I returned.  I redeployed to the B pillar of the
19    vehicle.
20              From that location, I had relative cover behind
21    the pillar.  I had the tactical advantage, in that I can
22    control the situation.  I can see what the suspect is
23    doing.  If the suspect were to reach for that weapon, I
24    would be -- I would see that.  If he were to get that
25    weapon and reach around, he would have to turn his entire
```

1    body around to face me, and I still have that B pillar as

2    additional cover.

3         Q.    Okay.   Was -- was anyone closer to the driver

4    than you were during the time between you seeing the gun

5    and firing your shot, of the officers?   I'm not

6    including the passenger.

7              MR. TOUCHSTONE:   Thank you.   I was going to

8    clarify it.

9              THE WITNESS:   No, I was the closest.

10   BY MR. GALIPO:

11        Q.    And you indicated that Officer Tamate, at some

12   point, pulled the passenger out of the vehicle?

13        A.    Yes.

14        Q.    And you requested him to do that?

15        A.    Yes.

16        Q.    And you already have explained why.

17        A.    Yes.

18        Q.    And then the passenger went somewhere behind

19   you at that point?   You weren't sure where?

20        A.    Yes.   My focus was on the driver, in the

21   vehicle, with the weapon.

22        Q.    And you indicated earlier that you now know

23   Officer Tamate, at some point, repositioned to the rear

24   or driver's side of the vehicle.   Do you believe, based

25   on what you know now, that he did that after he pulled

