# Exhibit 2
## (Robert Tamate Deposition Transcript Excerpts)

1              UNITED STATES DISTRICT COURT

2              CENTRAL DISTRICT OF CALIFORNIA

3                    --oOo--

4

5  NELSON VASQUEZ, ET AL.,

6         Plaintiff,

7

8  v.              Case No.  8:24-cv-02421-FLA-JDE

9  CITY OF LOS ANGELES; SEAN
   STEELMON; and DOES 2 through 10,
10 inclusive,

11        Defendants.
   _____/

12

13

14        STENOGRAPHIC REPORTER'S TRANSCRIPT OF

15             REMOTE DEPOSITION OF

16              ROBERT TAMATE

17         THURSDAY, JANUARY 8, 2026

18

19 Reported Stenographically by:

20 KIMBERLY D'URSO, CSR 11372, RPR

21 Job No.  22737

22

23

24

25

1   of the call.

2       Q.    You hadn't, for example, received information

3   that this person had fired the weapon?

4       A.    No.

5       Q.    No information that anyone was injured?

6       A.    No.

7       Q.    No information that anyone was verbally

8   threatened?

9       A.    No.

10      Q.    Or that this gun had been pointed at any

11  person?

12      A.    No.

13      Q.    How was it that you received this information?

14  Was it over your police radio --

15          (Simultaneous speakers.)

16          (Reporter clarification.)

17  BY MR. LEVINE:

18      Q.    -- or some other way?

19      A.    Sorry.

20          Correct.  Normally, what happens is it's

21  broadcast via the radio, and it also comes up on the

22  screen, your MDT, your computer screen that you have

23  inside the vehicle.

24      Q.    Was there any additional information that you

25  received by looking at the screen, beyond what you

1        A.    I was driving.

2        Q.    When you made it to the scene, did you see a

3    pickup truck there in the parking lot?

4        A.    I did.

5        Q.    What was -- how would you describe that pickup

6    truck?

7        A.    It was a pickup truck, dark.  It was also

8    tinted.  I mean, kind of a nondescript pickup truck.

9              We weren't quite sure -- you know, the

10   description of the vehicle in question was very vague,

11   and we did see a vehicle that could have been the

12   vehicle, but there was lots of SUVs and similar types of

13   vehicles in the area.

14             The parking lot was pretty crowded with a bunch

15   of people in other vehicles.  So, yeah, we did see the

16   vehicle that thought -- we thought could be the vehicle

17   in question.

18       Q.    Would it be accurate to say that this dark

19   truck that you're talking about, you thought it might be

20   the vehicle, but you didn't know?

21       A.    Correct.

22       Q.    At some point after you arrived, did additional

23   officers arrive at the scene?

24       A.    Yes.

25       Q.    Do you know who else arrived, prior to the

1    shooting?

2        A.    Officer Phan and Mirzoyan.  He was a new guy

3    back then.

4        Q.    That's all right.  I think I know who you're

5    referring to.

6        A.    David, David is his name.  David M.

7        Q.    When you saw the truck, could you see any

8    movement inside of it?

9        A.    No.

10       Q.    Could you tell, initially, whether it was on or

11   off?

12       A.    All indications were that it was not running.

13             (Reporter clarification.)

14             THE WITNESS:  The vehicle was not running.

15   BY MR. LEVINE:

16       Q.    Upon arriving, did you discuss with any of the

17   other officers a plan of approach or anything like that?

18       A.    Yeah.  I mean, basically with me -- my partner

19   and I, Steelmon, we have, like, a standing tactical

20   plan.  We've worked with each other for, you know, the

21   whole time he's been at Topanga.  So we've not worked

22   completely solely with each other, but we've worked many

23   times together.

24             And you know, we have a standard working

25   tactical plan where whoever is the driver is the contact

Robert Gonsalez

```
 1    sergeants, what they do is they let the primary follow

 2    through with the plan.  And basically, their main thing

 3    is, like, if they see something glaring, like a big

 4    no-no, then they put a stop to it, or they'll do some

 5    type of corrective action to -- to correct whatever, you

 6    know -- whatever he thinks that we were doing wrong.

 7    Yes.

 8         Q.   Did -- before you approached the truck, did you

 9    and the other officers have any discussion about a plan

10    of action?

11         A.   Well, me and Steelmon, our plan was that we

12    were going to on scene, A, if we didn't know that this

13    was the truck in question -- we thought it might have

14    been.  We were kind of unsure.  We needed to verify --

15    we needed to verify -- make an approach and verify to

16    see if that was -- in fact, that was the car.

17         Q.   Was that something that the two of you

18    discussed before approaching?

19         A.   I don't know if it was like a -- if it was a

20    long, drawn-out discussion or not, but, I mean, that

21    was -- you know, when you work with somebody for a long

22    time, it's like, you kind of know, like:  Okay, this is

23    what we're going to do.

24         Q.   I guess I'm just asking whether you talked

25    about it before approaching?
```

1    do.  But obviously, that was a plan that was directed.

2        Q.    So one of the two of you said something to that

3    effect, you just don't remember who it was?

4        A.    Yeah.

5        Q.    Prior to approaching the truck, did you or any

6    other officer that you were aware of try to address the

7    occupants or potential occupants of the truck via PA or

8    loud speaker?

