# Exhibit 3
## (David Mirzoyan Deposition Transcript Excerpts)

1               UNITED STATES DISTRICT COURT

2              CENTRAL DISTRICT OF CALIFORNIA

3                   --oOo--

4

5 NELSON VASQUEZ, ET AL.,

6         Plaintiff,

7

8 v.               Case No.  8:24-cv-02421-FLA-JDE

9 CITY OF LOS ANGELES; SEAN
STEELMON; and DOES 2 through 10,
10 inclusive,

11         Defendants.
_____/
12

13

14        STENOGRAPHIC REPORTER'S TRANSCRIPT OF

15            REMOTE DEPOSITION OF

16             DAVID MIRZOYAN

17          THURSDAY, OCTOBER 9, 2025

18

19 Reported Stenographically by:

20 KIMBERLY D'URSO, CSR 11372, RPR

21 Job No.  20649

22

23

24

25

 1   or before the incident?

 2        A.    Before the incident.

 3        Q.    So they essentially broadcast the actual call

 4   itself from the caller?  You heard the caller's voice

 5   and all of that?

 6        A.    No.  What we heard was the police dispatcher

 7   disseminating that call to all Topanga units.

 8        Q.    So just to clarify, when you say, "They

 9   disseminated the call," you're referring to the

10   information that was shared with them from the call?

11        A.    Yes.

12        Q.    You didn't hear the literal voice of the caller

13   or the exchange between the caller and dispatch;

14   correct?

15        A.    Correct.

16        Q.    So I think you shared with me that dispatch

17   relayed that there was a call about an unknown

18   individual with a gun; is that correct?

19        A.    Yes.

20        Q.    And I believe you referenced a truck, as well?

21        A.    Yes.

22        Q.    What information did you have about that truck

23   from the call?

24        A.    Very vague information.  All we knew at the

25   time, that it was a dark-colored pickup truck, possibly

1    gray.

2        Q.    And then did the call state -- or scratch that.

3            Did the information you received from dispatch

4    communicate to you whether the individual who was the

5    subject of the call was in the vehicle or somewhere else

6    relative to the vehicle?

7        A.    No.  There was not that specific information

8    that was relayed to us.  We just knew that there was a

9    suspect either within the proximity of the truck or

10   inside the truck, armed with a gun.

11       Q.    Did you receive any information about the

12   gender of the suspect from that call?

13       A.    Yes.  I believe the comments on the call

14   depicted that it was a male, unknown.

15       Q.    And when you say "unknown," does that refer to

16   their ethnicity?

17       A.    "Unknown" refers to ethnic back- -- ethnicity,

18   of course, and also the description of the suspect.

19       Q.    So "male, unknown" essentially means it's a

20   male, and no other details about them?

21       A.    Right.  Yes, sir.

22       Q.    So, for example, you didn't receive information

23   about whether they were young or old?

24       A.    Correct.

25       Q.    And you mentioned ethnicity already.  You

 1    didn't receive any information about whether they were

 2    White or Black or Hispanic or Asian or anything else?

 3         A.    Correct, sir.

 4         Q.    Did you receive any information from the call

 5    that you haven't told me about already?

 6         A.    No.

 7         Q.    Were you called to the scene personally, or

 8    were you backup, or something else?

 9         A.    We were a backup response unit for a supervisor

10    that initially -- what we would call "bought the call."

11    He assigned the call, essentially, to himself.

12         Q.    Was that Sergeant Talbot?

13         A.    Yes, sir.

14         Q.    Do you know generally where you were when you

15    received the call and decided to respond?

16         A.    Yes.  We were, I believe, in the area of

17    Sherman Way Boulevard and Canoga Avenue, which would be

18    a few block west of the location of.

19         Q.    And I heard you say "we."  Were you with a

20    partner at that time?

21         A.    Yes, sir.

22         Q.    Who was the partner?

23         A.    Police Officer 2, Phillip Phan.

24         Q.    Were the two of you in a police vehicle

25    together at that time?

1    direction to kind of try to triangulate on that truck,

2    in a high-risk formation.

3         Q.   So would Officer Steelmon's vehicle been

4    between your vehicle and Sergeant Talbot's vehicle after

5    you parked?

