# Exhibit 4

## (Phillip Phan Deposition Transcript Excerpts)

```
 1                UNITED STATES DISTRICT COURT

 2                CENTRAL DISTRICT OF CALIFORNIA

 3                          --oOo--

 4

 5   NELSON VASQUEZ, ET AL.,

 6             Plaintiff,

 7

 8   v.                    Case No.  8:24-cv-02421-FLA-JDE

 9   CITY OF LOS ANGELES; SEAN
     STEELMON; and DOES 2 through 10,
10   inclusive,

11             Defendants.
     _____/
12

13

14           STENOGRAPHIC REPORTER'S TRANSCRIPT OF

15                   REMOTE DEPOSITION OF

16                       PHILLIP PHAN

17                 THURSDAY, OCTOBER 9, 2025

18

19   Reported Stenographically by:

20   KIMBERLY D'URSO, CSR 11372, RPR

21   Job No.  20649

22

23

24

25
```

1  A. Street vernacular, yes, people refer to it that
2  way.
3  Q. And you were wearing a body camera as well, I
4  think you mentioned?
5  A. I was.
6  Q. What was -- when first heard about this
7  incident that you ended up responding to, what
8  information was relayed to you?
9  A. So, on October 7th of 2023, at approximately
10  12:56 p.m., a radio call was generated that was
11  broadcasted over the air that there was a possible 14
12  [sic], man with a gun, sitting inside of a dark gray
13  pickup truck sitting in front of the CVS at Sherman Way
14  and Variel. It stated that the possible suspect --
15  (Reporter clarification.)
16  THE WITNESS: -- was described as male unknown,
17  sitting inside of the vehicle.
18  BY MR. LEVINE:
19  Q. I think there you said something -- did you say
20  the number 14, or you said a number, I thought I heard.
21  A. Oh, 415.
22  Q. 415. Okay. And what does that refer to?
23  A. It refers to the Penal Code, 415 PC, which is
24  usually used to describe disturbing the peace.
25  Q. So was it essentially accurate to say that the

```
 1    information you received was there's one man in a pickup
 2    truck, outside the CVS, with a handgun, disturbing the
 3    peace?
 4         A.   Vaguely, yes.  It was a vague description.
 5         Q.   Right.  And the call referenced a single
 6    individual; correct?
 7         A.   Yes.
 8         Q.   Did the call give you any information about
 9    what this person was reported to be doing with this gun,
10    or just that they were in possession of a gun?
11         A.   It stated that they had a gun, but no further
12    information, as far as what the suspect was doing with
13    it.
14         Q.   Okay.  So you didn't know, for example, whether
15    the 415 was related to the gun or not?
16         A.   Right.  So, as officers, as we're responding,
17    we can only assume that this person was doing some sort
18    of action that caught the attention of a citizen or a
19    passer by.
20         Q.   When you're receiving this information that you
21    just have been describing to me, how did you receive
22    that information?
23         A.   Through radio broadcast.
24         Q.   Would that be from dispatch?
25         A.   Yes.
```

1  Q. Before you approached, was there any type of
2  discussion that you were a part of or that you overheard
3  regarding how to approach, who should approach, what
4  part of the car to approach? Anything along those
5  lines?
6  A. So our discussion at that point was upon
7  sharing our observations, that we couldn't see if the
8  vehicle was occupied or not, or if it was on.
9  Officer Steelmon decided to be the point officer because
10 he had his Remington 870 shotgun already, and that we
11 would approach the vehicle and attempt to ascertain to
12 see if there were any occupants in the vehicle, or it
13 was related to the radio call.
14 Q. When you approached, who approached with you?
15 A. Officer Steelmon went first, and the other
16 officers, myself, my partner, Officer Tamate, and
17 Sergeant Talbot, we began to move towards the suspect
18 vehicle.
19 Q. Okay. And were you in some type of formation
20 or arrangement when you were approaching?
21 A. Right. So we call that a "stick." So usually
22 the first person in that stick has some sort of long
23 rifle, and everybody else falls in behind him, and we
24 start to fill in our roles from there.
25 Q. When you were discussing the approach, was

