**LAW OFFICES OF DALE K. GALIPO**
Dale K. Galipo (SBN 144074)
dalekgalipo@yahoo.com
Benjamin S. Levine (SBN 342060)
blevine@galipolaw.com
21800 Burbank Blvd., Suite 310
Woodland Hills, CA 91367
Tel: (818) 347-3333
Fax: (818) 347-4118

*Attorneys for Plaintiffs*

# UNITED STATES DISTRICT COURT
# CENTRAL DISTRICT OF CALIFORNIA

| | |
|---|---|
| NELSON VASQUEZ, individually and as successor-in-interest to Decedent, Oscar Vasquez Lopez; DAYLIN VASQUEZ, individually and as successor-in-interest to Decedent, Oscar Vasquez Lopez; LUSSY VASQUEZ, individually and as successor-in-interest to Decedent, Oscar Vasquez Lopez; OSCAR VASQUEZ, individually and as successor-in-interest to Decedent, Oscar Vasquez Lopez; K.V., by and through her guardian ad litem, Daylin Vasquez, individually and as successor-in-interest to Decedent, Oscar Vasquez Lopez; A.V., by and through his guardian ad litem, Daylin Vasquez, individually and as successor-in-interest to Decedent, Oscar Vasquez Lopez; and JOSE VASQUEZ LOPEZ, individually,<br><br>Plaintiffs,<br><br>v.<br><br>CITY OF LOS ANGELES; SEAN STEELMON; and DOES 2 through 10, inclusive, | Case No. 8:24-cv-02421-FLA-JDE<br><br>Hon. Fernando L. Aenlle-Rocha<br><br>**DECLARATION OF JEFFREY J. NOBLE IN SUPPORT OF PLAINTIFFS' OPPOSITION TO DEFENDANT SEAN STEELMON'S MOTION FOR SUMMARY JUDGMENT AND/OR PARTIAL SUMMARY JUDGMENT OF ISSUES** |

| | |
|---|---|
| 1 | Defendants. |
| 2 | |

### DECLARATION OF JEFFREY J. NOBLE

I, Jeffrey J. Noble, do hereby declare as follows:

1. I am a police practices expert specializing in the procedures of police practices and proper police tactics, including proper procedures for detention and arrest of individuals and the type and degree of force, if any, appropriate under different circumstances.

2. I am a competent adult and am personally familiar with the facts contained herein and could competently testify thereto if called upon to do so.

3. I was retained in this action to render opinions regarding the incident that occurred on October 7, 2023, that resulted in the officer-involved shooting of Oscar Vasquez Lopez.

4. The opinions I formed are made within a reasonable degree of certainty within the field of police practices based on over 35 years of professional law enforcement experience and scholarship.

5. I was a police officer for 28 years. I retired in July 2012 as the Deputy Chief of Police with the Irvine Police Department. As a Deputy Chief, I was directly responsible for all police operations including Patrol, Traffic, Criminal Investigations, Emergency Management, Crime Prevention, DARE, K9s, Training, and SWAT. The City of Irvine encompasses over 70 square miles with a population of over 218,000. I served in a wide range of assignments as an Officer, Senior Officer, Sergeant, Lieutenant, Commander and Deputy Chief, including Patrol, Traffic, Detective, SWAT, Training, Internal Affairs, Emergency Management and Crime Prevention. The Irvine Police Department had over 200 police officers and over 100 civilian employees during my employment with the department.

6. In April 2014, I was hired by the Westminster, California Police

DECLARATION OF JEFFREY J. NOBLE IN SUPPORT OF PLAINTIFFS' OPPOSITION TO DEFENDANT SEAN STEELMON'S MOTION FOR SUMMARY JUDGMENT

Department as an interim Deputy Chief of Police. My employment with the Westminster Police Department was by means of a temporary contract, and I was asked to review the department's Internal Affairs unit; department policies relating to Internal Affairs investigations, discipline and police officer conduct; conduct department audits and inspections; and act as a liaison with a civilian oversight monitor who was hired during the same period. My employment was at the request of the Chief of Police, was ratified by the City Council and was sought due to the arrest of a police officer for an off-duty criminal sexual assault, the arrest of an on-duty officer for extortion and a lawsuit filed by three Latino officers alleging discrimination and retaliation. I concluded this interim position in January 2015. The Westminster Police Department had 87 police officers and 40 civilian employees during my temporary contracted employment.