```
 1    I could hear Dr. Mirzoyan put out a backup for a 415,
 2    man with a gun, which will bring us additional
 3    resources.  And so I'm waiting for those to arrive.
 4            I'm sorry.  I lost track of your question.
 5        Q.   Oh, that's okay.  I was wondering what you did
 6    to try to have someone who's Spanish-speaking give him
 7    the commands?
 8        A.   So I continued to verbalize with him.  I know
 9    Sergeant Talbot attempted to speak in Spanish, but I
10    believe he stopped.  And then ultimately, I requested --
11    I yelled out, "Get me a Spanish speaker."
12        Q.   And to your knowledge, was Officer Tamate, at
13    least to some extent, a Spanish-speaker?
14        A.   Yes.
15        Q.   Do you know if any commands were given in
16    Spanish in between the time you saw the gun and the time
17    you fired your shot?
18        A.   I believe Sergeant Talbot attempted to give
19    Spanish instructions; but other than that, no.
20        Q.   Was that when he used the word "pistola"?
21        A.   No.
22        Q.   That was some other instruction that was
23    attempted by the sergeant?
24            MR. TOUCHSTONE:  Objection.  Misstates his
25    prior testimony.
```

1    BY MR. GALIPO:  Okay.

2        Q.    Okay.  I probably asked a bad question.

3            Someone said "pistola" earlier.  Was that

4    someone other than the sergeant?

5        A.    Yes.  I believe that was Officer Mirzoyan.

6        Q.    Oh, you're right.  Okay.  Sorry about that.

7            So you're then saying that the sergeant

8    attempted to say something in Spanish.  Could you

9    understand what he was saying?

10       A.    No.  And it was difficult for me to hear at the

11   moment, based on just our positioning.  But he -- he

12   attempted to say something in Spanish.  I don't know

13   what it was or what he said.

14       Q.    So, at some point, you became aware that

15   Sergeant Talbot was there; or was that something you

16   learned after the fact?

17       A.    That's something I learned after the fact that

18   he was there.

19       Q.    So I understand that you're saying after the

20   passenger was pulled out of the vehicle, you maintained

21   that position of cover at the B pillar, essentially; is

22   that correct?

23       A.    Yes.

24       Q.    And you felt you had adequate cover there

25   because, as I think you said, if he pulled out the gun,

1    he'd have to turn around and shoot you, and you felt you

2    were in some position of advantage?

3         A.    Yes.  I believed I had the position of

4    advantage.  I even looked through the driver window to

5    make sure nobody had unwittingly walked over there and

6    was standing in the background, in case if a -- if a

7    shooting occurred and rounds went past their target,

8    somebody could be potentially in -- in the background.

9         I considered redeploying back to the vehicles.

10   I deemed the safest and reasonable thing was to maintain

11   my position, because we would have to -- we would have

12   to walk backwards.  I would lose visual on the truck

13   driver and the weapon.  The driver then, while we're

14   trying to walk backwards, could potentially arm himself,

15   turn around and take an armed shot -- sorry -- an aimed

16   shot through the window, without any of us knowing it.

17        The other issue is, I mentioned my background

18   was clear where I was at the B pillar.  If I was to

19   redeploy back to our police vehicles and behind the

20   doors, now in the background between -- or beyond the

21   suspect vehicle and the driver, is the taco stands, I

22   mentioned before, and all the occupants, all the

23   pedestrians, the vendors, the customers, standing there,

24   in front of the suspect vehicle.

25        I did -- I thought the safety thing was to

1  maintain my tactical advantage, where I was at the B

2  pillar, and control the incident as best from there.

3      Q.    Okay.

4      A.    Until --

5      Q.    Did you consider -- it sounds like you at least

6  had considered it as an option of redeploying back.  But

7  you're saying, after considering the factors you just

8  mentioned, you decided not to?

9      A.    Yes, based on -- yes.

10      Q.    Was one factor you considered creating, you

11  know, distance and cover and time, and maybe even being

12  able to communicate with the passenger to see what was

13  going on?  Did you at least consider that?

14      A.    Well, those are options that could be

15  considered.  But in the moment, my focus was on the

16  driver, who had a weapon, and minimizing the risk from

17  there.  Sure, I would love to be as far away as possible

18  from somebody armed with a gun.

19          But at that moment, my -- my responsibility was

20  to protect my officers and protect the citizens that

21  were there from this potentially armed person.  And I

22  felt I could do it reasonably and safe from my position

23  at the B pillar.

24      Q.    And I think you indicated after seeing a

25  portion of the weapon in the waistband, you saw his

1    he made eye contact with me.  At one point, we made eye

2    contact.  I continued to make commands.  He rolled his

3    eyes.  Looked forward.  I gave more commands, and he

4    nodded his head, as if in agreement.

5         And that is when his right hand moved down to

6    the gun.  He touched the gun.  He acquired the grip, just

7    as if I were to reach down and acquire my pistol from my

8    holster.  He acquired the grip.

9         In my mind, the next motion was that gun was

10   coming out.  He was going to point it at me.  He was

11   going to shoot me.  He was going to shoot my partner or

12   shoot anyone else on the team that night.

13       Q.    Okay.  And I think you've already told me, you

14   were, to your knowledge, the closest person to him?

15       A.    Yes, I was.

16       Q.    And you were in that position of cover at the B

17   pillar?

18       A.    Yes.

19       Q.    To your knowledge, did he ever fire that

20   weapon?

21       A.    No.

22       Q.    Did he ever point the weapon at anyone?

23       A.    No.

24       Q.    Was the weapon ever coming in -- removed from

25   the waistband, coming in your direction?

1    A.    I don't know if he began removing the weapon.

2    As soon as his hand moved to the weapon, he acquired his

3    grip, I decided to shoot to stop the threat.  And so my

4    focus was then transitioned to my sights and not looking

5    directly at the weapon.

6    Q.    Did you ever see the weapon removed from his

7    waistband before you fired?

8    A.    No.

9    Q.    How much time would you say passed from the

10    time he touched it to the time you fired?

11    A.    Fractions of a second.

12    Q.    Immediately after you fired, could you see his

13    hands?

14    A.    Immediately after I fired, I saw the impact of

15    my round.  The subject -- the subject immediately

16    slumped over, and his hands kind of bounced off of the

17    weapon and to the side.

18    Q.    So when his hands came up, were they -- did

19    they have any object in them or not?

20    A.    No, they did not.

21    Q.    And where were you aiming when you fired?

22    A.    From my position, I was aiming essentially

23    center mass on the driver.  I couldn't -- I was not

24    facing head-on with him, so I couldn't shoot directly

25    center mass, but I essentially drew a center line on the

1    side of the driver, and I aimed for what would be center

2    mass from the side.

3         Q.    Did both the driver and passenger appear to be

4    Hispanic?

5         A.    Yes.

6         Q.    Did they appear to be similar in age?

7              MR. TOUCHSTONE:  Vague as to "similar."

8              But if you know --

9    BY MR. GALIPO:

10        Q.    Well, close in age.  Let's say within five

11   years of each other?

12        A.    Generally, yes.

13        Q.    And given that they were both passed out in a

14   vehicle at 1:00 in the morning, did you at least

15   consider they both might be passed out drunk?

16              MR. TOUCHSTONE:  Objection.  Asked and

17   answered.  Calls for speculation.  Foundation.

18              THE WITNESS:  Yes, that's possible.

19   BY MR. GALIPO:

20        Q.    Did you ever give a verbal warning you were

21   going to shoot?

22        A.    Yes.

23        Q.    What did you say?

24        A.    I told him, "If you reach for that gun, I'm

25   going to shoot you."

1    side while I maintained cover, to remove the weapon.

2            Officer Tamate responded to the driver's side

3    of the vehicle.  He communicated with me.  So I lowered

4    my weapon to a low ready position, so it was pointed in a

5    safe direction.

6            Officer Tamate reached into the vehicle,

7    grabbed the pistol, placed it on the rear tonneau cover

8    of the pickup truck, then returned and grabbed another

9    extended magazine that was positioned next to the pistol

10   in the waistband, and placed that next to the weapon on

11   the tonneau cover.

12           Then Officer Tamate pulled the driver out,

13   placed him face down on the ground, where he and Officer

14   Phan handcuffed him.

15   BY MR. GALIPO:

16       Q.   Okay.  So your understanding is the pistol was

17    still in the waistband after the shooting?

18       A.   Yes, it was.

19       Q.   And the magazine, did you understand that was

20    separate from the pistol, in the waistband?

21           MR. TOUCHSTONE:  Objection.  Vague and

22    ambiguous.

23   BY MR. GALIPO:

24       Q.   You may answer it, if you understand my

25    question.

1    blocking your view of?

2        A.    A -- a portion of the driver's body.  I don't

3    know exactly what it was obstructing.  It was more

4    obstructive of my camera angle on my body-worn video.

5    My camera is typically carried a little lower than the

6    center of my chest.

7            And from that angle, it obstructed most of the

8    driver's lower body.  I had a little bit of a different

9    angle, just based on the height of my eyes compared to

10   the camera, but it still obstructed, say, the inner

11   portion of his waist and leg.

12       Q.    And --

13       A.    Outer portion, sorry.

14       Q.    "Outer portion"?

15       A.    Yes.

16       Q.    Thank you.  And would it be fair to say that

17   when you saw the passenger and driver, you know, passed

18   out or appeared to be unconscious or nonresponsive, from

19   your point of view, they appeared to be incapacitated?

20           MR. TOUCHSTONE:  Objection.  Lacks foundation.

21   Calls for speculation.  Asked and answered.

22           THE WITNESS:  I don't know what you mean by

23   "incapacitated."  They looked to be unconscious, but I

24   didn't know what their condition was.

25   BY MR. GALIPO:

1      Q.   Did you see the driver at some point, before he

2    touched the pistol, putting his hands together towards

3    his lower stomach area in some type of fashion or making

4    some type of motion with his hands?

5      A.   Yes.  While giving him commands, the -- I

6    mentioned the hands raising.  Then at some point -- I

7    described it as needing his hands.  But it was almost --

8    imagine drying your hands in like, you know, an air

9    dryer in a restroom.  It looked like that to me.

10           After reviewing the video, it looked more of

11    like a rolling of the fingers.  But how I saw it at the

12    time was he was kind of doing this.

13           (Indicating.)

14    BY MR. GALIPO:

15      Q.   Okay.  Did you consider at some point, getting

16    an airship and illuminating the vehicle with a light?

17      A.   I did not consider requesting an airship.

18      Q.   And did you see his hands going up and down

19    towards his waistband several times before he actually

20    touched the -- the pistol?

21      A.   Yes.

22      Q.   Did you think it would be have been appropriate

23    to shoot him if he didn't touch the pistol?

24      A.   No.

25      Q.   Do you remember what you said in the few