9        A.    No, because at that time, we weren't -- I mean,

10   it appears as if there was somebody in the vehicle.  But

11   I did do -- but as we approached, we did bang on the car

12   and say in Spanish -- you know, it's kind of a feign:

13   Hey -- it was a feigning tactic.

14            Even if we don't know if somebody is in the

15   car, we'll tell people:  Get out of the car or:  Come

16   out of the closet, just as a ruse.  Just in case there

17   is somebody in there, then, hopefully they'll come out.

18            So I do remember banging on the car, on the

19   rear quarter panel of the truck.

20       Q.    Before approaching the truck and banging on it,

21   was there any sort of verbal communications given to

22   anyone inside the truck from over where the police

23   vehicles were, for example?

24       A.    No.

25       Q.    You, I take it, as the driver, parked your

```
 1         A.    Correct.

 2         Q.    When you parked your police unit, did you park

 3    it near the Sergeant's police unit?

 4         A.    No.  The Sergeant's unit was there before us,

 5    and he was off to the east of us.  Yeah.

 6         Q.    Prior to approaching the truck, did you or any

 7    other officers take any positions of cover, for example,

 8    behind your unit?

 9         A.    No.  I mean, like I said, as we -- you know, we

10    pulled up slowly into the parking lot to assess the

11    situation.  And we were trying to think, like:  Is that

12    the car?  Is that the truck?  Is there anybody in there?

13              You know, so we were slowly assessing before we

14    parked.  Like I said, it didn't seem like there was

15    anybody in there.  Obviously, the engine was off.

16    Didn't see any movement.  The windows were tinted.

17              So at that time, we still were -- still weren't

18    sure whether that was the car, whether that was going to

19    be the threat or not.

20         Q.    And you might have said this already, but I

21    think you said that you and Officer Steelmon made some

22    determination about which of you would be the contact

23    officer and which one would be cover; is that correct?

24         A.    Correct.

25         Q.    Which of you was going to be contact and which
```

1    was going to be cover?

2         A.   Well, I was the driver, so standard protocol, I

3    would be -- I would be contact.

4         Q.   All right.  And then when you and the other

5    officers approached the truck, was there some sort of

6    formation that you did that in?  Or were you in a line,

7    something like that?

8         A.   Yes.

9         Q.   Were you in the front of that line?

10        A.   I think I might have been second, second in

11   line.

12        Q.   When you received -- you received training at

13   the LAPD; correct?

14        A.   Correct.

15        Q.   Did your training include this sort of contact

16   and cover roles that you mentioned already?

17        A.   Yes.

18        Q.   Based on that training, what exactly is a

19   contact officer?

20        A.   The contact person is basically, I mean -- like

21   it sounds, it's the person who contacts the person,

22   the -- the other person, the person in question.  And

23   the cover is more tactically ready to, you know, use any

24   type of force, if necessary, if -- you know, if it

25   should go that way.

Robert Gorate

```
 1          Q.    As the contact officer during this incident, is
 2    there a reason why you were not first in the line to
 3    approach?
 4          A.    Well, there again, I mean, it's just like, if
 5    you're going to contact a threat, I mean, you want the
 6    cover person to be able to handle that threat, which, if
 7    the cover person is behind, the contact, he's not going
 8    to be able to do that, or -- you understand what I'm
 9    saying?
10          Q.    I think so.
11                Was there a particular side of the -- or part
12    of the truck that you approached when you approached?
13          A.    The passenger side.
14          Q.    When you were approaching, could you see into
15    the truck?
16          A.    Initially, no.
17          Q.    How about after initially?
18          A.    So the back windows are all tinted.  The side
19    windows are tinted.  As we were coming up to the side
20    through the rear wing window -- the wing window is the
21    window that kind of tilts out to the side, but it
22    doesn't roll up and down.  It just kind of tilts up, out
23    to the side, and there's a gap in the rear -- facing the
24    rear of the vehicle, I mean.  That's when I realized
25    there's somebody in there.
```

Robert Gaته

```
 1        Q.   Did you see somebody through that rear wing

 2   window on the passenger side?

 3        A.   Yes.

 4        Q.   Who did you see?

 5        A.   I saw heads.  I'm not sure if I just saw one of

 6   them or both passenger and driver or just one of them.

 7   I can't recall what -- because when you view in through

 8   the rear wing window, you just get a view of the -- kind

 9   of like the center of the car, so I saw a head.

10             I'm assuming it must have been the driver, but

11   not for certain.  I saw -- I just remember seeing a

12   head.

13        Q.   Given the nature of the call, reporting

14   somebody with a gun, was this considered a high-risk

15   stop?

16        A.   It could be if it was -- if we had a verified

17   vehicle and a verified firearm and a verified suspect,

18   it could be.  But in this situation, we didn't know if

19   this was the car.

20        Q.   Would --

21        A.   We didn't know if there was anybody in the car.

22   So that being said, we'd have to verify all those things

23   in order to consider it high risk, I guess.

24        Q.   Based on your training at LAPD, would it not be

25   considered a high-risk stop until you have that
```

```
 1    verification?
 2        A.    Not necessarily.
 3            MR. BOJORQUEZ:  Objection.  I think it
 4    misstates the witness's testimony.
 5            MS. LUCERO:  Join.
 6    BY MR. LEVINE:
 7        Q.    You can answer.
 8        A.    So not necessarily.  If you're telling -- if
 9    you're telling me there's a situation where a radio call
10    comes out where there's an armed bank robber in a, let's
11    say -- let's say a yellow, 1972, 240Z car, in front of
12    the bank, sitting in a car.  Yeah, then, that's a very
13    unique car, and obviously, you know, probably have not
14    seen a 1972, 280Z or 240Z in years, and it's safe to
15    assume that's the car.
16            You give me just some scenario of a man,
17    possibly armed with a gun, sitting in, let's say, a
18    yellow taxi, and I'm in New York City and it's lined
19    with yellow taxis up and down the street, it's -- it
20    would be hard for me to treat each yellow taxi as a --
21    you know, as a felony stop, if that makes sense?
22            I mean, I'm just kind of using those extreme
23    examples, just to get a better picture.  And we didn't
24    really know if this was the car.  There was other
25    vehicles in the parking lot, similar, similar
```

1    description.