6         A.   Yes.

7         Q.   When you arrived, did you discuss with any of

8    the other officers who were already on scene what, if

9    anything, had happened so far at the scene?

10        A.   I had a brief conversation with Officer

11   Steelmon upon my arrival.

12        Q.   What did you discuss in that conversation?

13        A.   Well, we discussed that we couldn't see any

14   occupants inside the truck.  We couldn't verify if it

15   was occupied or not.  And essentially, we formed the

16   objective to form what we call a "stick formation," and

17   approach the vehicle on the passenger side to further

18   investigate if that was, indeed, the vehicle in

19   question, and to determine if it was occupied, as there

20   were no indications at the time that it was.

21             And the vehicle itself was equipped with heavy

22   window tint, so even with us attempting to illuminate

23   the vehicle with our spotlights, we were still unable to

24   see any occupants inside.

25        Q.   Approximately, how far were you away from the

1    the designated cover officer and contact officer.  And

2    then all the other officers fall behind that designated

3    point officer as we make our approach.

4        Q.   When you guys were making that approach, where

5    were you in the stick?  Were you directly behind Officer

6    Steelmon or somewhere else?

7        A.   I was behind Steelmon, so I would be considered

8    number two, the second officer in that stick formation.

9        Q.   And then when you were approaching the truck,

10   do -- could you determine whether the truck was on or

11   off?

12       A.   We had no indication that it was on, so we were

13   not able to determine exactly if it was on or off.

14       Q.   Did you see any exhaust coming out of the

15   tailpipe?

16       A.   I wanted to clarify that.  So there were no

17   exhaust fumes to make from the exhaust.  There were no

18   lights illuminated from the vehicle, as far as the brake

19   or taillights or headlights, so there was no indication

20   that it was on.

21       Q.   And similarly, you -- did you observe whether

22   the vehicle was vibrating at all, as if the engine was

23   running?

24       A.   Right.  There was no movement or no sound

25   consistent with the engine being activated, emitting

1    from that vehicle.

2        Q.    So did you assume, based on all of that at the

3    time, that the vehicle was off?

4        A.    Well, that was -- the whole objective of

5    approaching that vehicle was to, in fact, determine if

6    that vehicle was the vehicle involved in the call, and

7    if it was occupied or if it was on.

8        Q.    Right.  I guess I'm just more specifically

9    asking whether, while you were approaching and you're

10   seeing that there's no exhaust coming out, and no

11   vibrating, no lights, if that led you to believe that

12   the vehicle was off at that point?

13       A.    Yes.

14       Q.    And just backing up really quick, when you

15   arrived at the scene -- and I think you had said that

16   Sergeant Talbot and Officers Tamate and Steelmon were

17   there already, did you understand, was there an officer

18   in charge among the officers who were there?

19       A.    There was no specific officer that I would say

20   was in charge of the incident.

21       Q.    Would the sergeant have been the ranking

22   officer at the scene?

23       A.    Yes.  He would be the supervisor at scene,

24   correct.

25       Q.    Did he play any role in the discussion that

1    included you and Officer Steelmon, about forming the

2    stick formation and approaching the truck, to

3    investigate?

4         A.   No.  His -- his -- his role at the time as a

5    supervisor is to monitor us as we conduct our tactics.

6    And roles are always interchangeable.  Not everyone has

7    a specific role.

8              Every situation is dynamically fluid and can

9    change, so it's important for every individual officer

10   at scene to be open-minded to being interchangeable and

11   taking on a specific role when the circumstance presents

12   itself.

13        Q.   Was there some discussion that you were a part

14   of or overheard with Sergeant Talbot about it was going

15   to be -- you all, the -- his subordinate officers who

16   were in charge of coming up with a plan, and that he was

17   supervising; or was that more something you understood

18   from your training?

19        A.   Right.  I feel like every officer, we all train

20   in the same academy, we're all POST-certified peace

21   officers that get hired by the LAPD and we do our six

22   months in the academy.  And I can work with an officer

23   from a different bureau, a different division and,

24   universally, the tactical concepts are all the same.

25        Q.   So just to clarify, would that include the fact

1    that the sergeant there is supervising and is not giving

2    direction as to forming a tactical plan or anything like

3    that?