1    Q.   Still focusing on this period of time between
2    when you arrived and when that front door was popped
3    open, did you ever see the taillights of the vehicle on?
4    A.   I did not.
5    Q.   During that same time, did you ever see any
6    exhaust coming out of the tailpipe of the vehicle?
7    A.   I did not.
8    Q.   Did you, during that time, see any lights on in
9    or on the vehicle?
10   A.   At that moment, no.
11   Q.   Did you, during that time, observe any movement
12   or identify any people in the vehicle?
13   A.   From my vantage point, I don't believe that I
14   could have, because I was fourth in line.
15   Q.   But, so that would -- would that be "no," then?
16   A.   No, yeah; due to the window and my vantage
17   point.
18   Q.   Okay.  One moment.
19       Were -- from what you could tell, were the
20   windows of the truck closed when you approached?
21   A.   Do you mean prior to us approaching, us
22   initially observing the suspect vehicle?
23   Q.   At any time before the front door was popped
24   open.
25   A.   It didn't appear to me that any of the windows

1  themselves as police and when my partner asked if there
2  was any pistols.
3       And at that point, the front passenger did
4  raise his hands to acknowledge their presence and the
5  words that they were speaking.
6       Q.  And to be clear, you observed that on another
7  officer's body-worn camera, not --
8       (Simultaneous speakers.)
9       THE WITNESS:  Yes, upon reviewing body-worn
10  footage.
11  BY MR. LEVINE:
12       Q.  When you saw -- during the incident, based on
13  your own perspective and not another officer's body-worn
14  camera video -- we were just talking about a moment ago
15  when Officer Tamate pulled the passenger out from the
16  front passenger seat -- did you form any impression at
17  that time as to what you believed that individual's
18  condition was or what his state was?
19       A.  I was only able to form a vague, generalized
20  status of him, just because I was focused on the
21  tactical situation; but I did observe that, upon being
22  dragged to the ground, he wasn't responsive.
23       Q.  And what, at the time, did you believe that to
24  indicate about his condition?
25       A.  He -- that he was either under the influence of

1   some unknown substance, he could be inebriated with
2   alcohol, or he could just be noncooperative with police,
3   in general.  I wasn't exactly sure.  I just observed
4   that he wasn't responsive to what was going on.
5       Q.   Do you recall in your interview statement
6   saying that when you -- when you saw this individual,
7   you thought he appeared extremely intoxicated?
8       A.   Yes.  That was one of the -- yes.
9       Q.   Okay.  And do you also recall stating that he
10  did not appear to be able to comply with officers'
11  commands on his own?
12      A.   Where was this?  Where are you referring to?
13      Q.   In the same interview.
14      A.   Of this interview or --
15      Q.   No, not today.  The one that you did, you know,
16  later that morning with the force investigation's team.
17      A.   Okay.  I would like to state that the FID
18  interview, I was awake for approximately 18 hours, and I
19  was only briefly allowed to review my body-worn footage.
20  So I would refer that the body-worn footage is the most
21  accurate depiction of my experience; and the other
22  transcript was, of course, affected by those factors.
23      Q.   Sure.
24           So just to clarify, though, you don't recall or
25  do you recall whether or not you said that during the