7. As a police supervisor and manager, I have extensive experience conducting internal administrative investigations on a wide range of issues including use of force, vehicle pursuits, officer misconduct, criminal interrogations and interviews, harassment and sexual assaults.

8. My areas of expertise in policing include, but are not limited to: police use of force; tactics; pursuits; police administration; training; police operations; criminal investigations; interviews and interrogations; civil rights violations and investigations; internal/administrative investigations; criminal investigations; police discipline; citizen complaints; and police policies and procedures.

9. In forming my opinions, I reviewed the following materials: (1) First Amended Complaint; (2) Investigative Report; (3) August 8, 2024, Memorandum from Chief of Police to the Board of Police Commissioners; (4) Incident Recall Report; (5) Scene and Autopsy Photographs; (6) Autopsy Report; (7) Reports; (8) Death Investigation Report; (8) CAD Summary Report; (9) Officer Interview Transcripts; (10) Body Worn Videos: (a) Tamate, (b) Mirzoyan, (c) Phan, (d) Talbot, (e) Steelmon; (11) Radio Recordings; (12) Depositions: (a) David Mirozyan,

(b) Phillip Phan, (c) Sean Steelmon, (d) Robert Tamate; (13) Board of Rights Rationale.

10. It is well-recognized that an officer's use-of-force decisions (that is, whether, when, and how to use force) are predicated to a significant degree on events that occurred prior to the use of force itself. In most incidents, including the interaction in this case, an officer's use of force is the result of "a contingent sequence of decisions and resulting behaviors—each increasing or decreasing the probability of an eventual use of . . . force." Put differently, "[a]n officer's use-of-force decision . . . will almost always be affected by events that occur prior to the use of force itself, and often prior to the subject's noncompliance, resistance, or other physical actions upon which the use of force is immediately predicated." It follows that the use of force cannot be properly evaluated without considering the preceding actions of officers, subjects, or bystander.

11. Here, there was no need for haste. The vehicle was parked in a parking lot and there were three police vehicles and five officers present at the scene. Instead of engaging in contingency planning, Officer Steelmon simply told the other officers they would approach the vehicle from the passenger side to verify if the vehicle was occupied. Sergeant Talbot heard the plan and did not interject or offer planning assistance.

12. When the officers approached and saw there were two people inside the vehicle, Officer Phan suggested to Sergeant Talbot that they re-deploy but his suggestion was ignored as both Officer Steelmon and Sergeant Talbot felt they had a tactical advantage in maintaining their position. Re-deploying would have allowed the officers to take positions of cover and request additional resources such as a ballistic shield, an airship, or the Metropolitan Division. The officers could have used their lights and siren or their public address system from a position of cover to try to de-escalate the situation. While the officers should have re-deployed once they identified there were two subjects inside the vehicle, the necessity to re-deploy was

significantly heightened when Officer Steelmon saw a handgun in Oscar's waistband.

13. Moreover, the officers knew both Jose and Oscar appeared unconscious when they approached the vehicle and they did not initially respond to commands. The officers said they believed both Jose and Oscar were intoxicated on alcohol. A reasonable police officer would know that waking an individual in these circumstances may result in the subject not obeying commands and more time and de-escalation tactics may assist in resolving the situation without the need for force.

14. Reverence for human life is the guiding principle when responding to crimes in progress, and deadly force should be used only as a last resort.

15. Officers are trained that no arrest is so important that the patrol officers involved should expose themselves to needless danger. In order to meet the safety challenges inherent to the situation, patrol officers must employ tactically sound procedures when effecting any high-risk vehicle pullover, for the safety of the officers and of the suspect.

16. Officers are trained that they should rely on their training, experience, and proven tactics such as, but not limited to: planning and considering alternatives before taking action; waiting for backup officers to arrive; positioning vehicles in safe locations; using available cover and concealment; maintaining a position of advantage; employing proper containment of the scene; utilizing de-escalation techniques; and utilizing less-lethal options.

17. Once Officer Steelmon identified a handgun in Oscar's waistband, Officer Steelmon made no effort to seek a position of cover and instead stood in front of the open passenger door while directing Officer Tamate to remove Jose from the vehicle.

18. Officer Tamate, who had limited abilities in speaking Spanish, tried to communicate in Spanish to Jose and Oscar, and Officer Steelmon did request a Spanish speaking officer to respond but there was not enough time for a Spanish

speaking officer to respond. Had the officers slowed the situation as there was no exigency and no need for haste, a Spanish speaking officer could have responded and attempted to communicate with Oscar from a position of cover.