```
 1          When the occupant was pulled out of the
 2   vehicle, I saw that the driver had a weapon in his
 3   waistband.  He would be the suspect from that point on.
 4   I don't know if anyone checked him for weapons.
 5          After reviewing the video, it looked to me as
 6   if when Officer Tamate tried to wake the passenger,
 7   initially before we saw the weapon, it looked like when
 8   he raised him up, it looked as if he cleared his
 9   waistband, as well.  I'm not sure of that.  It's just
10   something that I noticed when watching the video
11   afterwards.
12      Q.    Okay.  And obviously, nobody ever cleared the
13   truck driver's waistband before he was woken up because
14   nobody went to the driver's side?
15      A.    Yes.
16      Q.    In terms of your deadly force training, were
17   you trained, essentially, that you can use deadly force
18   if there's an immediate or imminent threat of death or
19   serious bodily injury to yourself or others?
20      A.    Yes.
21      Q.    And as part of that training, were you trained
22   that there needs to be the ability, opportunity, and
23   apparent intent to immediately cause death or serious
24   bodily injury?
25      A.    Yes.
```

```
1   STATE OF CALIFORNIA)
                       ) ss:
2   COUNTY OF BUTTE    )

3
            I, KIMBERLY E. D'URSO, do hereby certify:
4

5           That the witness named in the foregoing

6   deposition was present remotely and duly sworn to testify

7   to the truth in the within-entitled action on the day and

8   date and at the time and place therein specified;

9           That the testimony of said witness was reported

10  by me in shorthand and was thereafter transcribed through

11  computer-aided transcription;

12          That the foregoing constitutes a full, true and

13  correct transcript of said deposition and of the

14  proceedings which took place;

15          Further, that if the foregoing pertains to the

16  original transcript of a deposition in a federal case,

17  before completion of the proceedings, review of the

18  transcript [ ] was [ ] was not requested.

19          That I am a certified stenographic reporter and

20  a disinterested person to the said action;

21          IN WITNESS WHEREOF, I have hereunder subscribed

22  my hand this 21st day of October, 2025.

23  _____

24  KIMBERLY D'URSO, CSR NO. 11372, RPR

25
```