2              And -- and, you know, you've got to remember,

3    in life when you -- when the PR puts out these

4    descriptions of these vehicles, I mean, half the time

5    they're wrong about these descriptions.  So everything

6    has to kind of ebb and flow.  I guess we -- I mean,

7    my -- my answer to that is just, like, you know, we

8    weren't sure that was the vehicle.  There was a lot of

9    vehicles in that parking lot.

10         Q.    Are you essentially saying that, based on your

11   training, whether or not a stop is considered a

12   high-risk stop depends on sort of the amount of detail

13   you receive about the call or the level of certainty you

14   have regarding whether the vehicle is the suspect

15   vehicle that you're pursuing?

16         A.    I mean, yeah.  To -- yeah.  That would be a

17   fair assessment.  I mean, if we're not sure if that's

18   the vehicle, we wouldn't necessarily do a high-risk

19   stop.

20         Q.    At some point, did someone open one of the

21   doors on the truck?

22         A.    Yes.

23         Q.    Was that you or somebody else, the first time

24   that door was opened while you were present?

25         A.    Oh, my God.  I believe that was me.  It must

```
 1    have been me.  Someone had the shotgun, so I'm going to

 2    assume it was probably me.  I don't have a recollection

 3    of that.  But, yeah, I'm assuming it was me.

 4        Q.   Okay.  And just to clarify, I should have said

 5    this at the beginning, but I don't want you to guess at

 6    anything.  You know, if you aren't sure, it's all right

 7    to say so.

 8        A.   Okay.

 9        Q.   But I just wasn't quite sure, based on your

10    last answer, whether you were guessing or speculating,

11    which I don't want you to do.

12             Does that make sense?

13        A.   Yeah.

14        Q.   Do you know what door was opened at that time,

15    of the car -- or the truck, I should say?

16        A.   That was the passenger.

17        Q.   All right.  Did you -- when that front

18    passenger door was opened, did you observe anything

19    inside the truck at that time?

20        A.   Yeah, there was two people.

21        Q.   Okay.  Was it two men or two women?  What kind

22    of people did you see?

23        A.   Two -- two men.

24        Q.   Did they appear to be awake when you first saw

25    them?
```

1        A.    No.

2        Q.    Do you know what their approximate age or ages

3    were, based on your perception at the time, I should

4    say?

5        A.    I would say, like, mid 20s to 30.

6        Q.    Were you able to tell what their apparent

7    ethnicities were?

8        A.    Hispanic.

9        Q.    Did you ever hear either of them speak prior to

10    the shooting?

11        A.    The driver did kind of -- he said something

12    unintelligible.  I don't know if you want to say that's

13    speaking or just making noises.

14        Q.    How about the passenger?

15        A.    No.

16        Q.    When you first saw them after that passenger

17    door was opened, did they appear to be passed out?

18        A.    Yeah.  That was my initial observation, was

19    that they were probably under the influence.

20        Q.    Did they appear to be drunk to you?

21        A.    Yeah.  I mean -- I mean, a lot of things were

22    running through your mind when you -- when you see

23    somebody in that state.  I mean, obviously, the first

24    one that always comes to mind is, like, okay, there's

25    intoxication.

 1          But there also could be -- you know, these days

 2    with all the Fentanyl out there, it's like, you don't

 3    know if there's drugs involved, O.D.  And then, you

 4    know, just in police work, it's everything.  It's like,

 5    are they victims of something?

 6          It's just -- you can't just -- even though your

 7    initial thought could be:  Hey, they're drunk, you also

 8    have to keep the whole -- keep your mind open as to what

 9    else could be going -- going on.

10          You know, one of the -- for example, like, you

11    know, several times this has happened where you pull

12    over -- you kind of assume:  Oh, this guy is a drunk

13    driver; right?  And I'm talking a totally different

14    situation where you think, like:  Oh, yeah, this -- you

15    pull somebody over and it's like:  Oh, this guy's a

16    drunk driver, and you know, you're ready to go through

17    the whole DUI, SSSD, and all that stuff.

18          And, you know, it turns out, oh, no, this guy

19    is in a -- he was having a diabetic -- diabetic episode

20    where, you know, RA comes and gets some sugar, and boom,

21    he's back to normal.

22          So you really got to keep your mind open and,

23    like I said, all these things are just kind of going

24    through your mind.