4         A.    Correct.

5         Q.    At some point, did one of the officers open a

6    door of the truck after you approached?

7         A.    Yes.

8         Q.    Who was that, if you know?

9         A.    Officer Tamate.

10        Q.    And would that be the front passenger door?

11        A.    Yes.

12        Q.    Before Officer Tamate opened that door, had you

13   been able to determine -- excuse me -- to determine

14   whether there were any occupants in the vehicle at any

15   time?

16        A.    Right.  So as we're making our approach, we

17   immediately observed that the -- the back window to that

18   truck was partially ajar.  It was kind of an older model

19   truck, so it had those push-out windows in the back.  So

20   we noticed that was partially ajar.

21             And utilizing our lighting equipment on our

22   department-approved weapons, we illuminated that

23   opening, and that's when we observed, initially, the

24   front passenger was inside that vehicle.

25        Q.    Could you tell whether -- at that time whether

 1    there was anyone in the driver's seat?

 2         A.   Not at that time specifically.

 3         Q.   Before Officer Tamate opened that front door,

 4    what were you able to observe about the person who was

 5    seated in the front passenger seat?

 6         A.   We observed that he was kind of stationary and

 7    slumped over, which is, you know, consistent to maybe

 8    somebody being inebriated or under the influence of an

 9    intoxicant or possibly sleeping.  But there was no

10    response from that individual upon making that initial

11    approach.

12         Q.   Were you or other officers calling out to him

13    before the front door was opened?

14         A.   Yes.  I believe Officer Tamate had made a call

15    out to that individual.

16         Q.   So when you say there was no response, you mean

17    he didn't respond to what Officer Tamate was saying?

18         A.   Correct.

19         Q.   And then so after Officer Tamate opened that

20    front door, did you approach the open door area and

21    observe anything about the inside of the truck cab?

22         A.   Yes.

23         Q.   What did you observe when you first approached

24    and looked into the truck?

25         A.   Well, I observed that passenger, that I

1        A.    Uh-huh.

2        Q.    Or something else entirely?

3        A.    Well, that was the thought process.  And what

4    was also a thought process was we knew that there was a

5    gun involved, a firearm involved, so we didn't know if

6    this was a potential suicide by means of that firearm.

7            We also -- we also considered that they may be

8    inebriated or under the influence of alcohol or

9    intoxicant, So our primary focus at that point was to

10    render any medical aid that was necessary.

11        Q.    When you were approaching the truck, did you

12    know whether the truck was the same truck that was

13    referenced in the call?

14        A.    That wasn't confirmed at the time, sir.  We had

15    very vague, limited information regarding that truck.

16    So we knew it was a truck, it was dark in color, but we

17    were still investigating, in fact, that was the truck

18    that was involved.

19            And also, I just wanted to highlight, upon

20    making that approach, we did observe condiments from a

21    taco truck on that truck bed.  And we know that there's

22    various vendors, taco venders, along Sherman Way

23    Boulevard just south of where that truck was parked, so

24    it was possible that, you know, maybe these occupants --

25    maybe the truck was involved and these occupants are out

1    there getting their food, or they're walking around that

2    parking lot.  That parking lot was also occupied by

3    pedestrians at the time of the incident.

4         Q.   And then I think you had mentioned that the

5    call referenced a single male, unknown; right?

6         A.   Yes.

7         Q.   It wasn't two males; correct?

8         A.   Correct.

9         Q.   So when you first looked into the truck and saw

10   these two guys there, did you consider that it was

11   possible that this was not the truck still, that was

12   referenced in the call, at least at that time?

13        A.   Yes, that was the thought process, sir.  It

14   wasn't confirmed at the time.

15        Q.   And then also, even if -- well, I'll scratch

16   that one.

17             Could you -- when you were observing these two

18   men in the front seat, could you ascertain anything about

19   what their apparent age or ages were?

20        A.   To me, they looked about middle-aged, two

21   middle-aged individuals.

22        Q.   Ethnicity?

23        A.   I'd say Hispanic.

24        Q.   Did you ever hear either of them speak?

25        A.   No.

Daniel Mirzaian

1    Q.    When you and the other officers were -- were

2    looking at these men after opening the door, did you or

3    another officer say something to the effect of, "These

4    guys are out"?