1  interview?  That was my question, was just --
2           (Simultaneous speakers.)
3           THE WITNESS:  I believe I might have, yes.
4  BY MR. LEVINE:
5      Q.   Okay.  When you saw the front passenger get
6  taken out from the front passenger seat, did you make
7  any observations about his appearance; for example, his
8  apparent age or ethnicity or anything else like that?
9      A.   Not in the moment, no.
10     Q.   At the time, did you have an understanding that
11 there were two occupants observed in the car, one in the
12 driver's seat and one in the front passenger's seat?
13     A.   At which point?
14     Q.   I guess at the time that the front passenger
15 was pulled out of the car.
16     A.   That there were two occupants, yes.
17     Q.   Okay.  All right.
18          And correct me if I'm wrong, but I think you
19 had testified that at least when you got call from
20 dispatch, there was only a referencing to a single
21 individual; is that correct?
22     A.   Yes.  We received the vague description of one
23 possible individual.
24     Q.   Okay.  And then just backing up a bit, when you
25 were approaching the vehicle before the door was opened,

```
 1   until the time that Officer Steelmon fired.
 2           Do you have that period of time in your mind?
 3      A.   Yes.  The entire incident, yes.
 4      Q.   Yes.  From arrival to the gunshot, yes.
 5           During that period of time, were you ever a
 6   part of or did you ever overhear any discussion among
 7   the officers about using or utilizing less-lethal
 8   weapons?
 9      A.   Not that I can recall; but I believe we just
10   fell back to our department training, which states that
11   because it's such a fluid situation, officers are able
12   to switch between, for instance, being somebody that's
13   assigned to physically grab a suspect, to now being the
14   officer utilizing the Taser.  We officers are trained to
15   fill in as needed, as the situation arises.
16      Q.   And then relatedly during the same time period,
17   was there any discussion that you heard or were a part
18   of regarding the possibility of calling in a helicopter
19   or an airship?
20      A.   There wasn't a discussion, because I believe we
21   all understood that I don't think it provided a unique
22   tactical advantage that would have helped us in this
23   situation where we were approaching a possibly
24   unoccupied vehicle.  And at that point in time, we had
25   no real concrete idea of what was exactly going on.
```

```
 1      Q.   And then during the same period of time, was
 2   there any discussion that you were a part of or
 3   overheard regarding possibly approaching the driver's
 4   side door?
 5      A.   I don't believe there was a discussion because,
 6   like I had mentioned earlier, the comments of the call
 7   stated that there was a male unknown.  It didn't speak
 8   to if the vehicle was empty or not, so we weren't sure
 9   exactly how many suspects.  But given that vague
10   information that there was at least one male unknown, I
11   think we approached the vehicle on the assumption that
12   if there was only one occupant in the vehicle, that they
13   would most likely be on the driver's side -- driver's
14   side of the vehicle; so we approached on the passenger
15   side to give us the greatest tactical advantage.
16      Q.   After it was discovered that there were two
17   occupants in the vehicle, was there at any point after
18   that, before the gunshot, any discussion about any one
19   or more officers going over to the driver's side of the
20   vehicle?
21      A.   You said after the gunshot or before the
22   gunshot?  I'm sorry.
23      Q.   Before -- after it was discovered that there
24   were two occupants in the vehicle, but before the
25   gunshot?
```

1    A.   So, once we discovered that there was an armed
2    occupant as well as the passenger, there was no
3    discussion on us approaching on the driver's side,
4    because that would have been dangerous for us to do so.
5    That would have placed us in direct -- in the direct
6    line of fire of Officer Steelmon on the opposite side,
7    on the opposing side.
8    Q.   Was there ever, as far as you're aware, any
9    attempt made to use any PA or loud speaker to address
10   the occupants or potential occupants of the truck before
11   the shot was fired by any officer?
12   A.   So upon our arrival, Officer Steelmon and
13   Officer Tamate, as well as Sergeant Talbot, they were
14   already at scene.  So I'm not sure exactly what efforts
15   they had made as far as the PA system.  However, for me
16   and my partner, we did not utilize the PA system,
17   because using the PA system while standing outside of a
18   patrol vehicle, it creates an echo effect, and it also
19   requires us to stand outside of the vehicle, which
20   exposes us.
21   Q.   Okay.  And just to clarify, just while you were
22   on scene, until the time of the gunshot, you didn't hear
23   any use of any PA system by any officer; correct?
24   A.   I was not aware of any attempts to use a PA
25   system prior to arrival; but at scene, afterwards, no.