19. Here, the officers failure to engage in reasonable planning by designating a less-lethal officer, their failure to use lights and/or a PA to attempt to call the truck's occupants out from a position of cover at their vehicles prior to approaching, their failure to move to a position of cover once Officer Steelmon identified that Oscar had a handgun and their belief that Oscar may not speak English resulting in his inability to obey commands, created the circumstances that ultimately led Officer Steelmon to use deadly force.

20. Police officers are trained, to use deadly force, there must be an immediate threat of death or serious bodily injury. Officers are trained that subjective fear or a hunch will not justify the use of force by police. Police officers are trained that in order to justify the use of deadly force, the suspect must objectively present an immediate or imminent threat of death or serious bodily injury.

21. Police officers are trained that a threat of death or serious bodily injury is imminent when, based upon the totality of the circumstances, a reasonable officer in the same situation would believe that a person has the present ability, opportunity, and apparent intent to immediately cause death or serious bodily injury to the peace officer or another person. The totality of the circumstances includes the officers' tactical conduct leading up to an ultimate use of deadly force.

22. Police officers are trained that the fact that an individual has a gun in his hand alone is not enough to justify the use of deadly force. The fact that an individual has a gun in his waistband also is insufficient.

23. An officer's perception that a threat exists is reasonable when the officer has reason to believe that an individual has the ability, opportunity, and intent to cause harm. Ability means the individual's physical capability to cause an identifiable type of harm. Opportunity refers the environment and situation,

specifically with regard to the individual's proximity to the potential target or targets. And demonstratable intent refers to the individual's perceived mental state, their apparent desire to cause physical harm the target or targets.

24. An imminent harm is not merely a fear of future harm, no matter how great the fear and no matter how great the likelihood of the harm, but is one that, from appearances, must be instantly confronted and addressed.

25. Here, Officer Steelmon knew that Oscar had been awakened from an unconscious state and that he believed that Oscar was drunk. Officer Steelmon knew that Oscar may not speak English and thus may not be able to follow the officers' commands either due to his inability to understand English or his impaired state. Officer Steelmon acknowledged that he did not see Oscar make any motion as though he was trying to remove the gun from his waistband that would demonstrate his intent, and Oscar did not pull out, raise, or point the gun. Indeed, Officer Steelmon said he used deadly force because, "In my mind, the next motion was the gun was coming out," identifying a possible future threat rather than his actual observations of Oscar's behavior, which is insufficient to support Officer Steelmon's use of deady force.

26. Additionally, Officer Steelmon said when Officer Tamate opened the passenger door, he re-deployed to a position of cover near the "B" pillar of the truck, and he was at the "B" pillar when he saw the gun. Officer Steelmon said he moved when Officer Tamate removed Jose Vasquez from the vehicle, but he then returned behind the "B" pillar for cover. Officer Steelmon said if Oscar were to get the weapon, "he would have to turn his entire body to face me, and I still have that 'B' pillar as additional cover," which further supports why the use of deadly force was inappropriate.

27. Officer Steelmon's position of cover, a position he believed was safer than moving to the police vehicles for cover; the necessity that Oscar, whom he believed was drunk and whom he believed may not speak English, not only draw the

handgun from his waistband, but also turn his body to be able to engage Officer Steelmon; combined with Officer Steelmon's statement acknowledging that Oscar never made any motion as though he was drawing the handgun undermines his claim that Oscar present an imminent threat of death or serious bodily injury.

28. The foregoing details indicate that at the time Officer Steelmon fired, Oscar lacked the present ability, opportunity, or apparent intent to immediately cause death or serious bodily injury.

29. Officer Steelmon's use of deadly force based on his perception of the possibility of a future harm rather than an immediate threat of death or serious bodily injury was inconsistent with generally accepted police practices and violated law enforcement standards and training.

I, Jeffrey J. Noble, declare under penalty of perjury under the laws of the State of California that the foregoing is true and correct.

Executed on 3/12/26 in Rancho Santa Margarita, California.

_____
Jeffrey J. Noble

8
DECLARATION OF JEFFREY J. NOBLE IN SUPPORT OF PLAINTIFFS' OPPOSITION TO DEFENDANT SEAN STEELMON'S MOTION FOR SUMMARY JUDGMENT