25          Q.    Do you recall from your recorded interview with

```
 1    FID, stating that it was your impression at the time

 2    that they were probably drunk?

 3         A.   Correct.  I mean -- sorry.

 4         Q.   I'm sorry.  Go ahead.

 5         A.   I mean, I don't recall having that talk with

 6    FID, but that sounds correct.  Like, that would be my --

 7    that is what I was initially thinking.

 8         Q.   Would me showing you the portion of the

 9    transcript refresh your recollection as to what you said

10    to FID during your interview?

11         A.   I'll just take your word for it.

12         Q.   So you don't dispute that that's what you said

13    to FID, then?

14         A.   I mean, if that's what you're saying was in the

15    transcript, I believe you.

16         Q.   All right.  Well, I guess I heard you say that

17    it could be any number of things, and -- but I was

18    asking whether or not you recall saying to FID --

19         A.   No, no, no.  Let me clarify that.  It's true

20    that my initial observation leaves me, like, thinking

21    like, they might be intoxicated.  But at the same time,

22    in police work, you can't rule out all the other factors

23    that are going through your mind of what's going on with

24    these people, is what I'm saying.

25              Whether that was conveyed to FID or not, I
```

Robert Turnate

1    don't know, but, you know, that's what was going through

2    my mind.

3        Q.   All right.  Well, just to be clear, really

4    quickly, I'm going to share my screen for a moment.  It

5    won't take too long.

6            Can you see my screen here that I'm sharing?

7        A.   It's very tiny.

8        Q.   Very tiny.  Let me try to zoom in.  One moment.

9            How's that?  Better?

10       A.   Okay.  Where are we?  Just --

11       Q.   Starting on line 6, up towards the top.

12           Do you see line 6?

13       A.   Yes.

14       Q.   Do you see that it says that a Detective Cruz

15   is asking what do you see inside the car when the

16   passenger door is open?

17       A.   Correct.

18       Q.   And then it has your answer starting on line 8,

19   where it says:  "Just two guys.  They're kind of like --

20   first I thought they are sleeping."

21           "Okay.  Well, they're not sleeping because

22   we're, like, yelling at them."

23           Do you see that?

24       A.   Yes.

25       Q.   And then a bit further down, starting on line

1    12, it says that you said:  "And then the passenger

2    wakes up or comes out of his stupor, and then I'm

3    thinking, all right, this guy is drunk."

4              Do you see that?

5         A.   Correct.

6         Q.   And on the next line, Detective Cruz says:

7    "Okay."

8              And on the following line, you say:  "They're

9    probably both drunk."

10             Do you see that?

11        A.   Correct.

12        Q.   Do you have any reason to think that's not an

13   accurate representation of what you said to FID?

14        A.   That is what I said to FID.

15        Q.   Okay.

16        A.   I was just clarifying to you that, like, you

17   know, as police officers, you cannot -- just what goes

18   on through officers minds is like:  Okay, you're

19   intoxicated, but you also -- there's a whole slew of

20   other things you have to keep in mind of what could be

21   going on with these -- these people.

22             I guess that's all I was saying.

23        Q.   Sure.  I understand that.

24             When you saw these two men in the vehicle, do

25   you recall if you or another officer said:  "These guys

1    are out," or something to that effect?

2        A.    Yes.

3        Q.    Do you recall if that was you who said that?

4        A.    I bel- --  I believe that was me, yeah.

5        Q.    When you said that, did you potentially mean

6    what we just discussed, that they appeared to be drunk?

7        A.    Correct.

8        Q.    Were you able to smell any alcohol coming from

9    the vehicle or the two men at that time?

10        A.    I don't have an independent recollection of

11    whether I did or not at this time.

12        Q.    When you opened that passenger door and first

13    saw those two men, and they appeared to be out, did it

14    appear to you that they were aware of your presence at

15    that time?

16        A.    No, not initially.

17        Q.    At that time -- still talking about pretty much

18    right after you opened the door and first saw them --

19    did you -- could you see if any of them appeared to be

20    armed with a weapon of any kind?

21        A.    No.

22        Q.    At some point after that door was opened, did

23    you hear Officer Steelmon call out, "Gun"?

24        A.    I did.

25        Q.    Where were you when you first heard him say

1    that?

2         A.    On the other side of the vehicle.

3         Q.    All right.

4         A.    I'm --

5         Q.    Go ahead.

6         A.    On the driver's side.

7         Q.    When you first heard him say that, did you have

8    an understanding about what he was referring to?

9         A.    Yes, that there was a gun.

10        Q.    Was your understanding that he was referring to

11   a gun in the vehicle as opposed to somewhere else?

12        A.    I mean, yeah, I mean, I assume that -- I knew

13   what he was talking about.  He said that there was a gun

14   in the vehicle.

15        Q.    And then after hearing him call out, "Gun," did

16   you return to the passenger side of the vehicle?

17        A.    I did.

18        Q.    At some point after returning to the passenger

19   side of the vehicle, did you remove the person who was

20   in the passenger seat from the vehicle?

21        A.    I did.

22        Q.    Did you handcuff him?

23        A.    I did.

24        Q.    What did that person's -- the passenger's

25   condition appear to be at the time that you were

1    removing him and handcuffing him?

2        A.    Unresponsive.

3        Q.    Did he appear to be drunk to you at that time?

4        A.    Yeah.

5        Q.    Did he appear to be awake at that time?

6        A.    He was coming to.

7        Q.    Did you see his eyes open, for example?

8        A.    No.  I didn't -- by that time, you know, my

9    assessment -- assessment of the passenger was very

10   limited, if at all.  Once that it became known that the

11   there is a firearm, that the driver is armed with a

12   firearm, my main goal was to get the passenger out of

13   the -- out of the danger zone, and -- and get him

14   secured as -- as well as I could get him secured.