5    A.    Yes.

6    Q.    Was that you or somebody else?

7    A.    That was Officer Tamate.

8    Q.    Okay.  And what did you understand him to mean

9    in saying that?

10   A.    My understanding, "These guys are out" was

11   defined as, you know:  These guys are possibly

12   inebriated or heavily intoxicated and unresponsive.

13   Q.    Was that basically your perception as well?

14   A.    Correct.

15          MR. BOJORQUEZ:  Objection.  Lacks foundation.

16   Calls for speculation.

17          MS. ROCAWICH:  Join.

18   BY MR. LEVINE:

19   Q.    You can answer unless you are instructed not to

20   answer.

21   A.    Can you rephrase the question, please?

22   Q.    Sure.  Well, we had been discussing -- I think

23   you testified that it was Officer Tamate who said,

24   "These guys are out," or something along those lines,

25   and that you had understood him to mean -- and I'm just

Daniel Morgan

```
 1   also a possibility.
 2        Q.   Okay.  You didn't see any blood in the car, did
 3   you?
 4        A.   No.
 5        Q.   Okay.  And when you say you didn't observe any
 6   injuries, you're referring to both of the occupants?
 7        A.   Correct.
 8        Q.   When the door was opened and you're looking at
 9   these two occupants, did you see any gun at that time?
10        A.   No.
11        Q.   Did you see any other weapon in the car at that
12   time?
13        A.   No.
14        Q.   Could you tell whether the occupants were
15   breathing at that time?
16        A.   Well, I could tell that they were breathing
17   because it's not like they were unconscious.  They were
18   unresponsive.  They appeared to be possibly inebriated,
19   but there was still movement amongst those individuals,
20   so I knew they were breathing.
21        Q.   Okay.  So would it be fair to say that they
22   appeared to be alive at that time?
23        A.   Correct.
24        Q.   Could you smell any alcohol in the -- coming
25   from the vehicle or the two men, at any point, while you
```

1    And also, he was receptive to any commands that were

2    given.

3         Q.    Okay.  I guess my question is just a little

4    broader, about whether you knew whether they understood

5    English or not?

6         A.    I was not aware.

7         Q.    And that would include the driver, too;

8    correct?

9         A.    Correct.

10        Q.    We were talking a bit ago, and I think your

11   attorney made an important clarification about my

12   question, and I was asking about what you could see in

13   the vehicle.  And at that time, we were talking about

14   the first -- the very initial period after the front

15   door was opened.

16             Kind of looking to the whole period now,

17   between when the front door was opened and when you

18   heard -- or when Officer Steelmon fired that gunshot, do

19   you have that kind of period in mind?  Do you understand

20   what period I'm referring to?

21        A.    You said from the period the door was open to

22   the time of the officer-involved shooting?

23        Q.    Yeah.  From the door opening to the gunshot.

24   Do you have that --

25        A.    Okay.

Daniel Morgan

 1    was at that time?

 2         A.    I was standing behind the B pillar of that

 3    passenger side of the truck.

 4         Q.    And when you say "behind the B pillar," do you

 5    mean, like, behind the -- sort of adjacent to that rear

 6    window that you mentioned earlier that had been popped

 7    open?

 8         A.    Correct.

 9         Q.    And I think you may have answered this already,

10    but you never heard either occupant of the vehicle say

11    anything before the gunshot; correct?

12         A.    Correct.

13         Q.    You told me a little bit earlier about the plan

14    to go into a stick formation that was developed with, I

15    think, you and Officers Steelmon and Tamate, after you

16    arrived, before your approach.  Do you remember that?

17         A.    Yes.

18         Q.    Was there any -- at that time or at any other

19    time before the gunshot, was there anything that you

20    heard or were a part of that you would describe as any

21    sort of tactical plan or tactical discussion about

22    approaching the car and addressing the situation?

23         A.    No, sir.  I feel like assigning individual

24    roles in a tactical incident can be problematic because

25    that officer is now -- in his head, he believes that

1    he's limited to the scope of that role.  Every

2    situation's dynamically fluid, and roles are always

3    interchangeable.