1    Q.   Okay.  And then relatedly, were there any
2    discussions that you were a part of or overheard, from
3    the time you arrived until the time of the gunshot,
4    regarding the possibility of using a PA?
5    A.   At that moment in time, there wasn't because,
6    like I said -- same thing with airship -- I don't think
7    it would have afforded us a tactical advantage in that
8    moment, because upon making contact with the occupant,
9    we were already within speaking distance.  And at that
10   point, utilizing the PA system would have required an
11   officer to leave the stick, and put us at another
12   tactical disadvantage by that officer leaving the stick
13   and being by himself where the patrol vehicles were.
14   Q.   At any time prior to Officer Steelmon firing
15   his gunshot, did you have any information as to whether
16   either of the occupants of the vehicle, the truck, had
17   any type of criminal history?
18   A.   There was no realistic way to ascertain that.
19   Q.   So just to confirm, would that answer be "no,"
20   then?
21   A.   Yes, no.
22   Q.   And then similarly, at any time before
23   Officer Steelmon fired, did you have any information
24   that either occupant of the truck had ever engaged in
25   any act of violence towards anybody?

1    A.    No.  There was no way of us knowing, no.

2    Q.    And then, similarly, at any point before Officer Steelmon fired, did you have any information that either occupant of the vehicle had ever used drugs of any kind?

6    A.    No.

7    Q.    Okay.  And then -- scratch that.

8          I think you testified earlier that you received -- you went to -- well, you went to the police academy; correct?

11   A.    Yes.

12   Q.    And you received training at the police academy?

14   A.    Yes, I did.

15   Q.    And then did you receive additional training after you graduated from the police academy, from the LAPD?

18   A.    Yes.  We received in-service training, yes.

19   Q.    Did you have a period of field training?

20   A.    I did.

21   Q.    How long was that period of field training?

22   A.    Approximately, one year.

23   Q.    Is that directly after you graduated from the academy?

25   A.    Yes, it was.

```
 1        A.   Yes.  So, unfortunately, if the suspect's
 2   actions and circumstances places us in a situation where
 3   officers are forced to use deadly force, that is
 4   considered one of the highest levels of force, yes.
 5        Q.   You said "one of the highest levels"?
 6        A.   The highest of force, yes.
 7        Q.   Oh, okay.  I just wanted to -- if there's some
 8   higher level of force, I'd be interested to know about
 9   it; but thank you for clarifying.
10             The training that you received from the LAPD,
11   based on that training, is it your understanding that
12   deadly force is supposed to be used only in situations
13   where it's to defend against an imminent or immediate
14   threat of death or serious bodily injury?
15        A.   Yes.  We're taught to use that as one of the
16   resorts of uses of force when we're placed in that
17   situation by a suspect's actions and the circumstances,
18   yes, in defense of imminent death or serious bodily
19   injury.
20        Q.   Were you trained that before using deadly
21   force, a warning should be given, if feasible?
22        A.   If feasible, yes, we should be giving a
23   warning.  Yes.
24        Q.   Okay.  And were you trained that if you're
25   going to give a warning before using deadly force,
```

```
 1  STATE OF CALIFORNIA)
                        ) ss:
 2  COUNTY OF BUTTE     )

 3
              I, KIMBERLY E. D'URSO, do hereby certify:
 4

 5            That the witness named in the foregoing

 6  deposition was present remotely and duly sworn to testify

 7  to the truth in the within-entitled action on the day and

 8  date and at the time and place therein specified;

 9            That the testimony of said witness was reported

10  by me in shorthand and was thereafter transcribed through

11  computer-aided transcription;

12            That the foregoing constitutes a full, true and

13  correct transcript of said deposition and of the

14  proceedings which took place;

15            Further, that if the foregoing pertains to the

16  original transcript of a deposition in a federal case,

17  before completion of the proceedings, review of the

18  transcript [ ] was [ ] was not requested.

19            That I am a certified stenographic reporter and

20  a disinterested person to the said action;

21            IN WITNESS WHEREOF, I have hereunder subscribed

22  my hand this 17th day of October, 2025.

23
                    _____
24

25  KIMBERLY D'URSO, CSR NO. 11372, RPR
```