15            Obviously, I'm not going to be able to do a

16   whole assessment on him, pat him down, all this stuff,

17   no.  My main is goal is get him out of the -- because

18   right now, he's between two guns; right?  You've got a

19   passenger between two guns.

20            I need to get him out of there.  I need to

21   secure him as best as I can.  And, not only that, I

22   needed to get back and back my partner.  So my

23   assessment of him was very limited.

24       Q.    Would it be fair to say that when you were

25   dealing with the passenger, after you pulled him out of

1    sticking out.

2        Q.    What -- could you tell what type of pants the

3    driver was wearing?

4        A.    Some type of, you know, just blue jeans or

5    something, you know.

6        Q.    Was the barrel of the gun inside of his pants?

7        A.    Correct.

8        Q.    Could you tell whether the trigger of the gun

9    was inside or outside of his pants?

10        A.    I don't recall that.

11        Q.    Do you recall seeing the trigger of the gun?

12        A.    No.  I mean, not at that time, no.

13        Q.    What color was the gun?

14        A.    You know, I don't even remember.  It's in the

15    video, but I don't have an independent recollection.

16        Q.    Do you have an independent recollection of what

17    type of gun it appeared to be?

18        A.    It was a semi-auto.

19        Q.    Before Officer Steelmon fired -- well, let me

20    back up.

21            When Officer Steelmon fired, did you see him

22    fire?

23        A.    I did.

24        Q.    Were you essentially standing kind of behind

25    him at that time?

Robert Foote

1  to the gun, but did not touch the gun?  Is that

2  accurate?

3      A.    That's not what I'm saying.  That's not --

4  that's inaccurate.  I'm not saying that what I saw was

5  that his hand came close to the gun, but it didn't touch

6  the gun.  His hand was so close, it appeared as if he

7  was touching the gun.

8      Q.    Could you tell for certain that his hand was

9  touching the gun, is what I'm trying to understand?

10     A.    That, I wouldn't it -- I don't know.  I don't

11  know if it was -- actually made contact.  But from my

12  point of reference, from what I could see, I mean, it

13  might have well -- I'm thinking of an example.

14          I mean -- yeah.  I mean, it's one of those --

15  you might as well -- you know, if you had a first base

16  camera on that video, it's like, in baseball, it's like,

17  was he -- was he -- was he safe or was he out?  I mean,

18  it's just like, I'm going to say he was touching the

19  gun.

20          I mean, I know this is kind of a crude analogy.

21  But I mean, it's -- it's, you know.

22     Q.    Did you see whether he acquired any type of a

23  grip on the butt of the gun, before Officer Steelmon

24  fired?

25     A.    You know, it's funny that -- I don't know if he

1    acquired an actual grip.  But it's funny, when you

2    review the video, after -- I mean, moments after, like,

3    fractions of a second after he was shot, you could see

4    his right hand jerk up.  His -- the palm of his right

5    hand is jerking up, away from the gun, fingers --

6    fingers -- his index -- or all of his fingers curled as

7    if he had a gun.

8            You should review that video.  It's -- it's

9    kind of very telling.

10       Q.   I heard you describing what saw in the video

11   there.  But based on your personal recollection, do you

12   recall ever seeing him acquire or appear to acquire a

13   grip on the gun itself, before Officer Steelmon fired?

14       A.   No, I didn't -- no, I couldn't tell if he

15   actually fully got to grabbing the gun.

16       Q.   When you described there that after

17   Officer Steelmon fired, the driver's hand came up, away

18   from his waistband area, is that what you saw?

19       A.   Correct.

20       Q.   When his hand came up, away from his waistband

21   area, after Officer Steelmon's shot, did the gun come up

22   with his hand?