4             So, universally, every officer within our

5    organization is trained the same, whether it's Central

6    Bureau or South Valley Bureau.  We all have a general

7    understanding of how to approach an incident, based on

8    the circumstances presented in front of us.

9         Q.   Are you saying that there's not any situation

10   where a tactical plan would be discussed or created?

11        A.   We did have a plan, an objective on how to

12   handle this incident, but it's not always required for

13   roles to be individually assigned and verbalized, if

14   that makes sense?

15        Q.   That makes sense.  Just to clarify, though, I'm

16   not asking whether it was required or not.  I'm just

17   asking whether it happened.

18             Do you understand the distinction?

19        A.   Correct.  So to answer your question, no

20   specific role was assigned to an individual officer.

21        Q.   Okay.  And then separate from whether anyone

22   was assigned a specific role, was there any other sort

23   of tactical discussion that happened, irrespective of

24   who was going to fill what role?

25        A.   No.

1    Q.    Because you could have a tactical plan without

2    specific roles assigned; correct?

3    A.    Correct.

4    Q.    Was there any -- ever any discussion that you

5    heard or were a part of about designating any officer to

6    be less lethal or have less lethal ready?

7    A.    There wasn't a discussion.  But going back to

8    our training, we know that the officer equipped with the

9    shoulder weapon or the long gun, would be point in that

10   stick formation and would be the designated cover and

11   contact officer.  And, generally, the number two or

12   number three man in that stick formation would

13   transition to less lethal, if the circumstance allows or

14   if feasibility allows.  So --

15          (Reporter clarification.)

16          THE WITNESS:  If there's feasibility utilized,

17   that number two or number three man in that stick would

18   transition.

19   BY MR. LEVINE:

20   Q.    Did you say that, based on your training, that

21   Officer Steelmon as the officer with the shotgun, would

22   have been the contact and the cover officer?

23   A.    In this specific incident, yes.

24   Q.    Okay.  Did you ever hear any discussion or were

25   part of any discussion about whether any officer should

1    approach the vehicle from the driver's side at any

2    point, before the shot was fired?

3        A.    No.

4        Q.    At any point before the shot was fired, were

5    you ever a part of or did you ever hear any discussion

6    about potentially calling for an airship, including to

7    illuminate the area?

8        A.    So I just want to highlight, I did put out the

9    backup request, as I took the role of communications.

10   Usually in that backup request, it's the responsibility

11   of the dispatcher, in conjunction with that backup

12   request, an air unit is automatically assigned to that

13   call, as well a supervisor.  However, the supervisor

14   obviously, was already at scene.

15       Do I feel like the air unit would have been

16   practical in this incident?  I don't believe so.  I

17   don't feel like the air unit would have the capabilities

18   of illuminating inside that vehicle from overhead

19   position.

20       And also, the air unit can also trigger anyone

21   who's under the influence, possibly, or inebriated, to

22   react in a way that we don't want them to react.

23       Q.    I just want to clarify part of something you

24   said there, where I know you mentioned that you had made

25   some type of call for backup.

1       A.    Uh-huh.

2       Q.    Are you saying that -- did you -- are you

3    saying that you did not specifically request any air

4    unit in that call for backup?

5       A.    Specifically, no, sir.

6       Q.    If you had wanted an air unit to come, would

7    you have been expected to specifically request that when

8    calling for backup?

9       A.    It depends on the circumstance, sir.  Like I

10   mentioned earlier, in that backup request, an air unit

11   is automatically assigned to that call for backup.

12   Plus, specifically, we can request an air unit on any

13   type of call if we feel like it's practical to do so, to

14   answer your question.

15      Q.    So based on your understanding of LAPD

16   procedures, are you saying that an air unit was or would

17   have been assigned to the call, in response to your call

18   for backup?

19      A.    Yes.

20      Q.    Did you ever receive any information that an

21   air unit was on route to the location?

22      A.    No, sir.

23      Q.    Was there -- at any time before Officer

24   Steelmon fired, was there ever any discussion that you

25   heard or were a part of, regarding possibly pulling the

1    police units closer to the truck?