23       A.   No.  No.

24       Q.   Was the gun in his hand at that time?

25       A.   No.

```
 1        Q.   You, after the shooting, removed the gun from
 2    the driver's waistband; correct?
 3        A.   I did.
 4        Q.   So after the shooting, the gun was still in his
 5    waistband; correct?
 6        A.   Correct.
 7        Q.   In the few seconds prior to the shooting, could
 8    you see the driver's face or his head?
 9        A.   Yes.
10        Q.   Could you see which way he was facing during
11    that time?
12        A.   By the time I went around, he's --  he's --
13    Steelmon's giving him commands.  He's -- he's -- you
14    could see he's looking around.  He looks directly in our
15    direction.  He kind of utters something, and then he
16    kind of looks forward, and then that's when he went for
17    the gun.
18        Q.   At the time that Officer Steelmon fired, which
19    direction was the driver, his face?  What direction was
20    his face facing?
21        A.   It was going -- it was forward.  But moments --
22    it was like, he was looking around, looked towards our
23    direction, looked forward, and then went for the gun.
24        Q.   When you say "forward," he was looking
25    "forward" --
```

```
 1    had been opened?
 2        A.    No.   So, by that time, I was too busy pulling
 3    the passenger out.
 4        Q.    Why did you decide to issue commands in
 5    Spanish?
 6        A.    I mean, generally, it's, you know -- it's -- in
 7    the area that we work at, you know, oftentimes, you
 8    know, if -- I mean, obviously, in the area that we work
 9    at, there's a lot of Spanish speakers.   If they're not
10    responding to one thing, then we, you know, figure maybe
11    they're a Spanish speaker, and we switch to Spanish, in
12    what limited Spanish we have.
13        Q.    Do you speak Spanish?
14        A.    No.
15        Q.    How did you know the Spanish commands that you
16    issued, then?
17        A.    Well, I mean, in the academy, they used to, you
18    know, teach you, like, simple phrases.
19        Q.    Basic commands in Spanish?
20        A.    Right.
21        Q.    In the few seconds before the shooting, did you
22    ever hear Officer Steelmon ask for a Spanish speaker?
23        A.    Somebody did.   When you see the video, somebody
24    was requesting a Spanish speaker.   And then in the
25    video, you can hear in the background somebody saying --
```

```
 1    somebody saying to the effect, like --
 2              (Reporter clarification.)
 3              THE WITNESS:  -- "ponga manos," you know, just
 4    from listening to the video.  So, you know, that
 5    basically means, "Put your hands" -- something else was
 6    said.  I -- I couldn't discern that in the video.
 7              But something else was said, and it sounds like
 8    they were saying, "Put your hands up," type of thing.  I
 9    don't know who -- who said that, but --
10    BY MR. LEVINE:
11        Q.   And I think you said earlier that when you saw
12    the two men, after the door was open, that they appeared
13    to be Hispanic; is that correct?
14        A.   Yes.
15        Q.   Did you ever consider that they might speak
16    Spanish, during the incident, I mean?
17        A.   Well, I mean, that's always a possibility.
18    That's why I was saying, "Get out of the car" in
19    Spanish.
20        Q.   During the incident, did you ever consider that
21    they might not understand English, one or both of them?
22        A.   Well, the passenger seemed to understand that,
23    you know, we're the police and he needs to get his hands
24    up.
25              So -- so, you know, I mean, we're all in
```

1    uniform.  We're in uniform.  We have guns.  We have

2    badges.  The passenger seemed to realize, like, I better

3    put my hands up.

4         Q.   I hear what you're saying.  I guess my question

5    was just a little bit different.

6              I'm more asking whether at any point, you --

7    during the incident, you considered whether the -- one

8    or both of the men might not understand English?

9         A.   Didn't I kind of -- that's kind of the same

10   answer, is like -- regardless of like the -- yeah, I

11   mean, we considered, like, in Los Angeles, there's

12   always a language barrier.  But, you know, not all

13   conversation is -- is verbal; right?

14             Like, if you go to Japan, and for whatever

15   reason the police come up to you and surround you and

16   start drawing their guns, you're just, like,

17   automatically going to say:  Oh, the police are here and

18   I need to comply and put my hands up.  I mean, it's like

19   you know, half of communication is non-verbal.

20             But to answer your point, did I ever consider

21   that they weren't speaking Spanish -- that they were

22   Spanish speakers?  Yeah, of course.  I mean, you know, in

23   Canoga Park, there's a lot of Spanish speakers, and

24   that's always a possibility.

25             Q.   Had you been stationed or assigned to the

1    Canoga Park area before this incident?

2        A.    I have, yes.

3        Q.    Do you have an estimated number of years you

4    had been working the area?  Any estimate?

5        A.    At that time, over ten years, I mean --

6        Q.    Based on your --

7        A.    I'm sorry.

8              I mean longer.  I mean between 10 and 15 years.

9    Yeah.

10       Q.    Based on your 10- to 15-year experience working

11   as a police officer in the area, prior to the incident,

12   was your experience that Spanish speakers are prevalent

13   in the area?

14       A.    There's a lot of them.  I mean, do you want me

15   to put a percentage?  Depending on where in the division

16   that you work, there could be a majority -- at least

17   half, if you -- depending on where in the division you

18   work.

19             You know, you work south of Ventura Boulevard,

20   you know, it's probably very low.

21       Q.    How about in this general area where this

22   incident took place?

23       A.    Yeah, there's a lot of Spanish speakers, but,

24   you know, most -- even with Canoga Park and Los Angeles

25   being, you know, high majority Spanish speakers, most of

1    I don't want to say they're -- they're out of danger,

2    because any time shots get fired, people are in danger.

3    But that's the optimal position we could obtain.

4            And we -- you know, like I said, the whole

5    redeployment doctrine is, you know, redeploy if you can

6    and it makes the scene safer, but don't do it if it's

7    just going to put you in a more dangerous situation for

8    everybody involved, if that makes sense?

9        Q.   I understand what you're saying.

10           I think you answered whether you ever suggested

11   to tactically reposition during that time.  Did you ever

12   hear any other officer say anything about it between --

13           (Simultaneous speakers.)

14       A.   I did not.

15       Q.   -- during that time?

16       A.   Sorry.  I did not.

17       Q.   And how about utilizing cover?  Did you hear

18   any officer say anything about that, between when

19   Officer Steelmon called out, "Gun" for the first time,

20   at the time of the shooting?

21       A.   I -- I did not hear people -- anybody say,

22   "Cover."  But unfortunately, in a large parking lot, in

23   that position, there is no cover, you know.  It's just

24   the terrain, you know, kind of dictates our -- our --

25   our tactics.

Robert Bonते

1  die.  You.  You, as the officer.

2          So we don't -- we don't confront -- not just we

3  don't confront firearms with less lethal.  We might

4  confront other deadly weapons, from a standoff position,

5  with deadly weapons -- I mean, with less lethal, like,

6  you know, somebody with a knife, obviously.  Somebody

7  with a bat, you know?  Where -- where we can use less

8  lethal and we can use time and distance and maybe some

9  type of cover.  But not -- not with a firearm.  No.