2        A.    Closer -- our police units closer to the truck?

3        Q.    Correct.

4        A.    No.  There was no discussion on that.

5        Q.    At any time after Officer Steelmon observed and

6    called out that, "Gun" for the first time, was there --

7    did you or any other officer you observed go -- make any

8    attempt to go around toward the driver's side of the

9    truck?

10       A.    Prior to him yelling out, "Gun" or identifying

11   the gun?

12       Q.    After.  After.

13       A.    After.  Yes, Steelmon did direct -- he

14   requested an arrest team on that driver's side to both

15   secure the firearm and to apprehend that individual.

16       Q.    How about between the time -- so after he first

17   called out, "Gun," but before the gunshot?

18       A.    Uh-huh.

19       Q.    How about during that time period?

20       A.    No.  There was no direction by anyone to

21   approach on the driver's side.

22       Q.    Would it be accurate to say that the first time

23   there was any direction or discussion of approaching

24   from the driver's side would have been after Officer

25   Steelmon fired?

1      A.   Correct.   And those directions were given by

2   Officer Steelmon at the time.

3      Q.   Was there ever any attempt made, that you were

4   aware of, to use any type of PA system to address the

5   occupants of the truck?

6      A.   No, sir.   I just want to highlight, a lot of

7   the PA systems in our SUV interceptors are a little

8   problematic.   Generally, to get an effect from that PA

9   system, we would have to be inside the vehicle and close

10   all the doors and windows, so that the sound emitting

11   from that PA system doesn't echo and create any

12   unnecessary noise, if that makes sense?

13            MR. LEVINE:   All right.   I think this might be

14   a good time to take our first break.   Does ten minutes

15   sound okay to everybody?

16            THE WITNESS:   Yes.

17            MS. ROCAWICH:   Fine with me.

18            MR. BOJORQUEZ:   Fine with the City.

19            MR. LEVINE:   Okay.   We can go off the record.

20            (Break taken.)

21   BY MR. LEVINE:

22      Q.   All right.   So, Officer Mirzoyan -- am I

23   pronouncing it correctly?

24      A.   Yes, sir.   Mirzoyan.

25      Q.   Okay.   I'm sorry.

 1    would be my striker-fired, semi-automatic pistol.

 2         Q.   And when was that?  Was that when you were

 3    approaching the vehicle in the stick formation?

 4         A.   Yes.

 5         Q.   At some point, did you holster it again?

 6         A.   Yes.

 7         Q.   When was that?

 8         A.   After the -- the shooting itself.

 9         Q.   You didn't fire any shots during this incident;

10    correct?

11         A.   No, sir.

12         Q.   To your knowledge, did any officer, other than

13    Officer Steelmon, fire any shots during this incident?

14         A.   No other officers fired their weapons, to my

15    knowledge.

16         Q.   How about any occupant of the vehicle?  Did the

17    driver ever fire any shot, to your knowledge, at any

18    time?

19         A.   No, sir.

20         Q.   And same for the passenger, I take it?

21         A.   Yes.  Correct.

22         Q.   Did you ever observe any officer unholster or

23    take out any less-lethal weapon, including a Taser, OC

24    spray, a baton, or anything else?

25         A.   No.

1    Q.   At any point after you joined the police

2  department and after you completed the police academy,

3  did you receive further training from the LAPD?

4    A.   Could you be more specific, sir, in what type

5  of training?

6    Q.   Any kind of training, to start.

7    A.   Yes, sir.  We called it "in-service training."

8  That's upon the completion of the academy and our

9  probationary period.

10    Q.   Did training that you received in the academy,

11  and also during your probationary period at LAPD,

12  include training on the use of deadly force?

13    A.   Yes.

14    Q.   Were you trained that deadly force is the

15  highest level of force that an officer can use?

16    A.   That's an accurate statement.

17    Q.   Is that what your training was?

18    A.   Yes.

19    Q.   Were you trained that deadly force should only

20  be used to defend against imminent or immediate threat

21  of death or serious bodily injury?

22    A.   Yes.

23    Q.   Were you trained that, before giving deadly

24  force, a warning should be given to the subject, if

25  feasible?

     1          A.   If feasible, yes.

     2          Q.   Did you receive any training about when

     3   communicating with a subject who you are considering

     4   using force -- deadly force against, that you should

     5   communicate with them or attempt to communicate with

     6   them in a language they can understand?