10  That's --

11      Q.   Was there ever any discussion that you heard or

12  were a part of regarding calling for an airship?

13      A.   An airship was not called, you know.  An

14  airship was not called.  I mean, we didn't call an

15  airship.  We didn't -- we didn't know if that was the

16  vehicle.

17          I mean, the vehicle was heavily tinted out.  I

18  mean, we're -- we're not -- I mean, in my mind, I didn't

19  think that the airship was going to -- was going to --

20          I mean, we -- we -- here's the thing:

21  Airships -- we didn't see -- we didn't see the firearm.

22  We didn't know that was the vehicle, right?  So we

23  didn't know if that was the vehicle.  We didn't know if

24  there was anybody in there.

25          We had to approach to look, to confirm.  We

1    didn't even see the firearm initially, right?  Until the

2    suspect made some type of -- you know, whatever movement

3    that he had made to expose this firearm, we didn't know

4    there was firearm.

5           So getting an airship to look into a tinted

6    window where even, you know, the boots on the ground

7    can't see a firearm, I don't -- I'm not sure where that,

8    you know, where that would have -- how that would have

9    played out.

10       Q.   And after Officer Steelmon called out the gun,

11   there was no discussion about calling for an airship

12   during that period; correct?

13       A.   I mean, you got to understand, this type of

14   tactical situation where you're presented with a

15   firearm, it's just like, hey, we're trying to control

16   the scene, the immediate threat at hand.

17           I mean, it's just -- I mean, no, we I didn't

18   have time for that.  We were trying to deal with -- we

19   were trying to extricate the passenger so he doesn't get

20   shot, right?  We're trying to deal with this guy who,

21   you know, imminently is an imminent threat.

22           Getting on the radio and trying to, like, you

23   know, call all these resources is like -- is not -- no,

24   we didn't do that.  Okay.

25       Q.   Was there ever any discussion that you heard or

1    were a part of regarding pulling any units closer to the

2    truck, for use as potential cover?

3        A.    No.  I mean, that's like -- not similar with

4    the airship -- but by the time the gun was presented, we

5    were too busy trying to, you know, secure the passenger

6    and get him out of the way and deal with the driver.

7        Q.    At any time prior to the shooting, did you have

8    any information regarding whether either occupant of the

9    vehicle had any type of criminal history?

10       A.    No.  I think I ran the plate just to make sure

11   that the plate was the plate of the vehicle, to make

12   sure that, you know, there was no wants or warrants.

13   No.

14       Q.    And you didn't have any information about

15   either of them regarding any criminal history from some

16   other source, besides running the plate; correct?

17       A.    No.

18       Q.    "No," that's not correct, or "No," you

19   didn't --

20       A.    No, I hadn't -- we did not have any criminal

21   history information on either -- either of the people.

22       Q.    This is related, I guess; but did you have any

23   information regarding whether either of them had ever

24   engaged in any acts of violence before?

25       A.    No.  I mean, other than being armed with a gun.

1      Q.   I'm sorry.  What part of his body did he fall

2  on?  Was it on his back or his front or some other part

3  of his body?

4      A.   I don't -- I don't even recall.  I mean, I

5  pulled from his left shoulder area, and I pulled him

6  out.  And, you know, I don't think he was a huge person.

7  I mean, he was probably similar to my size or maybe

8  little bit bigger, but it's hard to hold up a person

9  where -- where -- where, you know, they're not moving.

10  So, he pretty much just went down to the ground.

11      Q.   When you pulled him out of the vehicle and he

12  fell on the ground, could you tell if he was bleeding at

13  that time?

14      A.   Oh, yeah.

15      Q.   Where was he bleeding from, if you could tell?

16      A.   He had a pretty -- he had a massive wound to

17  his right carotid.

18      Q.   So sort of the right side of his neck?

19      A.   Yeah.

20      Q.   Did -- after he is out of the vehicle, after

21  you pulled him out and he's on the ground, did you

22  observe any officer provide medical attention to him?

23      A.   No.

24      Q.   Did you handcuff him after he was out of the

25  vehicle and on the ground?

Robert Gonsalez

```
1        Q.    I'll follow up with something more specific.

2              You also received additional training after the

3    police department, after completing the -- your time in

4    the academy; is that correct?

5        A.    Yes.

6        Q.    Did that include a period of field training?

7        A.    Yes.

8        Q.    The training that you received from the Los

9    Angeles Police Department, by which I'm referring to

10   your time in the academy and after, did that include

11   training on the use of deadly force?

12       A.    Yes.

13       Q.    Based on the training you received, is deadly

14   force considered the highest level of force that an

15   officer can use?

16       A.    Yes.

17       Q.    Were you trained that deadly force can be used

18   only to defend against an imminent or immediate threat

19   of death or serious bodily harm?

20       A.    Correct.

21       Q.    Were you trained that before using deadly force

22   a warning should be given, if feasible?

23       A.    Correct.

24       Q.    Were you trained that such a warning should be

25   given in a language that the person who's being warned
```