     7          A.   Yes, when feasible.  I feel like use of force

     8   is circumstantially driven on the suspect's actions.

     9   Ultimately, the suspect dictates the way we respond to

    10   that situation.  And it also dictates that feasibility

    11   to utilize intermediate force options or, you know,

    12   additional resources, and also to deescalate the

    13   situation.

    14               I feel like that's a dual process.  And the

    15   suspects, themselves, need to be willing to engage in

    16   that process for it to be effective and to reduce that

    17   intensity of that encounter.

    18          Q.   I understand all that.  I think my question was

    19   a little more narrow, though.  I'm just focused on what,

    20   if any, training you received about when you're

    21   communicating with a subject who is possibly going to be

    22   on the receiving end of some type of force, if -- you

    23   know, what to do in ascertaining what language they

    24   speak, and whether any communications that you're making

    25   are understood?

1          A.    Yes, that's included.

2          Q.    Okay.  Are you aware whether any warning that

3     deadly force was going to be used was issued in Spanish

4     during this incident?

5          A.    To my knowledge, that warning was given in

6     English.  I don't recall if it was given in Spanish.

7          Q.    Do you know who of the officers who were there

8     that evening spoke Spanish?

9          A.    I was not aware.  Again, this was my first

10    deployment period at this new division, so I had very

11    limited scope of knowledge of every individual officer,

12    even by name or their abilities in Spanish fluency.

13         Q.    Does LAPD have any procedures or protocols that

14    you're aware of for designating or identifying officers

15    who speak languages, other than English?

16         A.    Not to my recollection.  There's no particular

17    protocol to identify those individuals.  Usually when

18    there's -- when there's need of a translator, we often

19    request one and hope that an officer in the vicinity can

20    respond and assist us, if that makes sense?

21         Q.    So if like -- if you're going out with a

22    partner on patrol, for example, you might not

23    necessarily know or be informed whether that partner

24    speaks languages other than English.  There's no process

25    for that.  Is that what you're saying?

1          Were you trained that it's justifiable to use

2     deadly force against somebody just because that person

3     has a gun in their hand, that fact alone?

4          A.    No, sir.   We're trained that we apply deadly

5     force when -- when necessary, under the totality of

6     circumstances that we're defending ourselves against,

7     imminent threat of death or serious bodily injury.

8          Q.    Do you also receive training regarding tactics?

9          A.    Yes.

10         Q.    Did that include training on having less-lethal

11    options available to you when approaching an encounter

12    with a subject?

13         A.    Yes.

14         Q.    Did that include training on working

15    cooperatively with other officers to have one person who

16    is potentially tasked with deadly force or assigned

17    deadly force, and another one as lethal?

18         A.    Again, our training depicts that roles are

19    always interchangeable.   It's problematic to assign a

20    specific role to an officer, because tactical incidents

21    are fluid in nature and can change in dynamics.

22              So it's not necessarily that one officer was

23    assigned as lethal cover.   That officer can potentially

24    find his way in taking the role of communications.   It's

25    all circumstantially driven by the incident.

1    STATE OF CALIFORNIA)
                        ) ss:
2    COUNTY OF BUTTE     )

3            I, KIMBERLY E. D'URSO, do hereby certify:

4

5            That the witness named in the foregoing

6    deposition was present remotely and duly sworn to testify

7    to the truth in the within-entitled action on the day and

8    date and at the time and place therein specified;

9            That the testimony of said witness was reported

10   by me in shorthand and was thereafter transcribed through

11   computer-aided transcription;

12           That the foregoing constitutes a full, true and

13   correct transcript of said deposition and of the

14   proceedings which took place;

15           Further, that if the foregoing pertains to the

16   original transcript of a deposition in a federal case,

17   before completion of the proceedings, review of the

18   transcript [ ] was [ ] was not requested.

19           That I am a certified stenographic reporter and

20   a disinterested person to the said action;

21           IN WITNESS WHEREOF, I have hereunder subscribed

22   my hand this 20th day of October, 2025.

23

24   _____

25   KIMBERLY D'URSO, CSR NO. 11372, RPR