Robert Gonzalez

```
 1    If he's holding it at some person or holding it in my

 2    direction, yeah, absolutely.

 3         Q.   It sounds like you're saying that your training

 4     was there's got to be something more than just the fact

 5     of holding a gun without anything else?  But I don't

 6     want to put words in your mouth; but that's the question

 7     I'm trying to ask, whether you were trained that you can

 8     shoot somebody just for holding a gun, with nothing

 9     else?  Are you saying that's not what you were trained?

10              (Simultaneous speakers.)

11              (Reporter clarification.)

12              MS. LUCERO:  Objection.

13              Christian can proceed.

14              MR. BOJORQUEZ:  I just want to make an

15     objection again.

16              It's an incomplete improper hypothetical.

17     Lacks foundation.  Calls for speculation.

18              I do believe it's already been asked and

19     answered.  I think this is probably the third time.

20              MS. LUCERO:  And misstates his testimony.

21     BY MR. LEVINE:

22         Q.   You can answer.

23         A.   No.  I mean, just to cut it short, we're not

24      trained to just shoot at somebody who's holding a gun,

25      who is not posing any type of threat, okay?  Let me put
```

```
1    it that way.
2              If he's holding a gun and he's not doing it in
3    a manner that is threatening, right, then -- then we
4    wouldn't automatically jump to deadly force, okay?  But
5    it all depends on the circumstance.
6              And, you know, I don't -- I don't -- I don't
7    recall any type of LAPD training that posed a question
8    in that manner.  Like, it's -- it's all situationally
9    driven, right?  There's a gun; it's in somebody's hand.
10   What's he doing with a gun in his hand, right?  What's
11   the situation?
12             I mean -- I don't know how much more I can
13   clarify it.  But, I mean, you know -- I mean, to satisfy
14   your point, yeah, if you're not -- if you are holding a
15   gun and there is no threat, then, yeah, LAPD doctrine
16   would be no, you're not going to shoot the guy if you're
17   not posing a threat.
18             I mean, like I said, it depends on what you're
19   doing with the gun.
20        Q.   Okay.  Did you also receive training regarding
21   tactics from LAPD?
22        A.   Yes.
23        Q.   Was part of your training on tactics focused on
24   the use of cover and concealment?
25        A.   Cover versus concealment?  Yes.
```

1          Q.    Well, both I, guess.  Were you trained on each

2     of those things at LAPD?

3          A.    Yes.

4          Q.    Was part of the training that you received that

5     if somebody poses a potential deadly threat, to utilize

6     available cover, if feasible?

7               MS. LUCERO:  Objection.  It's an incomplete

8     hypothetical, again.

9               (Simultaneous speakers.)

10              Go ahead, Christian.

11              MR. BOJORQUEZ:  My apologies to Ms. D'Urso.

12              Objection.  It's an incomplete, improper

13    hypothetical.  It lacks foundation, and would call for

14    speculation.

15              MS. LUCERO:  Join.

16    BY MR. LEVINE:

17         Q.    You can answer.

18         A.    I mean, human nature is if somebody is pointing

19    a gun at you, you would seek cover.  But at the same

20    time, we, as police officers, we're like -- we're here

21    to protect, right?

22              So, yeah, we could -- and it goes back to the

23    whole redeployment thing.  Yeah, we could have went to

24    the back of the car, back of the truck, where it would

25    allow us more cover.  But then if he starts firing or we

1        So just to clarify, my question is:  Whether

2    you were trained by LAPD that if somebody poses a

3    potential deadly threat to you, you should utilize

4    cover, when feasible?  Were you trained that by LAPD?

5        MS. LUCERO:  Same objections.  Incomplete

6    hypothetical.  Calls for speculation.  Lacks foundation.

7    Also, vague as to time of when training was delivered.

8        MR. LEVINE:  At any time.

9        THE WITNESS:  Well, I mean, you added one

10   little part, "when feasible."  Yes, I mean, when

11   feasible, we should take cover.  But obviously, in this

12   situation, I don't the think that it would have been

13   feasible, because it would have been endangering -- it

14   would have involved redeployment, which would have

15   endangered the public.

16       Q.   Did you -- I think I might know your answer to

17   this based on what you just said, but did you utilize

18   cover in the few seconds prior to the shooting, during

19   this incident?

20       A.   No.

21       Q.   And did you observe Officer Steelmon utilize

22   cover in the few seconds prior to the shooting during

23   this incident?

24       A.   No.  And I'm just going to defer back to my old

25   answer of why.  I mean, I don't want to explain why that

```
 1   STATE OF CALIFORNIA)
                        ) ss:
 2   COUNTY OF BUTTE    )

 3           I, KIMBERLY E. D'URSO, do hereby certify:
 4

 5           That the witness named in the foregoing

 6   deposition was present remotely and duly sworn to testify

 7   to the truth in the within-entitled action on the day and

 8   date and at the time and place therein specified;

 9           That the testimony of said witness was reported

10   by me in shorthand and was thereafter transcribed through

11   computer-aided transcription;

12           That the foregoing constitutes a full, true and

13   correct transcript of said deposition and of the

14   proceedings which took place;

15           Further, that if the foregoing pertains to the

16   original transcript of a deposition in a federal case,

17   before completion of the proceedings, review of the

18   transcript [ ] was [ ] was not requested.

19           That I am a certified stenographic reporter and

20   a disinterested person to the said action;

21           IN WITNESS WHEREOF, I have hereunder subscribed

22   my hand this 20th day of January, 2026.

23   _____

24   KIMBERLY D'URSO, CSR NO. 11372, RPR

25
```